No. 26-2749

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

GAIA GARDENS LLC; R & J LAND CARE LLC; BOB FREDETTE d/b/a FREDETTE LANDSCAPING; and RICCARDO MANCUSO,

Plaintiffs-Appellants,

v.

TOWNSHIP OF MONTCLAIR,

Defendant-Appellee.

---

On Appeal from the United States District Court
for the District of New Jersey
2:23-cv-20733

---

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**
**AND JOINT APPENDIX**
**VOLUME I OF II (Pages JA1 to JA23)**

---


Charlene Koski
Justin R. Panitchpakdi
Benjamin W. Schultz
VAN NESS FELDMAN, LLP
1191 Second Avenue
Suite 1800
Seattle, WA 98101
Telephone: (206) 623-9372
Email: ckoski@vnf.com
jpanitchpakdi@vnf.com
bschultz@vnf.com

Counsel for Plaintiffs-Appellants

## CORPORATE DISCLOSURE STATEMENT

Pursuant to 3d Cir. L.A.R. 26.1, the Plaintiffs-Appellants Gaia Gardens LLC, R & J Land Care LLC, and Bob Fredette d/b/a Fredette Landscaping state that they are private corporations and not affiliated with any publicly owned corporations.

Riccardo Mancuso is a private citizen and not affiliated with any publicly owned corporations.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... v

JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF ISSUES .......... 1

RELATED CASES AND PROCEEDINGS .......... 2

STATEMENT OF THE CASE .......... 2

I. Overview .......... 2

II. The Ordinance .......... 4

A. The Township of Montclair mandates the use of electric motors to power leaf blowers. .......... 4

B. The Ordinance's definitions of leaf blowers .......... 5

C. The Ordinance's stated purpose and intent .......... 5

III. Court proceedings leading to the decision on review .......... 6

A. First complaint and motion for injunctive relief .......... 6

B. Amended complaint .......... 8

C. Montclair's motion to dismiss .......... 9

IV. The district court grants Montclair's motion .......... 11

A. The district court's analysis of the Clean Air Act .......... 12

B. The district court's conclusion that the Ordinance is a permissible "use" regulation .......... 13

SUMMARY OF ARGUMENT .......... 15

STANDARD OF REVIEW .......... 18

ARGUMENT ........ 18

I. The Ordinance is expressly preempted. ........ 18

A. Preemption under the Clean Air Act ........ 18

i. Congress's intent controls. ........ 19

ii. Through Title II of the Clean Air Act, Congress plainly intended to preempt local emission standards for "mobile" engines, including nonroad engines. ........ 21

iii. Section 209(e) expresses a "clear and manifest" intent to preempt state regulation of nonroad engines. ........ 24

iv. The Consolidated Appropriations Act of 2004 expressly affirmed and broadened the Clean Air Act's preemption for spark-ignition engines smaller than 50 horsepower. ........ 29

B. EPA has interpreted the Clean Air Act as authorizing local jurisdictions to adopt and enforce reasonable "use" regulations for nonroad engines, within limits. ........ 31

C. The Ordinance is a standard or other requirement relating to the control of emissions and is therefore preempted ........ 36

D. Although the district court incorrectly applied the presumption against preemption, its application does not change the result. ........ 42

i. The district court erred when it used the presumption to interpret section 209(e)(2) as disfavoring preemption. ........ 44

ii. The district court incorrectly applied the presumption against preemption to its interpretation of the Ordinance.......................... 46

iii. The district court incorrectly described its duty to disfavor preemption................................ 49

II. This Court should remand with instructions to invalidate the preempted parts of the Ordinance and enter judgment in favor of plaintiffs. ............................................ 50

CONCLUSION ........................................................................... 54

COMBINED CERTIFICATE OF COMPLIANCE .................................. 56

CERTIFICATE OF SERVICE................................................................ 57

CERTIFICATION OF BAR MEMBERSHIP ......................................... 58

ADDENDUM OF AUTHORITIES

JOINT APPENDIX - VOLUME I OF II

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008) .......... 44, 48, 49

*Am. Auto. Mfrs. Ass'n v. Cahill*,
152 F.3d 196 (2d Cir. 1998) .......... 35

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005) .......... 49

*Bell v. Cheswick Generating Station*,
734 F.3d 188 (3d Cir. 2013) .......... 21

*Const. Party of Pa. v. Aichele*,
757 F.3d 347 (3d Cir. 2014) .......... 51, 52

*CoreCivic, Inc. v. Murphy*,
690 F. Supp. 3d 467 (D.N.J. 2023) .......... 50

*Coventry Health Care of Mo., Inc. v. Nevils*,
581 U.S. 87 (2017) .......... 27

*Danvers Motor Co., Inc. v. Ford Motor Co.*,
432 F.3d 286 (3d Cir. 2005) .......... 53

*Engine Mfrs. Ass'n v. EPA*,
88 F.3d 1075 (D.C. Cir. 1996) .......... *passim*

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
541 U.S. 246 (2004) .......... *passim*

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 51

*Fellner v. Tri-Union Seafoods, L.L.C.*,
539 F.3d 237 (3d Cir. 2008) .......... 27, 44

*Gaia Gardens, LLC v. Twp. of Montclair*,
No. 23-3026, 2024 WL 5199327 (3d Cir. Dec. 23, 2024) ....................... 8

*Gobeille v. Liberty Mut. Ins. Co.*,
577 U.S. 312 (2016) ........................................................................... 48

*Helen L. v. DiDario*,
46 F.3d 325 (3d Cir. 1995) ................................................................ 50

*Huang v. BP Amoco Corp.*,
271 F.3d 560 (3d Cir. 2001) .............................................................. 54

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*,
903 F.3d 278 (3d Cir. 2018) .............................................................. 53

*Lutter v. JNESO*,
86 F.4th 111 (3d Cir. 2023) ............................................................... 53

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ...................................................................... 43, 48

*Metro. Taxicab Bd. of Trade v. City of New York*,
633 F. Supp. 2d 83 (S.D.N.Y. 2009), *aff'd*, 615 F.3d 152 (2d Cir. 2010) ...................................................................... 39, 40, 41

*Motor & Equipment Mfrs. Ass'n, Inc. v. EPA*,
627 F.2d 1095 (D.C. Cir. 1979) ........................................................ 35

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. N.Y. State Dep't of Env't Conservation*,
17 F.3d 521 (2d Cir. 1994) ..................................................... 22, 23, 25

*Nazay v. Miller*,
949 F.2d 1323 (3d Cir. 1991) ............................................................ 50

*Pac. Merch. Shipping Ass'n v. Goldstene*,
517 F.3d 1108 (9th Cir. 2008) .................................................. 26, 28, 31

*Simon v. FIA Card Servs., N.A.*,
732 F.3d 259 (3d Cir. 2013) .............................................................. 18

*St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*,
218 F.3d 232 (3d Cir. 2000) .......... 20

*Transource Pa., LLC v. DeFrank*,
156 F.4th 351 (3d Cir. 2025) .......... 19, 20, 44

**Statutes**

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

28 U.S.C. § 2106 .......... 50, 54

42 U.S.C. § 7407 .......... 21

42 U.S.C. § 7507 .......... 23

42 U.S.C. § 7521 et seq. .......... 21

42 U.S.C. § 7521(a)(2) .......... 23

42 U.S.C. § 7543 .......... 25

42 U.S.C. § 7543(a) .......... 24

42 U.S.C. § 7543(b) .......... 22

42 U.S.C. § 7543(e) .......... 1, 25, 32

42 U.S.C. § 7543(e)(1) .......... 25

42 U.S.C. § 7543(e)(2)(A) .......... 22

42 U.S.C. § 7543(e)(2)(B) .......... 23

42 U.S.C. § 7550(10) .......... 12

Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, 118 Stat. 3 .......... 13, 16, 30, 32

**Regulations**

40 C.F.R. pt. 1074, subpt. A, app. A ..... 31, 32

40 C.F.R. § 1068.30 ..... 12

40 C.F.R. § 1074.10(c) ..... 27, 46

40 C.F.R. § 1074.105 ..... 23

40 C.F.R. § 1074.110(b) ..... 7, 30, 46

59 Fed. Reg. 36969 (July 20, 1994) ..... 27

62 Fed. Reg. 67733 (Dec. 30, 1997) ..... 26

71 Fed. Reg. 29621 (May 23, 2006) ..... 23

73 Fed. Reg. 59034 (Oct. 8, 2008) ..... 30, 46

**Other Authorities**

EPA Decision Document, California State Nonroad Engine Pollution Control Standards; Small Off-Road Engines Regulations, EPA-420-R-24-026 (Dec. 2024), *available at* https://19january2025snapshot.epa.gov/system/files/documents/2024-12/420r24026.pdf ..... 9, 23, 36

Montclair's Code, Chapter 219, *available at* https://ecode360.com/42952623#42952623 ..... 4

U.S. Const. art. VI, cl. 2 ..... 1

## JURISDICTIONAL STATEMENT

This case arises under section 209(e) of the Clean Air Act, 42 U.S.C. § 7543(e), and the Supremacy Clause of the U.S. Constitution, U.S. Const. art. VI, cl. 2. On June 16, 2026, the district court entered a final order dismissing the amended complaint with prejudice. JA4-5. On July 13, 2026, appellants timely filed a notice of appeal. JA1–3. The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the Township of Montclair's (Montclair or Township) ordinance O-23-31 banning the use of gas-powered leaf blowers (Ordinance) is, in effect, a standard or other requirement relating to the control of emissions and therefore preempted under the Clean Air Act. JA171 (Amended Compl.); ECF 79 at 15–45[1] (Pls.' Br. in Supp. of Opp'n to Montclair's Mot. to Dismiss); JA19–22 (Opinion); ECF 61-3 at 8, 21–31 (Montclair's Mot. to Dismiss Amended Compl.); ECF 81 at 5, 8–16 (Reply in Supp. of Montclair's Mot. to Dismiss).

[1] ECF cites are to the district court docket and ECF page numbers refer to pages of the PDF.

2. Whether, if this Court agrees the Ordinance is preempted, it should remand with instructions to invalidate the preempted parts of the Ordinance and enter judgment in favor of Plaintiffs-Appellants (Gaia Gardens).

## RELATED CASES AND PROCEEDINGS

Appellants are unaware of any related cases or proceedings. This case was previously before the Third Circuit in *Gaia Gardens, LLC v. Township of Montclair*, No. 23-3026.

## STATEMENT OF THE CASE

### I. Overview

This case involves a single legal claim: whether the Clean Air Act preempts the Township of Montclair's Ordinance, which requires all leaf blowers used in Montclair to have electric motors. While the U.S. Environmental Protection Agency (EPA) has interpreted the Clean Air Act as allowing local jurisdictions to, within limits, regulate the "use and operation" of engines such as those used to power leaf blowers, the Clean Air Act preempts regulations that, although labeled restrictions on "use," function as standards or other requirements related to the control of emissions. Because the Ordinance is a standard or other requirement relating to the control of emissions, it is preempted.

The district court agreed with Gaia Gardens that if the Ordinance operates as a standard or other requirement related to the control of emissions, it is preempted. JA19. But when deciding that question, the court misconstrued the Clean Air Act and, as a result, incorrectly relied on a presumption against preemption and wrongly concluded that the Ordinance is not preempted because it "regulates *leaf blowing*, not *leaf blower engine emissions*." JA22.

In addition to being based, at least in part, on an incorrect legal analysis, the district court's reasoning is irreconcilable with the Ordinance's plain language and effect. The Ordinance allows the use of electric leaf blowers but imposes a total ban on gas-powered leaf blowers and the use of gas-powered generators to power electric leaf blowers. If it truly regulated only "leaf blowing," it would not treat leaf blowers differently based on power source or restrict the use of gas-powered generators, which do not blow leaves. Instead, by requiring that all leaf blowers used in the Township be equipped with electric motors, the Ordinance is, in effect, a zero-emissions mandate on leaf-blower engines and preempted by the Clean Air Act.

## II. The Ordinance

### A. The Township of Montclair mandates the use of electric motors to power leaf blowers.

On August 15, 2023, Montclair enacted Ordinance O-23-31, which mandates that "[g]as-powered leaf blowers are not permitted to be used within the Township of Montclair, effective October 15, 2023." JA177.[2] The Ordinance further mandates: "No gas or diesel generators may be utilized to power any electric leaf blowers at any time." *Id.*

The Ordinance allows the use of electric leaf blowers "throughout the year" except on dates Montclair declares "Air Quality Action Days" based on state pollution standards. *Id.* It also restricts the use of electric leaf blowers to certain times of day: on weekdays from 9 a.m. to 6 p.m. or until 8 p.m. for occupants or owners of the premises; and on weekends from 10 a.m. to 6 p.m. or until 8 p.m. for occupants or owners of the premises. *Id.*

On September 26, 2023, Montclair amended the Ordinance to eliminate provisions restricting the number of electric leaf blowers that could be used at one time on a single property and to add a severability

---

[2] The Ordinance is codified at Chapter 219 of Montclair's Code, *available at* https://ecode360.com/42952623#42952623.

clause. JA179–80. Anyone who violates the Ordinance is subject to escalating fines of up to $250 for the first offense, $500 for the second offense, and $1,000 for the third or subsequent offense. *Id.*

### B. The Ordinance's definitions of leaf blowers

The Ordinance defines a gas-powered leaf blower as either, "[a] leaf blower that is powered by *an engine using gasoline or a mixture of gasoline and oil blend as fuel*," or "[a]n electric-powered leaf blower that is plugged into an operating generator that is powered by *an engine using gasoline or a mixture of gasoline and oil blend as fuel*." JA177 (emphasis added). It defines an electric-powered leaf blower as "[a] leaf blower that is powered *solely by an electric motor*, whether using a battery or cord." *Id.* (emphasis added).

### C. The Ordinance's stated purpose and intent

The Ordinance's description of its purpose and intent includes the following legislative findings:

> The Township of Montclair hereby finds that the use of gas-powered leaf blowers impairs the health and social welfare, as well as the peace and quality of life of persons residing and working in Montclair. The purpose of this section is to eliminate the adverse impact of such equipment by prohibiting its use within the Township. This section shall apply to all properties within the Township whether publicly or privately owned.

> The Township further finds that the practice of blowing leaves and other debris for property maintenance has unintended environmental and health consequences. The blowing of leaves, dust and debris, causes fine particulate emissions and disruption to pollinator habitats. Exposure to fine particulate matter may impact workers using this equipment, those living with respiratory conditions, children, as well as others, and the Township encourages community education regarding alternatives to such use, where possible. It shall be the policy of the Township to balance leaf blowing with mulching fallen leaves into grassy areas and moving leaves into flower beds to be used as organic mulch material.

JA176.

## III. Court proceedings leading to the decision on review

### A. First complaint and motion for injunctive relief

On September 28, 2023, eighteen plaintiffs consisting of affected landscaping companies and Montclair residents filed a lawsuit challenging the Ordinance as unlawful. JA39–84. The complaint raised six legal claims and sought declaratory and injunctive relief. *Id.* at JA56–63.[3] Plaintiffs simultaneously moved for a preliminary injunction. ECF 2-1. Included with the motion were various declarations, including

[3] The complaint alleged violations of the Equal Protection Clause under federal and state law, the Supremacy and Takings clauses of the U.S. Constitution, and the New Jersey State Constitution and Civil Rights Act. JA56–62.

from plaintiffs Daria Paxton (owner of Gaia Gardens LLC) and Riccardo Mancuso (Montclair resident), both of whom are still plaintiffs in this action.[4] Among other things, their declarations established that they were subject to the Ordinance and, to continue operating leaf blowers in Montclair, had to purchase electric-leaf-blower equipment, which is more expensive, less efficient, requires more time to complete jobs, cannot run as long, and presents infrastructure and other obstacles, especially for professional landscapers working in heavily treed communities such as Montclair. JA85–96. On October 14, 2023, the district court denied injunctive relief after finding plaintiffs were unlikely to succeed on the merits of their claims and had failed to show irreparable harm. JA134–42.[5]

On appeal, trade groups representing engine and equipment manufacturers, landscapers, and tree-care professionals filed an amicus brief in support of plaintiffs arguing that the Ordinance is expressly preempted by the Clean Air Act. Br. of Truck & Engine Mfrs. Ass'n, et

---

[4] Plaintiff Mancuso lived in Montclair until November 2025.

[5] On the merits of the preemption claim, the district court considered whether the Ordinance is preempted by 40 C.F.R. § 1074.110(b), which implemented the Consolidated Appropriations Act of 2004, and applied a presumption against preemption. JA134–40.

al. as Amicus Curiae in Supp. of Appellants, *Gaia Gardens, LLC v. Twp. of Montclair*, No. 23-3026, 2024 WL 688481 (3d Cir. Feb. 13, 2024) (Amicus Brief). On December 23, 2024, this Court affirmed the district court's order based on a lack of irreparable harm without deciding whether plaintiffs had shown a likelihood of success on the merits. *Gaia Gardens, LLC v. Twp. of Montclair*, No. 23-3026, 2024 WL 5199327 (3d Cir. Dec. 23, 2024); JA144–45.

### B. Amended complaint

While this Court's review was pending, plaintiffs' counsel unexpectedly died. JA153–54. After some confusion as to how to proceed, plaintiffs connected with current counsel on March 12, 2025, who, several days later, filed notices of appearance in the district court. *Id.* On August 20, 2025, plaintiffs amended the complaint to remove all but the remaining four plaintiffs and the single legal claim of federal preemption. JA155–80. The Amended Complaint seeks a declaratory order that the Ordinance is void and unenforceable as a matter of law and directing Montclair to rescind the Ordinance and prevent its enforcement. JA171–72.

### C. Montclair's motion to dismiss

Montclair's answer to the Amended Complaint was due September 24, 2025. JA34 (Sep. 5, 2025 text entry). In lieu of an answer, Montclair filed a motion to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). ECF 61-3. In its motion, Montclair argued, in relevant part, that the Ordinance is subject to a presumption against preemption, and is not an emission standard or other requirement relating to the control of emissions for purposes of the Clean Air Act. *Id.* at 18–27.

Gaia Gardens filed a response in the form of a cross-motion for summary judgment in which it argued that, under the Clean Air Act, Congress expressly preempted states and other political subdivisions from regulating nonroad engines and the Ordinance was a preempted standard or other requirement relating to the control of emissions.[6] ECF 72-1 at 30–46.

---

[6] EPA and California have described the spark-ignition engines typically used in lawn and garden equipment such as gas-powered leaf blowers as rated at or below 25.5 horsepower. *See, e.g.*, EPA Decision Document, California State Nonroad Engine Pollution Control Standards; Small Off-Road Engines Regulations, EPA-420-R-24-026 (Dec. 2024) (describing and applying California's definition), *available*

Gaia Gardens also noted that, in the Consolidated Appropriations Act of 2004, Congress expressly affirmed and expanded the scope of federal preemption for nonroad engines smaller than 50 horsepower, which would include the engines used in leaf blowers, by instructing that "[n]o State or any political subdivision thereof may adopt or attempt to enforce any standard or other requirement applicable to spark ignition engines smaller than 50 horsepower," with a lone exception for the state of California and any state that had adopted nonroad engine standards or other emission requirements prior to September 1, 2003. JA256. The motion also included additional declarations further establishing that the remaining plaintiffs were subject to the Ordinance and, to continue operating leaf blowers in Montclair, had to acquire electric-leaf-blower equipment that was more expensive and presented numerous obstacles. JA257–64.

The district court denied the cross-motion as premature and ordered Gaia Gardens to file an opposition to the motion to dismiss. JA36 (ECF 77 text order). On December 1, 2025, Gaia Gardens filed its

---

*at* https://19january2025snapshot.epa.gov/system/files/documents/2024-12/420r24026.pdf.

opposition brief, which in substance was nearly identical to its cross-motion for summary judgment, including the argument that, through the Consolidated Appropriations Act of 2004, Congress expressly expanded the scope of federal preemption for small nonroad engines. JA274–84; *see also* ECF 79-1 to 79-10 (Decl. of Claire S. Ommen and Exhibits). Briefing was completed on December 15, 2025. *See* ECF 81 (Montclair's Reply Br.).

During the six months it took for the district court to issue its decision, Montclair propounded discovery, purportedly on the question of standing. *See* JA285 (ordering initial discovery on topics of standing, injuries, and factual allegations in pleadings). Gaia Gardens has not sought discovery and has maintained that, because the Amended Complaint alleges only a single claim that is a pure question of law, any discovery beyond the issue of standing is unwarranted. *See id.* (noting that plaintiffs do not seek discovery).

## IV. The district court grants Montclair's motion

Although both parties had requested oral argument, the district court did not hear from the parties. JA4. Instead, on June 16, 2026, the

court issued a written final order dismissing the Amended Complaint with prejudice. JA5.[7]

### A. The district court's analysis of the Clean Air Act

In its opinion accompanying the final order, JA6–23, the district court first noted that Title II of the Clean Air Act, which applies to mobile sources of emissions such as motor vehicles and nonroad engines,[8] generally preempts state standards and other requirements relating to the control of emissions. JA14. The court also recognized that, despite Congress's scheme of federal preemption under the Clean Air Act, EPA allows states to regulate the "use and operation of nonroad engines, such as regulations on hours of usage, daily mass emission limits, or sulfur limits on fuel." JA15 (citing 40 C.F.R. pt. 1074, subpt.

[7] Although Montclair had asked the court to consider various materials outside the pleadings, the district court did not cite or otherwise rely on that material in its opinion. ECF 61-3 at 8 n.1, 10, 12–14; *see also* JA6–23 (Opinion).

[8] "Nonroad engines" are internal combustion engines (including their fuel systems) not used in motor vehicles or stationary emission sources, 42 U.S.C. § 7550(10), and include engines "in or on a piece of equipment that is intended to be propelled while performing its function (such as lawnmowers and string trimmers)" or that "[b]y itself or on a piece of equipment, is portable or transportable." 40 C.F.R. § 1068.30 (defining nonroad engine).

A, app. A). The court further acknowledged that local "use" regulations are preempted when, in effect, they operate to enforce an emission "standard or other requirement relating to the control of emissions." JA19–21.

Turning to section 209(e) of the Clean Air Act, which pertains to nonroad engines, the court concluded that section "209(e) does not demonstrate a 'clear and manifest' intent to preempt ordinances like the one at issue here," and that Congress's federal regulatory scheme concerning nonroad engines is not "so pervasive as to make reasonable the inference that Congress 'left no room' for the States to supplement it." JA17–18. Although it had been briefed, JA283–84, the court made no mention of Congress's express preemption of local "standards or other requirements applicable to spark ignition engines smaller than 50 horsepower." JA6–23; *see also* Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, § 428, 118 Stat. 3, 418 (A-5).

### B. The district court's conclusion that the Ordinance is a permissible "use" regulation

The court ultimately held that section 209(e)(2), "impl[ies] a preemption" of state "standards relating to control of emissions from nonroad vehicles or engines." JA19. The court said it would apply a

presumption against preemption with "particular force" because Congress's intent to preempt was not "clear and manifest," and the Ordinance was designed to protect the public health, welfare, and environment, which are typically areas within local police powers to regulate. JA16–19. Finally, turning to the "central issue" in the case—whether the Ordinance unlawfully imposes a standard or other requirement relating to the control of emissions—the court concluded it does not.

Relying primarily on the Supreme Court's definition of "standard" in *Engine Manufacturers Ass'n v. South Coast Air Quality Management District*, 541 U.S. 246 (2004) (*South Coast*), the district court noted that, under section 209(e), preempted standards are mandates that "relate to the emission characteristics of a vehicle or engine," such as requirements that an "engine must not emit more than a certain amount of a given pollutant, must be equipped with a certain type of pollution-control device, or must have some other design feature related to the control of emissions." JA20. The court further noted that, to be preempted, standards "need not be expressed as a numerical limit at the point of manufacture," and that enforcement mechanisms that tell

"regulated parties they must 'buy or sell only those vehicles that comply' with a numerical or technology specification" are impermissible standards. *Id.*

After citing these legal standards, the court concluded that the Ordinance "does not impose a quantifiable emissions limit, require pollution-limiting equipment or after-treatment specification, or dictate engine-emissions criteria. Nor does the Ordinance even reference engine emissions. At most, the Ordinance notes that '[t]he *blowing of leaves, dust and debris*, causes fine particulate emissions.'" JA20–21 (quoting Ordinance § 219-1). Referencing the part of the Ordinance that imposes hour/day restrictions on the use of *electric* leaf blowers, the Court also found that the Ordinance restricts "*all* leaf-blower use to specific hours and days, even though electric leaf blower engines do not give off emissions." JA21. Based on these findings, the Court concluded the Ordinance "regulates *leaf blowing*, not *leaf blower engine emissions*" and is not preempted. JA22.

## SUMMARY OF ARGUMENT

Although the district court agreed with Gaia Gardens that the Clean Air Act preempts local standards and other requirements related

to the control of emissions from small nonroad engines such as those used in leaf blowers, its conclusion that the Ordinance is not preempted was based in part on an erroneous analysis of the Clean Air Act. In particular, the court concluded Congress did "not demonstrate a 'clear and manifest' intent" to preempt local regulation of emissions from nonroad engines and instead left room for local jurisdictions to supplement the federal regulatory scheme. That conclusion appears to have led the court to erroneously rely on—and incorrectly interpret—a presumption against preemption despite Congress's plain intent to preempt.

The court's finding that Congress's intent is not "clear and manifest" conflicts with the plain language and structure of the Clean Air Act, EPA's implementing regulations, and the Consolidated Appropriations Act of 2004, which the district court failed to cite or otherwise reference, in which Congress expressly stated: "No State or any political subdivision thereof may adopt or attempt to enforce any standard or other requirement applicable to spark ignition engines smaller than 50 horsepower," 118 Stat. at 418 (A-5), which necessarily includes the small engines at issue here. Nonetheless, treating

Congress's intent as "ambiguous," and incorrectly assuming it had a duty to interpret both the Ordinance and Clean Air Act in manners that would avoid preemption, the court concluded the Ordinance is a permissible "use" regulation unrelated to the control of emissions because it "regulates leaf-blowing, not the engines that perform it." JA21.

The district court's reasoning cannot be reconciled with the Ordinance's plain language, which treats leaf blowers differently based on power source, not whether they blow leaves, and restricts the use of gas- and diesel-powered generators, which do not blow leaves at all. Because the Ordinance requires leaf blowers used in Montclair to have electric motors, it imposes a technology requirement related to the control of emissions and is preempted.

Finally, if this Court agrees the Ordinance is preempted, it should remand with instructions to invalidate the preempted parts of the Ordinance and enter judgment in favor of Gaia Gardens. Evidence already in the record establishes that Plaintiffs-Appellants—who use leaf blowers in Montclair—are subject to the Ordinance and therefore have standing to challenge it. No other issue remains.

## STANDARD OF REVIEW

Under Rule 12(b)(6), a motion to dismiss may be granted "only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that those allegations 'could not raise a claim of entitlement to relief.'" *Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 264 (3d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)). This Court reviews an order granting a Rule 12(b)(6) motion de novo. *Id.* (citing *Mariotti v. Mariotti Bldg. Prods, Inc.*, 714 F.3d 761, 765 (3d Cir. 2013)).

## ARGUMENT

### I. The Ordinance is expressly preempted.

#### A. Preemption under the Clean Air Act

To justify its reliance on a "presumption against preemption," which is overcome when Congress's intent is "clear and manifest," the district court said Congress's intent to preempt local regulation of emission standards for nonroad engines is *not* "clear and manifest" and leaves room "for the States to supplement it." JA17–19. That was legal error. Congress's intent to preempt local standards and other requirements relating to the control of emissions from nonroad engines,

and particularly from small nonroad engines less than 50 horsepower, such as those used in leaf blowers, is unambiguous and leaves absolutely no room for state supplementation. The district court's contrary conclusion conflicts with the plain text and structure of the Clean Air Act, the 2004 Act in which Congress expressly broadened the scope of preemption for small nonroad engines such as those used in leaf blowers, and EPA's regulations implementing that language. Because Congress's clear and manifest intent controls, the presumption against preemption is overcome and the court should not have relied on it.[9]

**i. Congress's intent controls.**

In every preemption case, this Court's analysis is guided by two principles. First, Congress's intent is the "ultimate touchstone." *Transource Pa., LLC v. DeFrank*, 156 F.4th 351, 372 (3d Cir. 2025) (citing *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010)). Second, the presumption against preemption that usually applies when a local

[9] As explained more fully below, in addition to relying on the presumption when it should not have, the district court applied it incorrectly. *See infra* Argument Part I.D. Regardless, because Congress's intent here is plain, the presumption plays no role.

regulation falls within the state's police power is overcome when Congress's intent to preempt is "clear and manifest." *Id.* at 373 (citing *Farina*, 625 F.3d at 117). Indeed, under the Supremacy Clause, even a state law "clearly within a State's acknowledged power" must yield when it "interferes with or is contrary to federal law." *Id.* at 372 (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992)); *see also St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*, 218 F.3d 232, 238 (3d Cir. 2000) (describing categories of preemption).

Congress's intent may be revealed by the text of a statute or the statute's structure and purpose, including how Congress intended the statute to affect businesses, consumers, and law. *Transource*, 156 F.4th at 372. Here, as described below, every indication of congressional intent, including Congress's plain language, the text and structure of the Clean Air Act, and EPA's implementing regulations, demonstrates Congress's "clear and manifest" intent to preempt local regulation of emissions from nonroad engines.

### ii. Through Title II of the Clean Air Act, Congress plainly intended to preempt local emission standards for "mobile" engines, including nonroad engines.

The Clean Air Act reflects Congress's longstanding view that, unlike emissions from stationary sources such as power plants, emissions from mobile sources, due to their mobile nature, should be regulated through a uniform federal framework rather than a patchwork of state and local requirements. *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079 (D.C. Cir. 1996).

Stationary sources are addressed in Title I of the Clean Air Act, through which Congress expressly reserved for the states the "primary responsibility" for improving air quality. 42 U.S.C. § 7407; *Engine Mfrs. Ass'n v. EPA*, 88 F.3d at 1078–79; *see also Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013) (noting the Act's "cooperative federalism" structure when discussing Title I's regulation of stationary sources).

Title II works much differently. *See* 42 U.S.C. § 7521 et seq. Title II regulates air pollution from "mobile" emission sources that can travel across state lines. Faced with the "spectre of an anarchic patchwork" of federal and state regulatory programs, Congress made regulation of

mobile sources a "principally federal project," and preempted state standards and other requirements related to the control of emissions. *See Engine Mfrs. Ass'n v. EPA*, 88 F.3d at 1079; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. N.Y. State Dep't of Env't Conservation*, 17 F.3d 521, 525–26 (2d Cir. 1994) (*NYSDEC*); *see also* Amicus Brief, 2024 WL 688481, at *21 ("[I]f municipalities were not preempted from adopting . . . nonroad source emission control ordinances . . . the ultimate result would be the same type of 'anarchic patchwork' of local emission-related standards and other requirements . . . Congress expressly sought to avoid.").

The only exception Congress eventually allowed to its preemptive scheme was for California. In recognition of California's unique air-quality challenges and because it was the only state regulating emissions prior to enactment of the Clean Air Act, Congress incorporated "waiver" provisions allowing California to obtain a waiver of federal preemption so long as it meets certain requirements. 42 U.S.C. § 7543(b), (e)(2)(A).

Although, with a preemption waiver, California may adopt and enforce emission standards that vary from EPA's, its ability to do so is

restricted. To obtain a waiver, California must satisfy specific statutory criteria designed to balance California's desire for improved air quality with the ability of engine and equipment manufacturers to develop compliant technology still capable of meeting their customers' needs. *Id.* § 7543(b)(1), (e)(2)(A)(iii); *NYSDEC*, 17 F.3d at 525. Those criteria include assurances of adequate lead time, technological feasibility, and basic market demand, and take into account costs of compliance and safety. *See, e.g.*, 42 U.S.C. § 7521(a)(2); 40 C.F.R. § 1074.105 (A-11); *see also* 71 Fed. Reg. 29621, 29622 (May 23, 2006) (A-22); EPA Decision Document, *supra* note 6, at 29–30 (describing factors EPA considers when deciding whether to grant California's request for a preemption waiver under section 209(e)(2)(A)(iii)). Only if California meets these requirements will it receive a waiver allowing it to adopt and enforce standards that vary from federal standards.

With a few exceptions, including for emission standards pertaining to small nonroad engines less than 50 horsepower (as explained more fully below), other states may adopt standards identical to California's. 42 U.S.C. § 7543(e)(2)(B) (nonroad); *id.* § 7507 (motor vehicles). As a result, there are only two emission standards for mobile

sources in the United States: EPA's and California's. This preemption scheme is considered "the cornerstone" of Congress's regulatory scheme for controlling pollution from mobile sources. *Engine Mfrs. Ass'n v. EPA*, 88 F.3d at 1079 (quoting *NYSDEC*, 17 F.3d at 524–27).

#### iii. Section 209(e) expresses a "clear and manifest" intent to preempt state regulation of nonroad engines.

The district court agreed with Gaia Gardens that section 209(e) preempts state regulation of standards and other requirements related to the control of emissions from nonroad engines but also concluded that Congress's intent to preempt was "implied," not "clear and manifest," and left room for states to supplement the federal preemption scheme. JA17–19. Regardless of whether Congress's intent to preempt is implied or express, however, it is undeniably clear and manifest and prohibits state supplementation. *See Engine Mfrs. Ass'n v. EPA*, 88 F.3d at 1088 (declining to defer to EPA's interpretation of section 209(e)(2) because Congress's intent to preempt state regulation is "clear from the text and structure of the statute").

Title II expressly regulates emissions from two types of mobile sources: (1) motor vehicles and motor vehicle engines under section

209(a), 42 U.S.C. § 7543(a); and (2) nonroad engines and vehicles under section 209(e), *id.* § 7543(e). *NYSDEC*, 17 F.3d at 526; *see also* 42 U.S.C. § 7543. The district court suggested Congress's preemptive scheme is broader for motor vehicles than nonroad engines, JA17 (distinguishing between sections 209(a) and 209(e)), but the opposite is true. States have *less* authority to implement emission standards and other requirements related to the control of emissions from nonroad engines, particularly those with less than 50 horsepower, including those used in leaf blowers. That is because, as explained more fully below, the Consolidated Appropriations Act of 2004 prohibits states from adopting *any* standards or other requirements, including California's, relating to the control of emissions from those engines.

As the district court correctly observed, section 209(e)(1), which applies to new nonroad engines used in locomotives and those used in construction and farm equipment smaller than 175 horsepower, expressly states: "No State or any political subdivision thereof shall adopt or attempt to enforce any standard or other requirement relating to the control of emissions from" those sources, without exception, even for California. 42 U.S.C. § 7543(e)(1).

Section 209(e)(2) applies to all other nonroad engines (new and used),[10] which necessarily includes the engines used in leaf blowers. That section allows only California to obtain a waiver of preemption and allows other states to subsequently adopt California's standards. Courts have recognized that, by allowing only California to obtain a preemption waiver, Congress intended to preempt state regulation of emissions from nonroad engines. *Engine Mfrs. Ass'n v. EPA*, 88 F.3d at 1087 ("Obviously, if no state regulation were preempted, California would have no need to seek authorization for its regulations[.]").

Although, as the court noted, section 209(e), pertaining to nonroad engines, uses somewhat different language than sections 209(a) and (b) pertaining to motor vehicles, its preemptive effect is the same. *Id.* at 1081 (explaining that, with section 209(e), "[a]s it had done with respect to motor vehicles, Congress not only authorized the EPA to regulate nonroad sources but also preempted state regulation."); *see also*

---

[10] The district court emphasized that section 209(e)(1) specifically preempts local standards on "new" nonroad engines. JA18. To be clear, however, 209(e)*(2)*, which applies to the engines at issue here, preempts emission standards and requirements for both new and used nonroad sources. 62 Fed. Reg. 67733 (Dec. 30, 1997) (A-17); *Engine Mfrs. Ass'n v. EPA*, 88 F.3d at 1092–93; *Pac. Merch. Shipping Ass'n v. Goldstene*, 517 F.3d 1108, 1113 (9th Cir. 2008) (*Pacific Merchant*).

*Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 99 (2017) ("[The Supreme Court] do[es] not require Congress to employ a particular linguistic formulation when preempting state law[.]").

EPA has also recognized section 209(e)'s preemptive effect. The agency explained that the provisions in sections 209(e) and 209(b) "are in many respects alike and in those respects should be similarly interpreted." 59 Fed. Reg. 36969, 36970, 36981 (July 20, 1994) (A-13, A-14). The agency also acknowledged that "the language of section 209(e)(2)(B)," which allows other states to adopt California's emission standards for nonroad engines, is "nearly identical to" the section that allows other states to adopt California's motor vehicle emissions standards. *Id.* at 36983 (A-16). Based on section 209(e)'s plain language and structure, EPA concluded that "[s]tates and localities are preempted" from adopting or enforcing standards and other requirements relating to the control of emissions from nonroad engines, except as authorized under the California waiver process. 40 C.F.R. § 1074.10(c). These regulations have "no less preemptive effect" than the text of the statute they implement. *Fellner v. Tri-Union Seafoods,*

*L.L.C.*, 539 F.3d 237, 243 (3d Cir. 2008) (citing *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153–54 (1982)).

Courts considering what forms of preemption apply under section 209(e) have largely recognized that, at minimum, section 209(e)(2) "impl[ies] a preemption." *See Engine Mfrs. Ass'n v. EPA*, 88 F.3d at 1087-88; *Pacific Merchant*, 517 F.3d at 1113. That is consistent with the district court's conclusion here. JA19 ("The plain text of § 209(e)(2), therefore, impliedly preempts" standards related to the control of emissions from nonroad vehicles or engines). But the district court did not go far enough, and its conclusion misses the point.

Regardless of whether the plain text of section 209(e)(2) expressly or impliedly preempts state regulation of small nonroad engines, Congress's intent is "clear and manifest" from the statute's text and structure. *See Engine Mfrs. Ass'n v. EPA*, 88 F.3d at 1088 (concluding Congress's intent to preempt under section 209(e)(2) is "clear from the text and structure of the statute"). But just as important, and what the district court failed to address in any way, is Congress's express instruction in 2004 affirming and expanding the scope of federal preemption for the small nonroad engines at issue here, leaving no

doubt whatsoever that Congress intended to preempt state and local action.

#### iv. The Consolidated Appropriations Act of 2004 expressly affirmed and broadened the Clean Air Act's preemption for spark-ignition engines smaller than 50 horsepower.

In the Consolidated Appropriations Act of 2004, which the district court did not cite or otherwise reference, Congress expressly broadened and affirmed its preemption of state and local regulation of a subset of engines: those under 50 horsepower, which necessarily includes the smaller engines typically used in leaf blowers.[11] Specifically, Congress instructed:

> (c) No State or any political subdivision thereof may adopt or attempt to enforce any standard or other requirement applicable to spark ignition engines smaller than 50 horsepower.
>
> (d) EXCEPTION FOR CALIFORNIA.—The prohibition in subsection (e) does not apply to or restrict in any way the authority granted to California under section 209(e) of the Clean Air Act (42 U.S.C. 7543(e)).
>
> (e) EXCEPTION FOR OTHER STATES.—The prohibition in subsection (c) does not apply to or restrict the authority of any State under section 209(e)(2)(B) of the Clean Air Act (42 U.S.C. 7543(e)(2)(B)) to enforce standards or other

[11] As noted above, engines typically used in lawn and garden equipment such as leaf blowers are 25.5 horsepower or less. *See supra* note 6.

> requirements that were adopted by that State before September 1, 2003.

118 Stat. at 418–19 (A-5 to A-6); *see also* 40 C.F.R. § 1074.110(b) (A-11).

Through this provision, Congress altered 209(e)(2)'s preemptive framework by expressly precluding other states from adopting California's standards and requirements applicable to combustible fuel engines less than 50 horsepower. *See* 73 Fed. Reg. 59034, 59038 (Oct. 8, 2008) (A-27) (implementing the 2004 Act's "preemption changes" and explaining that, "[i]n addition" to preemption under section 209(e), "in section 428 of the 2004 Consolidated Appropriations Act, Congress further precluded other states from adopting new California standards for nonroad spark-ignition engines below 50 horsepower.").

EPA has recognized that the 2004 Act "preempts State law" and "[takes] away the authority of states' to adopt California standards" for this subset of engines. *Id.* at 59172 (A-28); *see also* 40 C.F.R. § 1074.110(b) (A-11). In other words, unlike most other nonroad engines, even when California obtains a preemption waiver under section 209(e)(2) to adopt and enforce standards and other requirements related to the control of emissions for nonroad engines less than 50 horsepower, no other state may adopt those standards or requirements.

Although Congress's intent to preempt local regulation of emissions from nonroad engines is plain from 209(e)(2) and EPA's implementing regulations, if the district court had any lingering doubt, the 2004 Act should have resolved it. Indeed, it is difficult to imagine how Congress could have more clearly preempted local emission standards applicable to the engines at issue here. If it is not enough to say, "No State or any political subdivision thereof may adopt or attempt to enforce any standard or other requirement applicable to spark ignition engines smaller than 50 horsepower," 118 Stat. at 418 (A-5), it seems nothing would be.

### B. EPA has interpreted the Clean Air Act as authorizing local jurisdictions to adopt and enforce reasonable "use" regulations for nonroad engines, within limits.

As the district court noted, although Title II of the Clean Air Act preempts state and local standards and other requirements relating to the control of emissions from mobile engines, EPA has interpreted the Act as allowing states and local jurisdictions to impose reasonable regulations on the "use and operation" of nonroad engines. 40 C.F.R. pt. 1074, subpt. A, app. A (A-10 to A-11); *see also* JA15; *Pacific Merchant*, 517 F.3d at 1115.

Examples of “use and operation” regulations include “regulations on hours of usage, daily mass emission limits, or sulfur limits on fuel,” and permit requirements. 40 C.F.R. pt. 1074, subpt. A, app. A (A-10 to A-11). As the district court also noted, however, local jurisdictions are constrained in their authority to adopt such rules. Specifically, regardless of whether they pertain to “use,” regulations that operate as a “standard or other requirement relating to the control of emissions” are unlawful and preempted. JA17; JA19; 42 U.S.C. § 7543(e); *see also* 118 Stat. at 418 (A-5). The central question here is whether the Ordinance, which requires anyone who wants to use a leaf blower in Montclair to obtain and use only leaf blowers equipped with electric motors, is a permissible “use and operation” regulation, or a preempted standard or other requirement relating to the control of emissions.

“Standard or other requirement” is not defined in the Clean Air Act, but in *South Coast*, the Supreme Court construed the term “standard” for purposes of Title II, which includes section 209(e) and regulates the engines at issue here. *South Coast*, 541 U.S. at 253 (explaining that the Court’s interpretation of “standard” under section 209(a) “is consistent with the use of ‘standard’ throughout Title II of

the" Clean Air Act). At issue in *South Coast* was whether a local air agency in California could prohibit fleet operators from purchasing vehicles other than "alternative-fuel" vehicles, which, in effect, meant they could not purchase vehicles powered by gasoline or diesel fuel. *Id.* at 249-51 & nn.1-3, 255.

The Court rejected arguments that section 209(e) preempts only standards that apply to manufacturers, reasoning that "[t]he manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them." *Id.* at 255. The Court further explained that "standards" include "requirements such as numerical emission levels with which vehicles or engines must comply, *e.g.*, 42 U.S.C. § 7521(a)(3)(B)(ii), or emission-control technology with which they must be equipped, *e.g.*, § 7521(a)(6)," and often apply directly to manufacturers. *Id.* at 253. Similarly, "standard-enforcement efforts," which are attempts to ensure engines comply with emission "standards," are preempted and can apply to manufacturers or purchasers. *Id.*

> A command, accompanied by sanctions, that certain purchasers may buy only vehicles with particular emission characteristics is as much an "attempt to enforce" a "standard" as a command, accompanied by sanctions, that a

> certain percentage of a manufacturer's sales volume must consist of such vehicles.

*Id.* at 255. The Court explained that such mandates create consumer demand that is "not generated by the market but compelled by the Rules, which in turn effectively compels production." *Id.* at 256. Included within the zone of preempted regulations are those that "tell[] regulated parties they must 'buy or sell'" only equipment that complies with "a numerical or technology specification." JA20 (citing *South Coast*, 541 U.S. at 255).

As the district court recognized, this does not mean a regulation is only preempted if it expressly prohibits buying or selling. For example, a rule that "no person . . . *shall operate* any auxiliary diesel engine" if doing so would result in emissions greater than would be emitted using certain other specified fuels was preempted because it required vessels to use engines that do "not emit more than a certain amount of a given pollutant." *Pacific Merchant*, 517 F.3d at 1114–15 (emphasis added); *see also* JA19-20 (citing *Pacific Merchant*, 517 F.3d at 1114). Similarly, a requirement that sales of zero-emission vehicles comprise a certain percentage of new-light-duty-vehicle sales is an impermissible

"standard relating to the control of emissions" and is preempted. *Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196, 200 (2d Cir. 1998).

This long-recognized interpretation reflects the purpose behind the Clean Air Act's preemption scheme, which is to prevent the type of piecemeal regulation that would result from differing local emission standards. *Engine Mfrs. Ass'n v. EPA*, 88 F.3d at 1079; *Motor & Equipment Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979) (explaining that, to avoid "an anarchic patchwork of federal and state regulatory programs," Congress occupied "the regulatory role over emissions control to the exclusion of all the states all, that is, except California").

*South Coast* and the other cases interpreting Title II recognize that local jurisdictions may not bypass the protections Congress intended preemption to provide by masking emission standards as local regulations on use. Doing so allows states and local governments to compel manufacturers to produce products based on standards for which no preemption waiver has been granted. If "one State or political subdivision may enact such rules, then so may any other; and the end result would undo Congress's carefully calibrated regulatory scheme."

*South Coast*, 541 U.S. at 255. Indeed, if California could simply mandate the "use" of electric motors, why bother seeking a preemption waiver at all?[12]

### C. The Ordinance is a standard or other requirement relating to the control of emissions and is therefore preempted.

The district court identified the legal precedents prohibiting "use and operation" regulations that operate as emission standards and enforcement mechanisms and agreed with Gaia Gardens that if the Ordinance acts as a standard or other requirement relating to the control of emissions it is preempted. But the court's application of those rules to the Ordinance cannot be squared with the Ordinance's plain language or effect. According to that plain language, all leaf blowers used in Montclair must be equipped with specific emissions-control technology: electric motors. The effect is a standard or other

[12] For example, California recently obtained preemption waivers to adopt and enforce standards intended to transition most small nonroad engines and equipment to zero-emissions technology. *See* EPA Decision Document, *supra* note 6. EPA subsequently sent the waivers to Congress for invalidation under the Congressional Review Act and California has filed a lawsuit challenging that action. *California v. EPA*, 1:26-cv-02185 (D.D.C. filed June 22, 2026).

requirement relating to the control of emissions from the engines used in leaf blowers.

In reaching a contrary result, the district court reasoned that, because the Ordinance regulates both electric and gas-powered leaf blowers, and because one of the Ordinance's stated purposes is to address health and environmental concerns regarding "fine particulate emissions" from "[t]he blowing of leaves, dust and debris," JA20–21, the Ordinance "concerns the public-health and quality-of-life consequences of blowing leaves rather than emissions of leaf blower engines." JA21. The court further emphasized that the Ordinance "restricts *all* leaf-blower use to specific hours and days, even though electric leaf blower engines do not give off emissions." *Id.* The court similarly reasoned that the Ordinance "does not provide an underlying emissions standard to enforce, rather it restricts leaf blower use within Montclair." *Id.* In short, the court concluded the Ordinance is not preempted because it "regulates leaf blowing, not the engines that perform it." *Id.*

But if it were true that the Ordinance merely regulated "leaf blowing," it would not treat leaf blowers differently based on power source. All leaf blowers blow leaves; that is precisely what leaf blowers

are designed to do. And gas-powered generators do *not* blow leaves, yet the Ordinance restricts them, too. Instead, the Ordinance's treatment of leaf blowers turns on whether their power source is a gas engine or electric motor, not whether they blow leaves.

The district court was also wrong that the Ordinance "restrict[s] all leaf-blower use to specific hours and days." *Id.* The Ordinance restricts only the use of *electric* leaf blowers to certain times of day. The Ordinance bans *without exception* the use of gas-powered leaf blowers. JA177. The court largely ignored language from the Ordinance describing its treatment of *gas*-powered leaf blowers, including: "[t]he Township of Montclair hereby finds that the *use of gas-powered leaf blowers* impairs the health and social welfare," and "[t]he purpose of this section is to eliminate the adverse impact of such equipment by prohibiting its use within the Township." JA176 (emphasis added). This section of the Ordinance makes no mention of electric-powered leaf blowers, leaf blowers generally, or the blowing of leaves. It specifically describes and prohibits only gas-powered leaf blowers which, as defined by the Ordinance, includes gas- and diesel-powered generators.

Although the court also found the ban is not a "technology specification," JA20, the Ordinance mandates electric motors. That is the very definition of a technology specification. If a leaf blower does not have an electric motor, it cannot be used in Montclair. If manufacturers want to sell leaf blowers for use in Montclair, they must produce leaf blowers with electric motors. That is not a "use and operation" regulation; it is a technology mandate related to the control of emissions. As explained in the Amicus Brief previously submitted in this case, mandating the use of zero-emission leaf blowers coerces manufacturers "into producing and selling only [zero-emission] battery-powered products for the Montclair market" which "could significantly disrupt the nationwide market for small hand-held power equipment." Amicus Brief, 2024 WL 688481, at *17, 21.

The Southern District of New York's analysis in *Metropolitan Taxicab Board of Trade v. City of New York*, 633 F. Supp. 2d 83 (S.D.N.Y. 2009), *aff'd*, 615 F.3d 152 (2d Cir. 2010) (*Metro*), is informative. That case involved a regulatory scheme New York City enacted to incentivize the purchase of taxicabs that use hybrid or clean-

diesel engines over taxicabs with conventional gasoline engines. *Id.* at 85–86.

Unlike Montclair, New York City did not outright ban gas-powered taxi cabs to achieve its goals. Instead, it reduced the rates at which taxicab owners could lease vehicles to taxi drivers, thus reducing the owners' overall profit, if the vehicle did not have a hybrid or clean-diesel engine. *Id.* at 85. Yet the *Metro* court still found that the "effect" of New York City's regulations was to "mandate taxicab owners to buy only hybrid vehicles." *Id.* at 87. The court reasoned that because "a requirement to purchase hybrid taxicabs is also a command that would directly affect the level of emissions" from taxicabs, the regulations were preempted. *Id.* at 104–05.

The Ordinance is even more clearly an emissions standard than New York City's regulations because, under the Ordinance, landscapers have no choice. If they do not have leaf blowers equipped with electric motors, they cannot use leaf blowers in Montclair. Because the Ordinance effectively mandates the purchase of electric leaf blowers and prohibits the use of internal combustion engines to power leaf

blowers, it has a specific "purpose of reducing emissions from" leaf blowers and is preempted.

The district court cited *Metro*, suggesting it is distinguishable without clear explanation. JA20. The court also distinguished *South Coast* and *Pacific Merchant* on grounds those cases involved regulations that required entities to purchase equipment satisfying emission specifications or imposed a technological requirement on engines. *Id.* But, again, the Ordinance does the same thing: it requires leaf blowers operated in Montclair to be equipped with a specific emissions-control technology—electric motors—for the purpose of promoting "health and social welfare." JA176. The text of the Ordinance makes clear Montclair banned gas-powered leaf blowers (and generators) not because they blow leaves, but because their engines produce emissions. After all, if the point was merely to regulate the blowing of leaves, the Ordinance would restrict electric leaf blowers in the same manner as gas-powered leaf blowers and would have no reason to restrict gas-powered generators.

The effect of the Ordinance is a mandate, accompanied by sanctions, to use zero-emission leaf blowers. *See Metro*, 633 F. Supp. 2d

at 93 (explaining that regulations presenting “only a single ‘real’ option” for the regulated parties are mandates). The Ordinance operates as a total and complete ban on emissions from the internal combustion engines used in gas-powered leaf blowers and requires landscapers and individuals who use leaf blowers in Montclair to use zero-emissions equipment or face sanctions. The Ordinance is, in effect, a standard or other requirement relating to the control of emissions and is therefore expressly preempted.

### D. Although the district court incorrectly applied the presumption against preemption, its application does not change the result.

The district court held that, through section 209(e) of the Clean Air Act, Congress “impliedly” preempted state regulation of small nonroad engines while leaving room “for the States to supplement” EPA’s regulation of nonroad engine emissions. JA18–19. The court then reasoned that, because Congress’s intent to preempt was not “clear and manifest,” the “presumption against preemption” applied with “particular force.” JA15–17; JA19. That presumption generally applies when a federal statute is ambiguous as to its preemptive effect and the local legislation at issue concerns areas traditionally within the police

powers of local jurisdictions, such as health, safety, and the environment. *See, e.g.*, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); JA15–16; JA19.

For reasons stated above, Congress's intent to preempt local standards and other requirements related to the control of emissions from nonroad engines is clear and manifest from the statutory text and structure and EPA's regulations implementing that text and structure. Nonetheless, although it is not entirely clear how much the "presumption" influenced the district court's conclusions, to the extent the district court relied on it to find no preemption here, it committed legal error.

The court's explanation of the presumption against preemption is fatally flawed in at least three ways: First, the court applied it despite Congress's plainly expressed intent and EPA's regulations recognizing that intent. Second, the court appears to have used the presumption to justify its interpretation of the Ordinance, but the presumption applies only to ambiguities in *Congress's* intent, not Montclair's. Third, the court said its duty to accept an interpretation "disfavoring" preemption applies even when the presumption against preemption does not, but

there is no legal support for that proposition, which would require courts to interpret congressional intent as disfavoring preemption even when Congress has clearly expressed its desire to preempt.

**i. The district court erred when it used the presumption to interpret section 209(e)(2) as disfavoring preemption.**

The "presumption against preemption" applies only "when the text of a preemption clause is susceptible of more than one plausible reading" as to the scope of its preemptive effect, and the local regulation falls within the traditional police powers of local government. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (internal quotations omitted) (citing *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)). Under those circumstances, "courts ordinarily accept the reading" of the preemption clause "that disfavors preemption." *Id.*

By contrast, and regardless of whether a local ordinance concerns areas typically within the police powers of local jurisdictions, when Congress's intent to preempt is "clear and manifest," the presumption against preemption is overcome. *Fellner*, 539 F.3d at 249 (quoting *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 715 (1985)); *Transource*, 156 F.4th at 373 (quoting *Fellner*, 539 F.3d at

249). Here, for reasons stated above, there can be no serious question that Congress intended to preempt state and local standards and other requirements related to the control of emissions from nonroad engines. The entire regulatory scheme of Title II of the Clean Air Act depends on federal preemption, the Consolidated Appropriations Act of 2004 expressly broadens the scope of that preemption for engines smaller than 50 horsepower, and EPA's regulations expressly describe as "preempted" any state and local regulation of such engines. *See supra* Argument Part I.A.

Despite the clear and manifest intent of section 209(e)(2) to preempt, the district court "applie[d] the presumption against preemption to § 209(e)(2) and the Ordinance," JA19, and, citing *Bates*, 544 U.S. at 449, concluded it had a "duty" to accept the reading of section 209(e)(2) "that disfavors preemption." JA22. Applying that "duty," and relying on its own flawed interpretation of the Ordinance, the district court concluded the Ordinance "regulates *leaf blowing*, not *leaf blower engine emissions*." The court therefore "presume[d] Congress did not intend" to preempt it. *Id.*

For reasons already stated, and even assuming Congress's intent to preempt was only "implied," there is no plausible reading of section 209(e)(2) that disfavors preemption. *Engine Mfrs. Ass'n v. EPA*, 88 F.3d at 1081 ("Congress not only authorized the EPA to regulate nonroad sources but also preempted state regulation."). Section 209(e) preempts state regulation of emissions from nonroad engines and the 2004 Act "further preclude[s] other states from adopting new California standards for nonroad spark-ignition engines below 50 horsepower." 73 Fed. Reg. at 59038, 59172 (A-27, A-28); 40 C.F.R. §§ 1074.10(c), 1074.110(b) (A-10, A-11). Because there is no way to plausibly interpret section 209(e)(2) as disfavoring preemption and such an interpretation would also be contrary to the 2004 Act and EPA's regulations, the presumption against preemption plays no role here, and the court erred when it assumed it had a "duty" to interpret the Clean Air Act as disfavoring preemption.

#### ii. The district court incorrectly applied the presumption against preemption to its interpretation of the Ordinance.

The district court said it applied the presumption to both "section 209(e)(2) and the Ordinance," and seems to have done just that. JA19.

Although, as described above, the presumption and its corresponding duty to choose a reasonable interpretation disfavoring preemption only applies to questions of *Congress's* intent, the court appears to have also relied on it when interpreting the parties' competing interpretations of Montclair's Ordinance.

For example, after saying the presumption applied, the court described the Ordinance's restriction on the use of electric leaf blowers at certain times of day as concerning "the public-health and quality-of-life consequences of blowing leaves rather than emissions of leaf blower engines. Thus, the Ordinance, by its own terms, regulates leaf-blowing, not the engines that perform it." JA21. The court then concluded that the Ordinance was not preempted because "Montclair enacted the Ordinance to protect its residents from the adverse health and environmental effects of leaf blowing, not the emissions generated by leaf blower engines, which is well within its police power." JA22.

As a preliminary matter, the Ordinance's time restrictions on the use of electric leaf blowers do not apply to gas-powered leaf blowers, which are completely banned. More fundamentally, however, the presumption against preemption turns on Congress's intent, not

Montclair's. *Medtronic*, 518 U.S. at 485–86 ("[T]he scope of a pre-emption statute must rest primarily on a fair understanding of *congressional purpose*.") (internal quotations and citation omitted); *Altria*, 555 U.S. at 76. Here, because, as described above, the control of emissions from nonroad engines is a fundamental area of federal regulation, the presumption is overcome. It plays no role because there is no doubt as to section 209(e)(2)'s preemptive effect, whether express or implied.

To the extent the court used the presumption to interpret the *Ordinance* in a manner disfavoring preemption, that is not how the presumption works. Courts cannot use the presumption as a basis for validating state law when that law "enters a fundamental area of [federal] regulation and thereby counters the federal purpose." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 324–26 (2016). Whether Montclair intended to enact a standard or other requirement relating to the control of emissions from leaf-blower engines is irrelevant. If the Ordinance is, in effect, such a standard or requirement, it is preempted.

#### iii. The district court incorrectly described its duty to disfavor preemption.

Citing *Bates*, the district court said, "even if the presumption did not apply," the court would have a "duty to accept the reading" of the Clean Air Act disfavoring preemption. JA19 n.7. Again, there is no reading of section 209(e) that disfavors preemption of local emission standards and other requirements relating to the control of emissions from nonroad engines, and the court implicitly conceded as much when it found preemption applied. But, just as importantly, the court misapplied *Bates*, which, contrary to the court's description, does not establish any independent duty beyond the presumption. *See Bates*, 544 U.S. at 449; *Altria*, 555 U.S. at 77.

*Bates* says the presumption (and its corresponding duty) apply "*unless* Congress has made" its intent to preempt "clear and manifest." *Bates*, 544 U.S. at 449 (citations omitted) (emphasis added). Indeed, it makes no sense that courts would have a duty to accept a statutory interpretation disfavoring preemption when the only plausible interpretation of a statute is that Congress intended to preempt. If Congress's intent is "clear and manifest," there is no presumption.

Without a presumption, there can be no duty. Instead, the "clear and manifest" intent of Congress controls.

## II. This Court should remand with instructions to invalidate the preempted parts of the Ordinance and enter judgment in favor of plaintiffs.

If this Court agrees the Ordinance is preempted, Gaia Gardens respectfully asks it to exercise its broad authority under 28 U.S.C. § 2106 to instruct the district court to enter judgment in plaintiffs' favor based on evidence already in the record. *See* 28 U.S.C. § 2106 ("The Supreme Court or any other court of appellate jurisdiction . . . may remand the cause and direct the entry of such appropriate judgment, decree, or order . . . as may be just under the circumstances."); *Nazay v. Miller*, 949 F.2d 1323, 1328 (3d Cir. 1991) ("[28 U.S.C. § 2106] is consonant with the important policy of conserving scarce judicial resources because it avoids remanding for trial where factual development is not required."); *Helen L. v. DiDario*, 46 F.3d 325, 339 (3d Cir. 1995) ("When an appeal concerns only issues of law, [the court is] free to enter an order directing the district court to enter summary judgment in favor of the appellant."); *CoreCivic, Inc. v. Murphy*, 690 F. Supp. 3d 467, 476 (D.N.J. 2023) (entering summary judgment sua

sponte in a Supremacy Clause dispute because "the sole question presented is legal").

By deciding the sole alleged claim as a matter of law, the district court (and Montclair) have recognized that this case does not turn on a question of fact. Indeed, the only other material "fact" is plaintiffs' Article III standing but, based on sworn declarations already in the record, there is no reasonable basis to dispute plaintiffs' right to bring this action. As this Court has recognized, the factual support needed "to establish standing depends considerably upon whether the plaintiff is himself an object of the action . . . . If he is, there is ordinarily little question that the action or inaction has caused him injury[.]" *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 362 (3d Cir. 2014) (internal quotations omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) ("[R]egulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements.").

Plaintiffs-Appellants have already introduced affidavits establishing that three of them are professional landscapers who

provide services in Montclair and, under the Ordinance, had to stop using gas-powered leaf blowers. JA85–91; JA257 (declaring that Gaia Gardens LLC, a "landscape and garden design company serving Montclair . . . since 2002," uses leaf blowers to provide its services, and the owner "had to purchase a new electric blower system that [she] would not have purchased if not for the Ordinance"); JA259 (declaring that Fredette Landscaping "provides lawn and garden maintenance services for properties located in Montclair," uses leaf blowers to provide those services, and purchased electric leaf blowers to ensure it could continue providing services in Montclair without violating the Ordinance); JA261 (declaring that R & J Land Care LLC "provides lawn and garden maintenance services for properties located in Montclair," uses leaf blowers in doing so, and purchased new electric leaf blowers to ensure it could continue providing services in Montclair). The lone individual plaintiff also provided sworn statements that, until he moved in November 2025, the Ordinance prevented him from using gas-powered leaf blowers on his Montclair property. JA92–96; JA263–64. That at least one of the plaintiffs is subject to Montclair's Ordinance is sufficient to show standing to challenge its constitutionality. *Const.*

*Party of Pa.*, 757 F.3d at 362; *see also Lutter v. JNESO*, 86 F.4th 111, 123 (3d Cir. 2023) (explaining that Article III standing requires "genuine adversity between at least two parties to the litigation[.]").

Even if being subject to the regulation was not enough, plaintiffs' declarations further establish that they have suffered economic injury, one of the "paradigmatic forms" of injury-in-fact for purposes of Article III. *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005). The precise amount of that injury is not relevant because plaintiffs are not seeking damages and, for purposes of Article III, need only establish facts that would allow a factfinder to determine economic injuries of "something more than zero dollars without resorting to mere conjecture." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 285 (3d Cir. 2018). Plaintiffs have already met that standard.

There can be no real question that, if plaintiffs are not allowed to use gas-powered leaf blowers, they must, at minimum, stop using their gas-powered equipment and, if they want to continue using leaf blowers, acquire electric equipment. And that is what their declarations establish. *See* JA87–88; JA91 (describing lost value of investments in

gas-powered blowers, the expenses of purchasing batteries and other new equipment needed to comply with the ordinance, and business impacts); JA258 (same); JA259–60 (describing need to purchase electric leaf blowers, spare batteries, and charging units, and other impacts on business); JA261–62 (describing need to purchase new electric leaf blowers, spare batteries, charging units, and other costs); JA263–64 (describing purchase of new electric leaf blower and other increased costs).

If this Court finds the Ordinance preempted, it should exercise the broad authority granted to it under 28 U.S.C. § 2106 to order judgment in favor of Gaia Gardens because "there can be but one reasonable conclusion" as to plaintiffs' standing. *Huang v. BP Amoco Corp.*, 271 F.3d 560, 564 (3d Cir. 2001). Under such circumstances, allowing the case to proceed to litigation would be inefficient, waste resources, and needlessly delay relief.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order granting Montclair's motion to dismiss and instruct the court to enter final judgment in favor of Gaia Gardens invalidating the

preempted parts of the Ordinance. Because the only legal claim in the Amended Complaint is the purely legal claim on review here, and because plaintiffs have already provided declarations sufficient to show standing, there are no remaining issues subject to reasonable dispute.

Respectfully submitted,

/s/ *Charlene Koski*
Charlene Koski, WA Bar No. 43178
Justin R. Panitchpakdi
Benjamin W. Schultz
VAN NESS FELDMAN, LLP
1191 Second Avenue
Suite 1800
Seattle, WA 98101
Telephone: (206) 623-9372
Email: ckoski@vnf.com
jpanitchpakdi@vnf.com
bschultz@vnf.com

Counsel for Plaintiffs-Appellants

Dated: September 8, 2026

## COMBINED CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 32(a) and 32(c), and 3d Cir. L.A.R. 32.1, I hereby certify that the foregoing Plaintiffs-Appellants' Opening Brief has been prepared in a proportionally spaced typeface (using Microsoft Word 365, in 14-point Century Schoolbook font), contains 10,435 words total, excluding items exempted by Federal Rule of Appellate Procedure 32(f).

Pursuant to 3d Cir. L.A.R. 31.1(c), I hereby certify that the text of the electronic brief is identical to the text in the hard, paper copies of the brief, and that a virus detection program was performed on this brief using CrowdStrike Windows Sensor Version 7.40.21306.0, and that no virus was detected.

Respectfully submitted,

/s/ *Charlene Koski*
Charlene Koski

Dated: September 8, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2026, I electronically filed Plaintiffs-Appellants' Opening Brief and Joint Appendix with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

/s/ *Charlene Koski*
Charlene Koski

Dated: September 8, 2026

## CERTIFICATION OF BAR MEMBERSHIP

Pursuant to 3d Cir. L.A.R. 46.1(e), I, Charlene Koski, certify under penalty of perjury that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Respectfully submitted,

/s/ *Charlene Koski*
Charlene Koski

Dated: September 8, 2026

## ADDENDUM OF AUTHORITIES

Page

**Federal Statutes**

Clean Air Act Section 209, 42 U.S.C. § 7543................................A-1

Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, 118 Stat. 3 (*excerpts*)........................................................A-3


**Federal Regulations**

40 C.F.R. Part 1074 (*excerpts*)....................................................A-7

59 Fed. Reg. 36969 (July 20, 1994) (*excerpts*)..............................A-12

62 Fed. Reg. 67733 (Dec. 30, 1997) (*excerpts*)..............................A-17

71 Fed. Reg. 29621 (May 23, 2006) (*excerpts*)..............................A-21

73 Fed. Reg. 59034 (Oct. 8, 2008) (*excerpts*)................................A-23

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



## § 7543. State standards

### (a) Prohibition

No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

### (b) Waiver

(1) The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such waiver shall be granted if the Administrator finds that—

(A) the determination of the State is arbitrary and capricious,

(B) such State does not need such State standards to meet compelling and extraordinary conditions, or

(C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

(2) If each State standard is at least as stringent as the comparable applicable Federal standard, such State standard shall be deemed to be at least as protective of health and welfare as such Federal standards for purposes of paragraph (1).

(3) In the case of any new motor vehicle or new motor vehicle engine to which State standards apply pursuant to a waiver granted under paragraph (1), compliance with such State standards shall be treated as compliance with applicable Federal standards for purposes of this subchapter.

### (c) Certification of vehicle parts or engine parts

Whenever a regulation with respect to any motor vehicle part or motor vehicle engine part is in effect under section 7541(a)(2) of this title, no State or political subdivision thereof shall adopt or attempt to enforce any standard or any requirement of certification, inspection, or approval which relates to motor vehicle emissions and is applicable to the same aspect of such part. The preceding sentence shall not apply in the case of a State with respect to which a waiver is in effect under subsection (b).

### (d) Control, regulation, or restrictions on registered or licensed motor vehicles

Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles.

### (e) Nonroad engines or vehicles

#### (1) Prohibition on certain State standards

No State or any political subdivision thereof shall adopt or attempt to enforce any standard or other requirement relating to the control of emissions from either of the following new nonroad engines or nonroad vehicles subject to regulation under this chapter—

(A) New engines which are used in construction equipment or vehicles or used in farm equipment or vehicles and which are smaller than 175 horsepower.

(B) New locomotives or new engines used in locomotives.

Subsection (b) shall not apply for purposes of this paragraph.

#### (2) Other nonroad engines or vehicles

(A) In the case of any nonroad vehicles or engines other than those referred to in subparagraph (A) or (B) of paragraph (1), the Administrator shall, after notice and opportunity for public hearing, authorize California to adopt and enforce standards and other requirements relating to the control of emissions from such vehicles or engines if California determines that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such authorization shall be granted if the Administrator finds that—

(i) the determination of California is arbitrary and capricious,

(ii) California does not need such California standards to meet compelling and extraordinary conditions, or

(iii) California standards and accompanying enforcement procedures are not consistent with this section.

(B) Any State other than California which has plan provisions approved under part D of subchapter I may adopt and enforce, after notice to the Administrator, for any period, standards relating to control of emissions from nonroad vehicles or engines (other than those referred to in subparagraph (A) or (B) of paragraph (1)) and take such other actions as are referred to in subparagraph (A) of this paragraph respecting such vehicles or engines if—

(i) such standards and implementation and enforcement are identical, for the period concerned, to the California standards authorized by the Administrator under subparagraph (A), and

(ii) California and such State adopt such standards at least 2 years before commencement of the period for which the standards take effect.

The Administrator shall issue regulations to implement this subsection.

(July 14, 1955, ch. 360, title II, § 209, formerly § 208, as added Pub. L. 90–148, § 2, Nov. 21, 1967, 81 Stat. 501; renumbered and amended Pub. L. 91–604, §§ 8(a), 11(a)(2)(A), 15(c)(2), Dec. 31, 1970, 84 Stat. 1694, 1705, 1713; Pub. L. 95–95, title II, §§ 207, 221, Aug. 7, 1977, 91 Stat. 755, 762; Pub. L. 101–549, title II, § 222(b), Nov. 15, 1990, 104 Stat. 2502.)

**Editorial Notes**

CODIFICATION

Section was formerly classified to section 1857f–6a of this title.

PRIOR PROVISIONS

A prior section 209 of act July 14, 1955, as added Nov. 21, 1967, Pub. L. 90–148, § 2, 81 Stat. 502, was renumbered section 210 by Pub. L. 91–604 and is classified to section 7544 of this title.

Another prior section 209 of act July 14, 1955, ch. 360, title II, as added Oct. 20, 1965, Pub. L. 89–272, title I, § 101(8), 79 Stat. 995, related to appropriations for the fiscal years ending June 30, 1966, 1967, 1968, and 1969, and was classified to section 1857f–8 of this title, prior to repeal by Pub. L. 89–675, § 2(b), Oct. 15, 1966, 80 Stat. 954.

AMENDMENTS

1990—Subsec. (e). Pub. L. 101–549 added subsec. (e).

1977—Subsec. (b). Pub. L. 95–95, § 207, designated existing provisions as par. (1), substituted ''March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards'' for ''March 30, 1966, unless he finds that such State does not require standards more stringent than applicable Federal standards to meet compelling the extraordinary conditions or that such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title'', added subpars. (A), (B), and (C), and added pars. (2) and (3).

Subsecs. (c), (d). Pub. L. 95–95, § 221, added subsec. (c) and redesignated former subsec. (c) as (d).

1970—Subsec. (a). Pub. L. 91–604, § 11(a)(2)(A), substituted ''part'' for ''subchapter''.

Subsec. (b). Pub. L. 91–604, § 15(c)(2), substituted ''Administrator'' for ''Secretary''.

Subsec. (c). Pub. L. 91–604, § 11(a)(2)(A), substituted ''part'' for ''subchapter''.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7544. State grants

The Administrator is authorized to make grants to appropriate State agencies in an amount up to two-thirds of the cost of developing and maintaining effective vehicle emission devices and systems inspection and emission testing and control programs, except that—

(1) no such grant shall be made for any part of any State vehicle inspection program which does not directly relate to the cost of the air pollution control aspects of such a program;

(2) no such grant shall be made unless the Secretary of Transportation has certified to the Administrator that such program is consistent with any highway safety program developed pursuant to section 402 of title 23; and

(3) no such grant shall be made unless the program includes provisions designed to insure that emission control devices and systems on vehicles in actual use have not been discontinued or rendered inoperative.

Grants may be made under this section by way of reimbursement in any case in which amounts have been expended by the State before the date on which any such grant was made.

(July 14, 1955, ch. 360, title II, § 210, formerly § 209, as added Pub. L. 90–148, § 2, Nov. 21, 1967, 81 Stat. 502; renumbered and amended Pub. L. 91–604, §§ 8(a), 10(b), Dec. 31, 1970, 84 Stat. 1694, 1700; Pub. L. 95–95, title II, § 204, Aug. 7, 1977, 91 Stat. 754.)

**Editorial Notes**

CODIFICATION

Section was formerly classified to section 1857f–6b of this title.

PRIOR PROVISIONS

A prior section 210 of act July 14, 1955, was renumbered section 211 by Pub. L. 91–604 and is classified to section 7545 of this title.

AMENDMENTS

1977—Pub. L. 95–95 inserted provision allowing grants to be made by way of reimbursement in any case in which amounts have been expended by States before the date on which the grants were made.

1970—Pub. L. 91–604, § 10(b), substituted provisions authorizing the Administrator to make grants to appropriate State agencies for the development and maintenance of effective vehicle emission devices and systems inspection and emission testing and control programs, for provisions authorizing the Secretary to make grants to appropriate State air pollution control agencies for the development of meaningful uniform motor vehicle emission device inspection and emission testing programs.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

## § 7545. Regulation of fuels

### (a) Authority of Administrator to regulate

The Administrator may by regulation designate any fuel or fuel additive (including any fuel or fuel additive used exclusively in nonroad engines or nonroad vehicles) and, after such date or dates as may be prescribed by him, no manufacturer or processor of any such fuel or additive may sell, offer for sale, or introduce into commerce such fuel or additive unless the Administrator has registered such fuel or additive in accordance with subsection (b) of this section.

### (b) Registration requirement

(1) For the purpose of registration of fuels and fuel additives, the Administrator shall require—

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO



Public Law 108–199
108th Congress

# An Act

Making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2004, and for other purposes.

Jan. 23, 2004
[H.R. 2673]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*,

Consolidated Appropriations Act, 2004.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the “Consolidated Appropriations Act, 2004”.

**SEC. 2. TABLE OF CONTENTS.**

The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Table of contents.
Sec. 3. References.

DIVISION A—AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG ADMINISTRATION, AND RELATED AGENCIES PROGRAMS APPROPRIATIONS, 2004

Title I—Agricultural Programs
Title II—Conservation Programs
Title III—Rural Development Programs
Title IV—Domestic Food Programs
Title V—Foreign Assistance and Related Programs
Title VI—Related Agencies and Food and Drug Administration
Title VII—General Provisions

DIVISION B—COMMERCE, JUSTICE, AND STATE, THE JUDICIARY, AND RELATED AGENCIES APPROPRIATIONS, 2004

Title I—Department of Justice
Title II—Department of Commerce and Related Agencies
Title III—The Judiciary
Title IV—Department of State and Related Agency
Title V—Related Agencies
Title VI—General Provisions
Title VII—Rescissions
Title VIII—Alaskan Fisheries

DIVISION C—DISTRICT OF COLUMBIA APPROPRIATIONS, 2004

Title I—Federal Funds
Title II—District of Columbia Funds
Title III—DC School Choice Incentive Act of 2003
Title IV—General Provisions

DIVISION D—FOREIGN OPERATIONS, EXPORT FINANCING, AND RELATED PROGRAMS APPROPRIATIONS, 2004

Title I—Export and Investment Assistance
Title II—Bilateral Economic Assistance
Title III—Military Assistance
Title IV—Multilateral Economic Assistance

Title V—General Provisions
Title VI—Millennium Challenge Act of 2003

DIVISION E—LABOR, HEALTH AND HUMAN SERVICES, AND EDUCATION, AND RELATED AGENCIES APPROPRIATIONS, 2004

Title I—Department of Labor
Title II—Department of Health and Human Services
Title III—Department of Education
Title IV—Related Agencies
Title V—General Provisions

DIVISION F—TRANSPORTATION, TREASURY, AND INDEPENDENT AGENCIES APPROPRIATIONS, 2004

Title I—Department of Transportation
Title II—Department of the Treasury
Title III—Executive Office of the President and Funds Appropriated to the President
Title IV—Independent Agencies
Title V—General Provisions
Title VI—General Provisions—Departments, Agencies, and Corporations

DIVISION G—VETERANS AFFAIRS AND HOUSING AND URBAN DEVELOPMENT, AND INDEPENDENT AGENCIES APPROPRIATIONS, 2004

Title I—Department of Veterans Affairs
Title II—Department of Housing and Urban Development
Title III—Independent Agencies
Title IV—General Provisions
Title V—Pesticide Products and Fees

DIVISION H—MISCELLANEOUS APPROPRIATIONS AND OFFSETS

1 USC 1 note.

**SEC. 3. REFERENCES.**

Except as expressly provided otherwise, any reference to “this Act” contained in any division of this Act shall be treated as referring only to the provisions of that division.

Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2004.

## DIVISION A—AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG ADMINISTRATION, AND RELATED AGENCIES APPROPRIATIONS ACT, 2004

# An Act

Making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2004, and for other purposes.

That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies programs for the fiscal year ending September 30, 2004, and for other purposes, namely:

(1) treat the Pioneer Homes in the State of Alaska collectively as a single State home for veterans for purposes of section 1741 of title 38, United States Code; and

(2) make per diem payments to the State of Alaska for care provided to veterans in the Pioneer Homes in accordance with the provisions of that section.

(b) TREATMENT NOTWITHSTANDING NON-VETERAN RESIDENCY.—The Secretary may treat the Pioneer Homes as a State home under subsection (a) notwithstanding the residency of non-veterans in one or more of the Pioneer Homes.

(c) PIONEER HOMES DEFINED.—In this section, the term "Pioneer Homes" means the six regional homes in the State of Alaska known as Pioneer Homes, which are located in the following:

(1) Anchorage, Alaska.

(2) Fairbanks, Alaska.

(3) Juneau, Alaska.

(4) Ketchikan, Alaska.

(5) Palmer, Alaska.

(6) Sitka, Alaska.

(d) LIMITATION.—The number of beds occupied by veterans collectively in the six Pioneer Homes listed under subsection (c) for which per diem would be paid under this authority shall not exceed the number of veterans in State beds that otherwise would be permitted in Alaska under the Department of Veterans Affairs State home regulations governing the number of beds per veteran population.

Space Shuttle Columbia.

SEC. 427. Of the amounts available to the National Aeronautics and Space Administration, such sums as maybe necessary for the benefit of the families of the astronauts who died on board the Space Shuttle Columbia on February 1, 2003, are available under the terms of section 203(c)(13) of the National Aeronautics and Space Act of 1958, as amended, independent of the limitations established therein.

California.

SEC. 428. REGULATION OF SMALL ENGINES. (a) In considering any request from California to authorize the State to adopt or enforce standards of other requirements relating to the control of emissions from new non-road spark-ignition engines smaller than 50 horsepower, the Administrator shall give appropriate consideration to safety factors (including the potential increased risk of burn or fire) associated with compliance with the California standard.

Deadlines. 42 USC 7547 note.

Federal Register, publication.

(b) Not later than December 1, 2004, the Administrator of the Environmental Protection Agency shall propose regulations under the Clean Air Act that shall contain standards to reduce emissions from new nonroad spark-ignition engines smaller than 50 horsepower. Not later than December 31, 2005, the Administrator shall publish in the Federal Register final regulations containing such standards.

(c) No State or any political subdivision thereof may adopt or attempt to enforce any standard or other requirement applicable to spark ignition engines smaller than 50 horsepower.

(d) EXCEPTION FOR CALIFORNIA.—The prohibition in subsection (e) does not apply to or restrict in any way the authority granted to California under section 209(e) of the Clean Air Act (42 U.S.C. 7543(e)).

(e) EXCEPTION FOR OTHER STATES.—The prohibition in subsection (c) does not apply to or restrict the authority of any State

under section 209(e)(2)(B) of the Clean Air Act (42 U.S.C. 7543(e)(2)(B)) to enforce standards or other requirements that were adopted by that State before September 1, 2003.

## TITLE V—PESTICIDE PRODUCTS AND FEES

SEC. 501. PESTICIDE REGISTRATION.

Pesticide Registration Improvement Act of 2003. 7 USC 136 note.

(a) SHORT TITLE.—This section may be cited as the "Pesticide Registration Improvement Act of 2003".

(b) REGISTRATION REQUIREMENTS FOR ANTIMICROBIAL PESTICIDES.—Section 3(h) of the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136a(h)) is amended—

(1) in paragraph (2)(F), by striking "90 to 180 days" and inserting "120 days"; and

(2) in paragraph (3)—

(A) in subparagraph (D)(vi), by striking "240 days" and inserting "120 days"; and

(B) in subparagraph (F), by adding at the end the following:

"(iv) LIMITATION.—Notwithstanding clause (ii), the failure of the Administrator to notify an applicant for an amendment to a registration for an antimicrobial pesticide shall not be judicially reviewable in a Federal or State court if the amendment requires scientific review of data within—

"(I) the time period specified in subparagraph (D)(vi), in the absence of a final regulation under subparagraph (B); or

"(II) the time period specified in paragraph (2)(F), if adopted in a final regulation under subparagraph (B).".

(c) MAINTENANCE FEES.—

(1) AMOUNTS FOR REGISTRANTS.—Section 4(i)(5) of the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136a–1(i)(5)) is amended—

(A) in subparagraph (A)—

(i) by striking "(A) Subject" and inserting the following:

"(A) IN GENERAL.—Subject"; and

(ii) by striking "of—" and all that follows through "additional registration" and inserting "for each registration";

(B) in subparagraph (D)—

(i) by striking "(D) The" and inserting the following:

"(D) MAXIMUM AMOUNT OF FEES FOR REGISTRANTS.—The";

(ii) in clause (i), by striking "shall be $55,000; and" and inserting "shall be—

"(I) for fiscal year 2004, $84,000;

"(II) for each of fiscal years 2005 and 2006, $87,000;

"(III) for fiscal year 2007, $68,000; and

"(IV) for fiscal year 2008, $55,000; and"; and

(iii) in clause (ii), by striking "shall be $95,000." and inserting "shall be—

"(I) for fiscal year 2004, $145,000;

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

# CODE OF FEDERAL REGULATIONS

# Title 40
## Protection of Environment

Part 1060 to End

Revised as of July 1, 2024

Containing a codification of documents
of general applicability and future effect

As of July 1, 2024

Published by the Office of the Federal Register
National Archives and Records Administration
as a Special Edition of the Federal Register

# Table of Contents


| | *Page* |
|---|---|
| Explanation | v |
| Title 40: | |
| Chapter I—Environmental Protection Agency (Continued) | 3 |
| Chapter IV—Environmental Protection Agency and Department of Justice | 665 |
| Chapter V—Council on Environmental Quality | 673 |
| Chapter VI—Chemical Safety and Hazard Investigation Board | 733 |
| Chapter VII—Environmental Protection Agency and Department of Defense; Uniform National Discharge Standards for Vessels of the Armed Forces | 775 |
| Chapter VIII—Gulf Coast Ecosystem Restoration Council | 795 |
| Chapter IX—Federal Permitting Improvement Steering Council | 817 |
| Finding Aids: | |
| Table of CFR Titles and Chapters | 823 |
| Alphabetical List of Agencies Appearing in the CFR | 843 |
| List of CFR Sections Affected | 853 |

Rio Arriba
Roosevelt
Sandoval
San Juan
San Miguel
Santa Fe
Sierra
Socorro
Taos
Torrance
Union
Valencia

STATE OF OREGON

Harney
Lake
Klamath

STATE OF TEXAS

Jeff Davis
Judspeth
Parmer

STATE OF UTAH

Beaver
Box Elder
Cache
Carbon
Daggett
Davis
Duchesne
Emery
Garfield
Grand
Iron
Juab
Kane
Millard
Morgan
Piute
Rich
Salt Lake
San Juan
Sanpete
Sevier
Summit
Tooele
Uintah
Utah
Wasatch
Wayne
Weber

STATE OF WYOMING

Albany
Campbell
Carbon
Converse
Fremont
Goshen
Hot Springs
Johnson
Laramie
Lincoln
Natrona
Niobrara
Park
Platte
Sublette
Sweetwater
Teton
Uinta
Washakie
Weston

[73 FR 59344, Oct. 8, 2008. Redesignated at 88 FR 4718, Jan. 24, 2023]

# PART 1074—PREEMPTION OF STATE STANDARDS AND PROCEDURES FOR WAIVER OF FEDERAL PREEMPTION FOR NONROAD ENGINES AND NONROAD VEHICLES

### Subpart A—Applicability and General Provisions

Sec.
1074.1 Applicability.
1074.5 Definitions.
1074.10 Scope of preemption.
APPENDIX A TO SUBPART A OF PART 1074—STATE REGULATION OF THE USE AND OPERATION OF NONROAD INTERNAL COMBUSTION ENGINES

### Subpart B—Procedures for Authorization

1074.101 Procedures for California nonroad authorization requests.
1074.105 Criteria for granting authorization.
1074.110 Adoption of California standards by other states.
1074.115 Relationship of federal and state standards.

AUTHORITY: 42 U.S.C. 7401–7671q.

SOURCE: 73 FR 59379, Oct. 8, 2008, unless otherwise noted.

## Subpart A—Applicability and General Provisions

### § 1074.1 Applicability.

The requirements of this part apply with respect to state and local standards and other requirements relating to the control of emissions from nonroad engines and nonroad vehicles.

### § 1074.5 Definitions.

The definitions in this section apply to this part. As used in this part, all undefined terms have the meaning the Act gives to them. The definitions follow:

*Act* means the Clean Air Act, as amended, 42 U.S.C. 7401–7671q.

*Administrator* means the Administrator of the Environmental Protection Agency and any authorized representatives.

*Commercial* means an activity engaged in as a vocation.

*Construction equipment or vehicle* means any internal combustion engine-powered machine primarily used in construction and located on commercial construction sites.

*Engine used in a locomotive* means either an engine placed in a locomotive to move other equipment, freight, or passenger traffic, or an engine mounted on a locomotive to provide auxiliary power.

*Farm equipment or vehicle* means any internal combustion engine-powered machine primarily used in the commercial production and/or commercial harvesting of food, fiber, wood, or commercial organic products or for the processing of such products for further use on the farm.

*Locomotive* means a piece of equipment meeting the definition of locomotive in 40 CFR 1033.901 that is propelled by a nonroad engine.

*New* has the following meanings:

(1) For locomotives, new has the meaning given in 40 CFR 1033.901.

(2) For engines used in locomotives, new means an engine incorporated in (or intended to be incorporated in) in a new locomotive.

(3) For other nonroad engines and equipment, new means a domestic or imported nonroad engine or nonroad vehicle the equitable or legal title to which has never been transferred to an ultimate purchaser. Where the equitable or legal title to an engine or vehicle is not transferred to an ultimate purchaser until after the engine or vehicle is placed into service, then the engine or vehicle will no longer be new once it is placed into service. A nonroad engine or vehicle is placed into service when it is used for its functional purposes. This paragraph (3) does not apply to locomotives or engines used in locomotives.

*Nonroad engine* has the meaning given in 40 CFR 1068.30

*Primarily used* means used 51 percent or more.

*States and localities* means any or all of the states, commonwealths, and territories in the United States including the District of Columbia and any or all of their political subdivisions.

*Ultimate purchaser* means the first person who in good faith purchases a new nonroad engine or new nonroad vehicle or equipment for purposes other than resale.

*United States* has the meaning given in 40 CFR 1068.30.

### § 1074.10 Scope of preemption.

(a) States and localities are preempted from adopting or enforcing standards or other requirements relating to the control of emissions from new engines smaller than 175 horsepower that are primarily used in farm or construction equipment or vehicles, as defined in this part. For equipment that is used in applications in addition to farming or construction activities, if the equipment is primarily used as farm and/or construction equipment or vehicles (as defined in this part), it is considered farm or construction equipment or vehicles.

(b) States and localities are preempted from adopting or enforcing standards or other requirements relating to the control of emissions from new locomotives and new engines used in locomotives.

(c) For nonroad engines or vehicles other than those described in paragraphs (a) and (b) of this section, States and localities are preempted from enforcing any standards or other requirements relating to control of emissions from nonroad engines or vehicles except as provided in subpart B of this part.

[73 FR 59379, Oct. 8, 2008, as amended at 88 FR 77099, Nov. 8, 2023]

### Appendix A to Subpart A of Part 1074—State Regulation of the Use and Operation of Nonroad Internal Combustion Engines

(a) This appendix describes EPA's interpretation of the Clean Air Act regarding the authority of states to regulate the use and operation of nonroad engines.

(b) EPA believes that states are not precluded under 42 U.S.C. 7543 from regulating the use and operation of nonroad engines, such as regulations on hours of usage, daily

mass emission limits, or sulfur limits on fuel; nor are permits regulating such operations precluded, once the engine is no longer new. EPA believes that states are precluded from requiring retrofitting of used nonroad engines except that states are permitted to adopt and enforce any such retrofitting requirements identical to California requirements which have been authorized by EPA under 42 U.S.C. 7543.

[86 FR 34590, June 29, 2021]

## Subpart B—Procedures for Authorization

### § 1074.101 Procedures for California nonroad authorization requests.

(a) California must request authorization from the Administrator to enforce its adopted standards and other requirements relating to control of emissions from nonroad engines or vehicles that are not preempted by § 1074.10(a) or (b). The request must include the record on which the State rulemaking was based.

(b) After receiving the authorization request, the Administrator will provide notice and opportunity for a public hearing regarding such requests.

[73 FR 59379, Oct. 8, 2008, as amended at 88 FR 77099, Nov. 8, 2023]

### § 1074.105 Criteria for granting authorization.

(a) The Administrator will grant the authorization if California determines that its standards will be, in the aggregate, at least as protective of public health and welfare as otherwise applicable federal standards.

(b) The authorization will not be granted if the Administrator finds that any of the following are true:

(1) California's determination is arbitrary and capricious.

(2) California does not need such standards to meet compelling and extraordinary conditions.

(3) The California standards and accompanying enforcement procedures are not consistent with section 209 of the Act (42 U.S.C. 7543).

(c) In considering any request from California to authorize the state to adopt or enforce standards or other requirements relating to control of emissions from new nonroad spark-ignition engines smaller than 50 horsepower, the Administrator will give appropriate consideration to safety factors (including the potential increased risk of burn or fire) associated with compliance with the California standard.

### § 1074.110 Adoption of California standards by other states.

(a) Except as described in paragraph (b) of this section, any state other than California that has plan provisions approved under Part D of Title I of the Act (42 U.S.C. 7501 to 7515) may adopt and enforce emission standards for any period for nonroad engines and vehicles subject to the following requirements:

(1) The state must provide notice to the Administrator that it has adopted such standards.

(2) Such standards may not apply to new engines smaller than 175 horsepower that are used in farm or construction equipment or vehicles, or to new locomotives or new engines used in locomotives.

(3) Such standards and implementation and enforcement must be identical, for the period concerned, to the California standards authorized by the Administrator.

(4) The state must adopt such standards at least two years before the standards first take effect.

(5) California must have adopted such standards two years before the standards first take effect in the state that is adopting them under this section.

(b) States and localities, other than the State of California, may not adopt or attempt to enforce any standard or other requirement applicable to the control of emissions from spark-ignition engines smaller than 50 horsepower, except standards or other requirements that were adopted by that state before September 1, 2003.

### § 1074.115 Relationship of federal and state standards.

If state standards apply to a new nonroad engine or vehicle pursuant to authorization granted under section 209 of the Act (42 U.S.C. 7543), compliance with such state standards will be treated as compliance with the otherwise applicable standards of this chapter for engines or vehicles introduced into commerce in that state.

(d)(3)(v), and revising paragraphs (e)(2)(i) and (f)(2)(i) to read as follows:

**§ 80.102 Controls applicable to blendstocks.**

* * * * *

(b)(1) * * *

$$BG_{by} = \frac{V_{bs}}{V_g}$$

* * * * *

$V_{bs}$ = Volume of applicable blendstock produced or imported and transferred to others during the calendar year, and used to produce gasoline

* * * * *

(d) * * *

(1) * * *

(i) * * *

$$BG_a = \frac{V_{bs}}{V_g}$$

* * * * *

$V_{bs}$ = Volume of applicable blendstock produced or imported and subsequently transferred to others during the averaging period

$V_g$ = Volume of conventional gasoline, reformulated gasoline and RBOB produced or imported during the averaging period, excluding California gasoline as defined in § 80.81(a)(2)

* * * * *

(2) * * *

(i) * * *

$$BGC_{comp} = \frac{\sum_{i=1}^{n} V_{bs,i}}{\sum_{i=1}^{n} V_{g,i}}$$

* * * * *

$V_{g,i}$ = Volume of conventional gasoline, reformulated gasoline and RBOB produced or imported during averaging period i, excluding California gasoline as defined in § 80.81(a)(2)

* * * * *

(3) * * *

(iv) Transferred between refineries which have been grouped pursuant to § 80.101(h) by a refiner for the purpose of determining compliance under this subpart; or

(v) Used to produce California gasoline as defined in § 80.81(a)(2).

* * * * *

(e) * * *

(2) * * *

(i) Include all blendstocks produced or imported and transferred to others in its compliance calculations under § 80.101(g) for two averaging periods beginning on January 1 of the averaging period subsequent to the averaging period when the exceedance occurs;

* * * * *

(f) * * *

(2) * * *

(i) EPA may grant the waiver referred to in paragraph (f)(1)(iii) of this section if the level of blendstock production was the result of extreme or unusual circumstances (e.g., a natural disaster or act of God) which clearly are outside the control of the refiner or importer, and which could not have been avoided by the exercise of prudence, diligence, and due care.

* * * * *

24. Section 80.104 is amended by revising paragraph (a)(2)(ix) to read as follows:

**§ 80.104 Recordkeeping requirements.**

* * * * *

(a) * * *

(2) * * *

(ix) In the case of any refinery-produced or imported products listed in § 80.102(a) that are excluded under § 80.102(d)(3), documents which demonstrate that basis for exclusion; and

* * * * *

25. Section 80.105 is amended by revising paragraph (a)(2) to read as follows:

**§ 80.105 Reporting requirements.**

(a) * * *

(2) (i) The total gallons of applicable blendstocks produced or imported and transferred to others that are not excluded under § 80.102(d)(3); and

(ii) The total gallons of applicable blendstocks produced or imported and transferred to others that are excluded under § 80.102(d)(3);

* * * * *

26. Section 80.125 is amended by revising paragraph (a) to read as follows:

**§ 80.125 Attest engagements.**

(a) Any refiner, importer, and oxygenate blender subject to the requirements of this subpart F shall engage an independent certified public accountant, or firm of such accountants (hereinafter referred to in this subpart F as "CPA"), to perform an agreed-upon procedure attestation engagement of the underlying documentation that forms the basis of the reports required by §§ 80.75 and 80.105.

* * * * *

27. Section 80.128 is amended by revising paragraphs (e)(2), (e)(5), and (g)(3)(iii) to read as follows:

**§ 80.128 Agreed upon procedures for refiners and importers.**

* * * * *

(e) * * *

(2) Determine that the requisite contract was in place with the downstream blender designating the required blending procedures, or that the refiner or importer accounted for the RBOB using the assumptions in § 80.69(a)(9);

* * * * *

(5) Agree the sampling and testing frequency of the refiner's or importer's downstream oxygenated blender quality assurance program with the sampling and testing rates as required in § 80.69(a)(7).

* * * * *

(g) * * *

(3) * * *

(iii) Obtain a listing from the refiner or importer of the batches of conventional gasoline or conventional sub-octane blendstock, and the compliance calculations which include oxygenate blended by the downstream oxygenate blender, and test the mathematical accuracy of the calculations contained in this listing;

* * * * *

28. Section 80.129 is amended by revising paragraph (e) to read as follows:

**§ 80.129 Agreed upon procedures for downstream oxygenate blenders.**

* * * * *

(e) Agree the sampling and testing frequency of the blender's quality assurance program with the sampling and testing rates required in § 80.69.

[FR Doc. 94-17131 Filed 7-19-94; 8:45 am]

BILLING CODE 6560-50-P

---

## 40 CFR Part 85

[AMS-FRL-5011-9]

## Air Pollution Control; Preemption of State Regulation for Nonroad Engine and Vehicle Standards

AGENCY: Environmental Protection Agency (EPA).

ACTION: Final rule.

SUMMARY: EPA is promulgating a final rule that sets forth requirements and procedures for EPA authorization of California enforcement of standards and other requirements relating to the control of emissions from new nonroad vehicles or engines under section 209(e) of the Clean Air Act (Act), as amended.

The rule includes definitions of the categories of new nonroad engines and vehicles that the Act specifies as preempted from state regulation. These

definitions of "farm equipment", "construction equipment", and "locomotive" clarify which nonroad engines and vehicles may be subject to state regulation because such regulation is not preempted. The definition of "new" in this rulemaking applies to all new nonroad engines and vehicles with the exception of locomotives and engines used in locomotives. This rule also provides procedures by which EPA may authorize California to enforce standards and provides guidance for states that adopt California standards. Finally, the rule discusses the criteria to be used by EPA in its analysis of California authorization requests. The rule will provide guidance to California, other states, and vehicle and engine manufacturers regarding new nonroad engine and vehicle preemption.

**EFFECTIVE DATE:** This regulation becomes effective August 19, 1994.

**ADDRESSES:** Copies of material relevant to this rulemaking have been placed in Docket A–91–18 and are available for public inspection between the working hours of 8 a.m. to 4 p.m., Monday through Friday, at: U.S. Environmental Protection Agency, Air and Radiation Docket and Information Center, Room M1500, First Floor Waterside Mall, 401 M Street, SW., Washington, DC 20460 (Telephone (202) 260–7548). A reasonable fee will be charged by EPA for copying docket material.

**FOR FURTHER INFORMATION CONTACT:** David Dickinson, Attorney Advisor, Manufacturers Operations Division (6405–J), U.S. Environmental Protection Agency, Washington, DC 20460, Telephone: (202) 233–9256.

**SUPPLEMENTARY INFORMATION:**

Table of Contents


I. Statutory Authority and Background
II. Discussion of Final Rule and Comments Received
  A. Changes to Proposed Rule for Final Rule
  B. Nonroad Engines and Vehicles
  C. Definitions of "new" as used in "new nonroad engine" and "new nonroad vehicle"
  D. Definition of "farm equipment"
  E. Definition of "construction equipment"
  F. Definition of "locomotive"
  G. Application of Definitions; Primary Use Test
  H. Labeling Requirement
  I. Authorization Criteria and Procedures
  J. State Adoption of California Standards and Test Procedures
  K. Rulemaking Procedure
  L. Executive Order 12291
  M. Paperwork Reduction Act
  N. Regulatory Flexibility Act


## I. Statutory Authority and Background

EPA is required under section 209(e) of the Clean Air Act (Act), as amended, 42 U.S.C. 7543, to "issue regulations to implement" subsection (e). Section 209(e) of the Act addresses the state adoption of emission standards for new nonroad vehicles and engines.

Under section 209(e), all states are preempted from adopting emissions standards for "[n]ew engines which are used in construction equipment or vehicles or used in farm equipment or vehicles and which are smaller than 175 horsepower" or for "[n]ew locomotives or new engines used in locomotives". In this final rule, EPA defines these preempted categories, except that EPA does not define the term "new" with respect to locomotives and engines used in locomotives. For new nonroad engines and vehicles not included in the preempted categories, EPA is directed to authorize California, after notice and opportunity for public hearing, to enforce such standards and other requirements as California adopts for the regulation of such engines and vehicles, if these regulations meet the criteria set forth in the Act. Several of the criteria to be used for nonroad engine and vehicle authorizations are similar to the requirements applicable to waivers of Federal preemption of emission standards for new motor vehicles under section 209(b). Section 209(a) prohibits state adoption of emission standards for new motor vehicles and engines. Section 209(b) directs EPA to waive this prohibition for California if certain criteria are met. Other states may adopt California nonroad vehicle or engine emission standards under section 209(e) if they comply with several requirements.

This rule was proposed at 56 FR 45866, Sept. 6, 1991. A public hearing was held on September 20, 1991. Many industries presented comments through an association or individually. Represented in the comments presented at the hearing and submitted in writing are the following: engine manufacturers; manufacturers and dealers of various types of equipment including agricultural, construction, mining, utility, and lawn and garden; manufacturers of emission controls; railroads; manufacturers of industrial trucks; the San Diego County Air Pollution Control District; and the State of California.

## II. Discussion of Final Rule and Comments Received

### *A. Changes to Proposed Rule for Final Rule*

After reviewing the comments received, EPA has made the following changes to the Notice of Proposed Rulemaking (NPRM) for the final rule. First, the final rule establishes one definition of "new" that applies equally to domestically manufactured and imported vehicles and engines. Second, the definition of "new" applies to all nonroad engines other than locomotives and engines used in locomotives. EPA will define "new" locomotives and "new" engines used in locomotives in its locomotive standards promulgated under section 213 of the Act. Third, in the final rule EPA defines the word "commercial," as used in the definitions of "farm equipment" and "construction equipment." Fourth, EPA makes minor modifications to the definitions of "construction equipment" and "locomotive." Fifth, the proposed federal labeling requirement is deleted. Sixth, EPA changes its interpretation of section 209(e) so that California may adopt, but not enforce, nonroad standards prior to EPA authorization. Seventh, EPA changes the standard of review of California's primary use determination to a preponderance of the evidence standard. Finally, EPA changes its interpretation of "consistent with this section" in section 209(e)(2)(A)(iii) to include section 209(b)(1)(C).

### *B. Nonroad Engines and Vehicles*

In the NPRM, EPA acknowledged that at some point it would be necessary to clarify whether certain internal combustion engines, such as those used in movable pumps, generators, and compressors, are stationary sources and therefore subject to regulations under Title I of the Act or are mobile sources and therefore potentially subject to nonroad regulations under Title II of the Act. The issue is complex. The definitions of "stationary source" in sections 111(3) and 302(z) of the Act and of "nonroad engine" in section 216(10) of the Act do not make clear under which Title certain internal combustion engines belong. The engines in question are those used in equipment for reasons other than propulsion.

Ingersoll-Rand, the Engine Manufacturers Association (EMA), and the Equipment Manufacturers Institute (EMI), among others, commented that EPA should determine in this rulemaking that both self-propelled and transportable equipment are mobile sources. This would clarify to manufacturers that transportable farm and construction equipment are exempted from state regulation for purposes of control of emissions.

EPA agrees that the above issue needs to be addressed and has resolved this issue in a rulemaking implementing

equipment contained an engine from a manufacturer who claimed its entire engine line as preempt from state regulation.

If the primary use determination were based on an engine line, EPA would have several concerns. As with the equipment based method, two equipment lists would still be developed, but additionally each engine line for every engine manufacturer must be determined to be preempted or not after gathering data on whether the engines were now installed in farm or construction equipment. This would add another layer of calculations to the process. According to many of those who commented at the public hearing, engine destination data are difficult to obtain. In a case where most engines in an engine line are used in non-preempted equipment, the engine line would be split, causing the same burden as manufacturers stated would occur in the equipment-based method and which they wanted to avoid. Additionally, this method would give a competitive advantage to manufacturers who now make engine lines which are primarily used in farm and construction equipment. Such manufacturers, who have engines for which state regulation is preempted, would enjoy an advantage over a manufacturer whose engines are not preempted and therefore must meet California's emission standards. Ford Motor Company recognized this issue and expressed its concerns and disagreement with EMA on this issue.

EPA is also concerned that the commenters' method would be contrary to section 209 in that it is overinclusive and inconsistent in its definition of farm and construction equipment. Under the commenters' method, if 70 percent of the engines in an engine line were used in farm and construction equipment and 30 percent were used in other equipment, the entire engine line would be preempted. Thus, the regulation of some engines would be preempted even though they are not used in farm or construction equipment. This would create a preemption greater than that contemplated by the statute. Moreover, the method is inconsistent in application: if 70 percent of the engines in an engine line were used in non-preempted equipment but the remainder were used in farm or construction equipment, California could only regulate 70 percent of the engines, not 100 percent. Therefore, the method gives engine manufacturers the benefit of full preemption when the majority of the engines are preempted, but it does not allow full California regulation if the majority of the engines are not preempted. This inconsistency appears arbitrary and could result in higher emissions (as noted by Ford Motor Company) because California would be precluded from regulating engines that it would otherwise be able to regulate under a more evenhanded approach.

Furthermore, this approach does not solve the question that is at the heart of the "primary use" issue: *i.e.*, when should a multiple use piece of equipment be defined as farm and/or construction equipment? In order to determine whether an engine line is being used 30 percent in farm and construction equipment or 70 percent in farm or construction equipment, one still must know what is meant by farm and construction equipment. This approach, taken by itself, does not provide an answer. Finally, manufacturers did not explain how a newly developed engine line would be judged (preempted or non-preempted) since there would be no existing data upon which to base a determination.

EMA stated that the equipment-based method would result in higher certification costs than the engine-line method. EPA believes that under both methods, engine manufacturers could face additional costs for any engine they wished to certify for sale in California. These costs would include research and development expenses to develop a cleaner engine, and administrative and testing expenses associated with the state certification process. Those engine manufacturers who chose to compete in the California market would face higher certification costs than those who did not, but there should be little difference in certification costs between the two methods.

In the final rule, rather than use the engine-line method, EPA is requiring a primary use test that preempts California from regulating new engines that are installed in equipment that is primarily used in farming or construction settings.

*H. Labeling Requirement*

The NPRM would require engine manufacturers to label new engines which are used in construction equipment or vehicles or used in farm equipment or vehicles and which are smaller than 175 horsepower. The label would state to which standard or standards (California, Federal, or both) the engine is certified.

Most commenters opposed the labeling requirement. CARB stated that it intended to require labels on engines that comply with California emission regulations. CARB, EMI, and EMA agreed that a federal labeling requirement was not appropriate until EPA determined under section 213 whether federal standards were necessary. In fact, EMI argued that authority for labeling lies in section 213, not section 209(e).

EPA has decided to not implement a labeling requirement under section 209(e). It should be noted that the regulation setting forth federal nonroad standards under section 213 contains a labeling requirement.[32]

*I. Authorization Criteria and Procedures*

In the NPRM, EPA noted that sections 209(b) and (e) are in many respects alike and in those respects should be similarly interpreted. One difference between the two provisions that the Agency identified, however, was an apparent difference in the sequence of California and EPA actions. In this regard, EPA focused on the following language of section 209(b):

> (b)(1) The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which *has adopted standards* . . . for the control of emissions from new motor vehicles or new motor vehicle engines *prior to March 30, 1966*. . . . (Emphasis added.)

EPA interpreted the phrase "has adopted" to mean that the Administrator could waive the prohibition of section 209(a) after a state has adopted standards. By contrast, section 209(e)(2) provides that "the Administrator shall . . . authorize California to adopt and enforce motor vehicle emission standards." EPA concluded that the difference in language indicated that California must receive authorization from EPA before it can adopt any nonroad standards or requirements.

CARB took issue with EPA's interpretation of section 209(e)(2) as requiring California to obtain authorization before adopting regulations. It believed that for several reasons, EPA could and should follow the same process under section 209(e) as it follows in granting motor vehicle waivers under section 209(b). First, CARB argued that although section 209(e) states that "the Administrator shall . . . authorize California to adopt and enforce standards . . . ," sections 209(a) and (b) could be similarly construed when read together. Section 209(a) states that "no state . . . shall adopt or attempt to enforce. . . ." The only exception to the prohibition is if the Administrator grants a waiver under section 209(b). Thus, considered together, sections 209(a) and (b) could

[32] *See* 59 FR 31306, June 17, 1994, specifically 40 CFR Part 89, Subpart B, § 89.110–96.

A-14

be construed to preclude prior adoption of a regulation by a state unless a waiver is granted.

CARB noted that despite this language, EPA has consistently interpreted sections 209(a) and (b) to provide that the waiver process commences after state regulatory adoption. EPA's rationale has been that the Administrator should consider a "final" regulation when making a determination to waive federal preemption of state regulations that may differ from federal regulations. Between the time CARB holds a hearing on a proposed regulation and submission of the final regulation to the California Office of Administrative Law (OAL), significant changes could be made to the regulation. Under the California procedures for adopting regulations, CARB releases a "Staff Proposal: Initial Statement of Reasons for Proposed Rulemaking" along with a Notice for Public Comment. The comment period is forty-five days. A Board hearing takes place at the end of this forty-five day period. CARB makes modifications to the regulation after the hearing. These modifications are made available for public comment for fifteen days. CARB then prepares a "Final Statement of Reasons for Rulemaking" in which it addresses changes made to the regulation and summarizes and responds to all comments received during the public comment period. This document is submitted to the Executive Officer, who signs an Executive Order which formally adopts the final version of the regulations. Then CARB is required to submit the final regulation to OAL, which reviews regulations adopted by state agencies. OAL has thirty days to review and either approve or disapprove. It has authority to disapprove if (1) the regulation is inconsistent with California law or (2) improper procedure has been followed. If OAL disapproves, CARB has 120 days to modify the regulation, re-adopt, and re-submit the regulation to OAL.[33]

Thus, significant changes could be made to a regulation between the CARB hearing and adoption as well as after CARB adoption due to the review by OAL. If significant changes were to occur, the waiver California received would be insufficient to cover the regulations as adopted and California would be forced to reapply for a waiver of a now final regulation.

EPA finds California's argument persuasive. As an initial matter, the Agency no longer believes that the difference in language between sections 209(b) and (e) was intended to delineate a difference in the sequence of events surrounding adoption and authorization. The use of the past tense in section 209(b) ("has adopted") was merely intended to identify the states that could obtain a waiver for motor vehicle standards. (In fact, California alone had adopted such standards prior to March 30, 1966, and therefore, all other states have been prohibited from adopting emission control standards for new motor vehicles except as provided under section 177.) EPA also acknowledges that sections 209(a) and (b) could be read to require California to obtain a waiver prior to adopting motor vehicle standards, but the Agency has not so interpreted these provisions. Therefore, sections 209(b) and (e) need not be interpreted as requiring different adoption and authorization processes.

Moreover, EPA believes section 209(e) should be interpreted to allow a process like that established under section 209(b) for the same reasons EPA construed 209(b) to permit California to seek a waiver after it has adopted motor vehicle standards. It is inefficient for EPA to rule on a waiver or authorization request for what amounts to a regulatory recommendation. Until California adopts its program, neither California nor EPA can be sure that the program for which a waiver or authorization is requested is the program that the responsible official will sign into law. If there is a difference between the program submitted to EPA by California and the program California eventually adopts, any waiver or authorization granted may be insufficient to cover the enacted program.

In fact, EPA received comments that illustrate the confusion that would result if California were required to receive EPA authorization before it could adopt final regulations. Several commenters were concerned that CARB had modified its proposed Utility Engine Rule twice since CARB had requested EPA authorization in December 1990. The commenters requested that EPA clarify that it will grant authorization based on the most recent version it has received from CARB and that if any changes are made after an authorization is granted, California must resubmit its authorization request. EPA believes that today's change allowing California to adopt before receiving EPA authorization resolves this confusion and inefficiency.[34]

At the same time, EPA does not believe that section 209(e) may be interpreted to permit California to enforce any nonroad regulations before receiving authorization. Were California to enforce its regulations before it receives authorization, it would defeat the protection section 209(e) was established to provide—that California's nonroad program only go forward if EPA authorizes it in accordance with the provisions of that section. Thus, EPA believes that while California may adopt nonroad regulations before receiving EPA authorization, its adoption must be conditioned upon EPA's authorizing those regulations under 209(e). In short, California may adopt, but not enforce, nonroad standards prior to EPA authorization.

Regarding the authorization criteria, EPA proposed that the first two criteria be interpreted the same as for section 209(b). These criteria are first, that no waiver or authorization shall be granted if EPA finds that California's determination that its standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards is arbitrary and capricious. Second, no waiver or authorization shall be granted if California does not need such standards to meet compelling and extraordinary conditions.

The language of the third criterion, however, was not as clearly similar to section 209(b). Section 209(e)(2)(A)(iii) stated that no authorization shall be granted if "California standards and accompanying enforcement procedures are not consistent with this section." EPA proposed that "this section" be interpreted to mean consistent with sections 209(a) and 209(e)(1).

Commenters disagreed with EPA's proposed interpretation of "consistent with this section," stating that "consistent with section 209" should mean all of section 209, particularly section 209(b). Some commenters also proposed that "consistent with this section" should include section 213.

EPA has determined that, given the plain language of section 209(e), interpreting "consistent with this section" to mean "consistent with section 213" is not a reasonable statutory interpretation. The phrase "consistent with this section" clearly refers to section 209, not section 213. EMA proposed to interpret this phrase to refer to section 222 of the Clean Air Act Amendments of 1990. This would require consistency with both sections 209 and 213 of the Act. Absent any legislative history to explain the intent of "consistent with this section", however, this interpretation would give

[33] Cal. Admin. Code tit. 2, §§ 11340–11356 (1989).

[34] EPA notes, however, that as with motor vehicle waivers under section 209(b), if CARB substantively amends a rule, EPA would expect CARB to request a new authorization.

to the phrase a meaning clearly different than its plain meaning in light of its placement in section 209 alone.

The Agency has decided, however, that it is reasonable and effects Congressional intent to interpret "consistent with this section" to include all of section 209, including section 209(b)(1)(C). Hence, EPA believes that it should review nonroad authorization requests under the same "consistency" criterion that it reviews motor vehicle waiver requests.

Under section 209(b)(1)(C), the Administrator shall not grant California a motor vehicle waiver if she finds that California standards and accompanying enforcement procedures are not consistent with section 202(a) of the Act. EPA has interpreted this criterion in previous motor vehicle waiver decisions. First, California's standards are not consistent with section 202(a) if there is inadequate lead time to permit the development of technology necessary to meet those requirements, giving appropriate consideration to the cost of compliance within that time frame. Second, California's accompanying enforcement procedures would be inconsistent with section 202(a) if the federal and California test procedures were inconsistent, that is, manufacturers would be unable to meet both the state and the federal test requirements with one test vehicle or engine.

EPA's review of nonroad authorization requests will include the following. First, CARB must request EPA authorization of its adopted nonroad standards. Second, EPA shall not grant an authorization if (1) EPA determines that CARB's "in the aggregate" determination is arbitrary and capricious; (2) California does not need such standards to meet compelling and extraordinary conditions; and (3) if California's nonroad standards are not consistent with section 209, *i.e.*, that they not be inconsistent with section 209(a), section 209(e), and section 209(b), as EPA has interpreted that subsection in the context of motor vehicle waivers.

*J. State Adoption of California Standards and Test Procedures*

EPA received comments on several aspects regarding how other states may adopt California nonroad standards and test procedures. First, both EMA and EMI argued that other states that decide to adopt California standards should be subject to the same process as California. However, the Act neither requires that states obtain EPA authorization to impose California's nonroad engine standards nor authorizes the Agency to require that states do so. Under section 209(e)(2)(B), any state which has plan provisions approved under part D of Title I of the Act (generally states within ozone nonattainment areas) may adopt and enforce, "after notice to the Administrator," California standards. Language requiring that other states request and receive authorization from EPA is noticeably absent. Indeed, the statutory text reads as *authorizing states* to adopt California standards on their own volition. In contrast, section 209(e)(2)(A) clearly states that California must receive authorization from EPA. Moreover, the language of section 209(e)(2)(B) is nearly identical to section 177 which provides that "any state which has plan provisions approved under this part may adopt and enforce" California motor vehicle emission standards. Under section 177 New York, Massachusetts and Maine have adopted California standards, and other states are considering following suit. These States did not ask for EPA authorization before they adopted the California standards, nor did EPA or the automobile industry suggest that they needed such authorization.[35]

Several commenters stated that section 209(e)(2)(B) required that California be subject to a two-year lead time requirement. EPA does not agree with this interpretation. Section 209(e)(2)(A) requires EPA to authorize California regulation of nonroad engines unless the Administrator makes certain findings, including that California's standards are "not consistent with this section." As discussed earlier, EPA interprets that phrase as requiring that California's standards are technologically feasible in the available lead time. Since California is thus required to provide adequate lead time under section 209(e)(2)(A), it would not make sense to interpret section 209(e)(2)(B) as independently requiring at least two years of lead time. Instead, EPA interprets section 209(e)(2)(B)'s reference to two years of lead time in the same way it interprets the virtually identical provision in section 177: that an adopting state must provide two years of lead time before the California standards take effect in the adopting state and California must have adopted standards two years before commencement of the period for which the standards take effect in the adopting state, but California may adopt standards having less than two years of lead time in California.

[35] Ford Motor Co. v. EPA, 606 F.2d 1293, 1298 (D.C. Cir. 1979).

*K. Rulemaking Procedure*

In the NPRM, EPA proposed definitions for the new engines used in the preempted categories: farm equipment, construction equipment, and locomotives. For equipment types that are used in a variety of applications, EPA also proposed a primary use test to assess whether such equipment is primarily used as farm or construction equipment. New engines used primarily in this equipment would be preempted from state regulation. EPA proposed that in determining "primary use", CARB would use sales data to show that an equipment type was or was not primarily used in farming or construction. When CARB requested EPA to authorize its proposed regulations, EPA would review California's determination regarding the primary use of particular equipment.

In the Proposed Authorization Decision, 53 FR 45876, September 6, 1991, EPA proposed to review the decision California made regarding the primary use of nonroad equipment under an arbitrary and capricious standard of review, the standard of review that section 209(e)(2) requires that the Administrator use in reviewing California's determination that its standards "will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards."

Several commenters, including EMA, EMI, PPEMA, and the Railway Engineering-Maintenance Suppliers Association, Inc. (REMSA) stated that EPA's proposed approach to determining the primary use of nonroad engines and equipment inappropriately relinquished authority to California. They pointed out that the primary use determination goes to the scope of the federal preemption accorded by section 209(e)(1), and argued that such a threshold determination should be made by EPA, not California. To the extent that California did have a role in determining primary use, they urged that EPA apply a clear and compelling evidence standard of review instead of the less strict arbitrary and capricious test in reviewing California's determinations.

EPA believes these commenters are essentially correct in that the scope of federal preemption is not for California to decide and that EPA should have a greater role in making that determination than the Agency's proposal would have required. At the same time, EPA sees nothing wrong with having California make a preliminary determination as to the use of nonroad engines and equipment.

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



Dated: October 31, 1997.

**R. Richard Newcomb,**

*Director, Office of Foreign Assets Control.*

Approved:

**James E. Johnson,**

*Assistant Secretary (Enforcement), Department of the Treasury.*

[FR Doc. 97–33840 Filed 12–23–97; 10:46 am]

BILLING CODE 4810–25–F

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 85 and 89

[AMS–FRL–5939–5]

### Control of Air Pollution: Emission Standards for New Nonroad Compression-Ignition Engines at or Above 37 Kilowatts; Preemption of State Regulation for Nonroad Engine and Vehicle Standards; Amendments to Rules

**AGENCY:** Environmental Protection Agency.

**ACTION:** Direct final rule.

**SUMMARY:** This direct final rulemaking, consistent with an order and opinion from the U.S. Court of Appeals for the District of Columbia Circuit, amends EPA's regulations setting emission standards for large (at or above 37 kilowatts) nonroad compression ignition engines, and EPA's regulations establishing procedures for EPA authorization of California nonroad emission standards. Specifically, EPA is withdrawing portions of an interpretive rule which set forth the Agency's position on the Clean Air Act (Act) regarding the status of certain internal combustion engines manufactured before the effective date of the final rulemaking promulgating EPA's definition of nonroad engine. Additionally, consistent with the D.C. Circuit opinion, EPA also is amending the remaining text of this interpretive rule, as well as EPA's regulations issued under section 209(e) of the Act regarding the Agency's California nonroad standards authorization process, to clarify that California must seek authorization from EPA prior to enforcing standards and other requirements relating to emissions from any nonroad vehicles or engines, and not just new nonroad vehicles and engines, which was the original language used in these regulations.

**DATES:** This direct final rule is effective on March 2, 1998 unless notice is received by January 29, 1998 that any person wishes to submit adverse comments and/or request a hearing. Should EPA receive such notice, EPA will publish a timely document in the **Federal Register** withdrawing this direct final rule. Any party who sends EPA notice of intent to submit adverse comments must in turn submit the adverse comments by March 2, 1998, unless a hearing is requested. Any party objecting to this direct final rule, at the time it notifies EPA of its intent to submit adverse comments, can request EPA to hold a public hearing on this action. If a hearing is requested, it will take place on March 2, 1998, and interested parties will have an additional 30 days after the hearing (until March 30, 1998) to submit comments on any information presented at the hearing. Because no hearing will occur absent a request for one, interested parties should contact Robert M. Doyle at the number listed below after January 29, 1998 to determine whether a hearing will take place.

**ADDRESSES:** Written comments should be submitted (in duplicate if possible) to: Air Docket Section (6102), Attention: Docket No. A–91–24, U.S. Environmental Protection Agency, 401 M Street, S.W., Washington, D.C. 20460, or hand-delivered to the Air Docket at the above address, in Room M–1500, Waterside Mall. A copy of written comments should also be submitted to Robert M. Doyle at the address below.

**FOR FURTHER INFORMATION CONTACT:** Robert M. Doyle, Attorney/Advisor, Engine Programs and Compliance Division (6403J), U.S. Environmental Protection Agency, 401 M. Street, S.W., Washington, D.C. 20560, (202) 564–9258, FAX (202) 233–9596, E-Mail, Doyle.Robert@EPAMAIL.EPA.GOV.

**SUPPLEMENTARY INFORMATION:**

## I. Regulated Entities

Entities potentially regulated by this direct final rule are the California Air Resources Board and other state air quality agencies. Regulated categories and entities include:

| Category | Examples of regulated entities |
|---|---|
| State and local government. | California Air Resources Board. State and local air quality agencies. |

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be regulated by this action. This table lists the types of entities that EPA is now aware could potentially be regulated by this action. Other types of entities not listed in the table could also be regulated. If you have questions regarding the applicability of this action to a particular product, consult the person listed in the preceding FOR FURTHER INFORMATION CONTACT section.

## II. Obtaining Electronic Copies of Documents

Electronic copies of the preamble and the regulatory text of this direct final rule are available via the Internet on the Office of Mobile Sources (OMS) Home Page (http://www.epa.gov/OMSWWW/). Users can find these documents and other nonroad engine and vehicle related information and documents by accessing the OMS Home Page and looking at the path entitled ''Nonroad engines and vehicles.'' This service is free of charge, except for any cost you already incur for Internet connectivity. The official **Federal Register** version is made available on the day of publication on the primary Web site (http://www.epa.gov/docs/fedrgstr/EPA–AIR/).

Please note that due to differences between the software used to develop the documents and the software into which the documents may be downloaded, changes in format, page length, etc., may occur.

## III. Legal Authority and Background

Authority for the actions set forth in this direct final rule is granted to EPA by sections 209, 213, and 301 of the Clean Air Act as amended (42 U.S.C. 7543, 7547, and 7601).

### *A. Amendments and Redesignation of Appendix Containing Interpretive Rule on Date and Scope of Nonroad Preemption*

On May 17, 1993, EPA proposed rules setting standards for emissions from nonroad compression ignition engines at or above 37 kilowatts (approximately 50 horsepower) in power (large nonroad engine rule).[1] In this NPRM, EPA was faced with the question (among many issues) of the manner and the extent to which states could regulate nonroad engines, which some states and localities previously had regulated as stationary sources. EPA noted that while emissions from nonroad engines are excluded from the Act's section 302(z) definition of stationary source,[2] the exclusion would apply only to those nonroad internal combustion engines that are manufactured after the effective

---

[1] 58 FR 28809 (May 17, 1993).

[2] Section 302(z) states that the ''term 'stationary source' means generally any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle as defined in section 216.''

date of the large nonroad engine rule. EPA also noted that nonroad engines may be subject to state-imposed in-use restrictions such as limits on hours of use and may be subject to state regulation under section 209(e)(2).[3]

During the rulemaking, EPA received comments from several parties objecting to its interpretation of the correct effective date. These parties generally asserted that the language in section 302(z) applied to all nonroad engines in existence on or after November 15, 1990, the date of the enactment of the Clean Air Act Amendments of 1990 (CAAA). The effect of this assertion would be that states would be preempted from promulgating emission standards or other requirements for nonroad engines produced after that date.

On June 17, 1994, EPA published a final rule[4] setting the standards for the large nonroad compression ignition engines; the effective date for this rule was July 18, 1994, 30 days after its **Federal Register** publication. In that rule, EPA finalized the definition of ''nonroad engine,'' which determined whether certain engines should be considered ''nonroad engines'' or ''stationary sources.'' After careful consideration of the comments on the rule's preemption date briefly summarized above, EPA added an interpretive rule in the form of an appendix (Appendix A) to the regulations summarizing EPA's decisions on these preemption issues. In Appendix A, EPA noted basically that it interprets the Act as not precluding state regulation of internal combustion engines manufactured prior to July 18, 1994, except that state regulation of such engines that are used in motor vehicles or vehicles used solely for competition is precluded. Additionally, EPA noted that it believes that states are not precluded under section 209 of the Act from regulating the use and operation of nonroad engines. Appendix A has been codified as part of the large nonroad engine rule and appears in the current volume of 40 CFR part 89 (July 1, 1996).

On or before August 16, 1994, nine parties timely filed petitions with the United States Court of Appeals for the D.C. Circuit for review of the large nonroad engine rule, and of the related rule establishing the scope of preemption of state or local standards regulating nonroad engines and the procedures that California must follow when seeking EPA authorization to adopt and enforce California-specific nonroad engine standards under section 209(e) of the Act. These nine petitions were consolidated as *Engine Manufacturers Association, et. al.,* v. *EPA,* Docket No. 94–1558, (*EMA* v. *EPA*). The petitioners challenged several aspects of these rules, including the EPA interpretation contained in Appendix A. After preliminary discussions with petitioners, EPA decided that it was appropriate to review its interpretation that preemption of state and local regulations did not effect engines manufactured prior to July 18, 1994. Therefore, on September 19, 1995, EPA filed with the Court a Motion for Vacatur and Remand of its interpretation. The consolidated petitioners did not oppose EPA's Motion.

On October 20, 1995, the Court granted EPA's Motion and ordered that paragraphs 1 and 2 of Appendix A be vacated and remanded to the Agency for further consideration. Today's direct final rule implements the order of the Court by removing paragraphs 1 and 2 from Appendix A, and retitling Appendix A to be descriptive of its revised content.

EPA notes that although paragraphs 1 and 2 of Appendix A are now vacated, paragraph 3 remains effective, though this rule revises that paragraph. This paragraph, which appears in the revised text of Appendix A, contains EPA's determination that states are not precluded from regulating the use of nonroad engines. On July 12, 1996, the Court handed down its decision in *EMA* v. *EPA,* and held that EPA had made a reasonable interpretation of the Act in finding that the preemption of state regulations did not extend to restrictions on the use of nonroad engines.[5] EPA, however, has deleted the last two sentences of paragraph 3 and added a new sentence consistent with the Court's ruling on the scope of implied preemption of state standards, discussed in detail in Section B. below.

*B. Scope of Implied Preemption of State Standards*

Under section 209(e) of the Act as amended, EPA was required to ''issue regulations to implement'' subsection (e), which addressed the ability of states to adopt emission standards and other requirements for nonroad engines and vehicles. Under section 209(e): (1) All states are preempted from adopting emission standards and other requirements for new nonroad engines used in construction or farm equipment or vehicles which are smaller than 175 horsepower and for new locomotives and new engines used in locomotives; (2) California may adopt and enforce standards and other requirements for nonroad engines other than the specifically preempted categories listed directly above, after receiving authorization to do so from EPA; and (3) other states may adopt California's nonroad emission standards and other requirements after EPA has authorized the standards and other requirements and the adopting state has allowed the statutorily required two-year leadtime.

On July 20, 1994, EPA promulgated regulations which established the process under which the Agency would authorize California nonroad emission standards and other requirements (section 209(e) regulations). During the rulemaking, EPA addressed the issue of the scope of the Act's preemption on state regulation of nonroad engines and vehicles. Section 209(e)(2) directs EPA to authorize, when all conditions are met, California emission standards for ''*any* nonroad vehicles or engines other than [the new under 175 hp farm and construction equipment engines and the new locomotive engines] * * * (emphasis added).'' EPA interpreted the implied preemption of state standards in section 209(e) to apply only to *new* nonroad engines rather than any nonroad engines, which could include both new and used engines. In the Preamble to these regulations, EPA stated clearly that it believed ''that the requirements of section 209(e)(2) apply only to new nonroad engines and vehicles (emphasis added).''[6] Accordingly, the regulations required California to seek EPA authorization only for ''standards and other requirements relating to the control of emissions from new nonroad vehicles or engines that are otherwise not preempted.''[7]

As discussed above, petitions to the D.C. Circuit for review of the section 209(e) regulations and the large nonroad engine rule were filed and consolidated as *EMA* v. *EPA*. In this litigation, the petitioners agreed with EPA that section 209(e)(2) implied preemption of state regulation of nonroad engines and vehicles, but argued that the preemption applied to standards for all nonroad

[3] Section 209(e)(2)(A) directs EPA to authorize California to adopt and enforce standards and other requirements for nonroad engines and nonroad vehicles (with some categorical exceptions) if California's regulations meet the criteria set forth in the Act. Other states may adopt EPA-authorized California nonroad engine or vehicle standards if the states comply with the criteria listed in section 209(e)(2)(B).

[4] 59 FR 31306 (June 17, 1994).

[5] *EMA* v. *EPA,* 88 F.3d 1075, 1093–94 (D.C. Cir. 1996).

[6] 59 FR 36969, 36973 (July 20, 1994).

[7] 40 CFR 86.1604(a) (July 1, 1996).

sources, both new and non-new, because the statute did not include the word "new" in specifying what nonroad vehicles and engines for which California and other states could promulgate standards,[8] and for other reasons. In its opinion in this case handed down July 12, 1996, the Court agreed with the petitioners on this particular point, and granted the EMA petition "insofar as they challenge the limitation of the implied section 209(e)(2) preemption to new nonroad sources." [9]

Today's direct final rule implements the opinion of the Court regarding the scope of preemption of section 209(e)(2) by amending the language of the implementing regulations to reflect that California must request authorization for its emission standards and other related requirements for all nonroad vehicles and engines.[10] EPA has also deleted the final two sentences of Appendix A, dealing with the ability of states to require retrofit technologies, as the language as currently written is inconsistent with the opinion of the Court, and added a sentence which reflects the Court's holding by noting that states may adopt only those retrofit requirements for nonroad engines identical to California requirements which have been authorized by EPA under section 209 of the Act. EPA has also modified the language of Appendix A to state more simply and clearly that state regulation of the use and operation of nonroad engines can occur when the engines are no longer new.

*C. Public Participation and Effective Date*

EPA is publishing this rule without prior proposal because EPA views these amendments as noncontroversial and anticipates no adverse comments. However, in the event that adverse or critical comments are filed, EPA has prepared a Notice of Proposed Rulemaking (NPRM) proposing the same amendments. This NPRM is contained in a separate document in this **Federal Register** publication. The direct final action will be effective March 2, 1998 unless adverse or critical comments are received by January 29, 1998. If EPA receives adverse or critical comments on the revisions discussed in this section, the revisions receiving adverse comment will be withdrawn before the effective date. In case of the withdrawal of all or part of this action, the withdrawal will be announced by a subsequent **Federal Register** document. All public comments will then be addressed in a subsequent final rule based on the accompanying proposed rule. EPA will not implement a second comment period on this action. Any parties interested in commenting on this rule should do so at this time. If no adverse comments are received, the public is advised that the rule will be effective March 2, 1998.

EPA is continuing to review its policy concerns and options regarding the date of preemption for the nonroad engine rules. EPA may in the future determine that it is appropriate to issue a new interpretation to address this issue.

## IV. Administrative Requirements

*A. Administrative Designation*

Under Executive Order 12866 (58 FR 51735 (October 4, 1993), the Agency must determine whether the regulatory action is "significant" and therefore subject to OMB review and the requirements of the Executive Order. The Order defines "significant regulatory action" as one that is likely to result in a rule that may:

(1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities;

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or,

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

It has been determined that this rule is not a "significant regulatory action" under the terms of Executive Order 12866 and is therefore not subject to OMB review.

*B. Reporting and Recordkeeping Requirements*

This rule does not change the information collection requirements submitted to and approved by OMB in association with the large nonroad engine final rulemaking (59 FR 31306, June 17, 1994).

*C. Regulatory Flexibility*

EPA has determined that it is not necessary to prepare a regulatory flexibility analysis in connection with this final rule. This rule will not have a significant adverse economic impact on a substantial number of small businesses. The only revisions EPA is making in this final rule are pursuant to the decision of the Court. These changes are directed at state and local governments and are expected to affect few, if any, existing or future local or state regulations.

*D. Submission to Congress and the General Accounting Office*

Under 5 U.S.C. 801(a)(1)(A) as added by the Small Business Regulatory Enforcement Fairness Act of 1996, EPA submitted a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives and the Comptroller General of the General Accounting Office prior to publication of the rule in today's **Federal Register**. This rule is not a "major rule" as defined by 5 U.S.C. 804(2).

*E. Unfunded Mandates Act*

Under section 202 of the Unfunded Mandates Reform Act of 1995 ("Unfunded Mandates Act"), signed into law on March 22, 1995, EPA must prepare a budgetary impact statement to accompany any proposed or final rule that includes a Federal mandate that may result in estimated costs to State, local, or tribal governments in the aggregate; or to the private sector, of $100 million or more. Under Section 205, EPA must select the most cost effective and least burdensome alternative that achieves the objectives of the rule and is consistent with statutory requirements. Section 203 requires EPA to establish a plan for informing and advising any small governments that may be significantly or uniquely impacted by the rule.

EPA has determined that this rule does not include a Federal mandate that may result in estimated costs of $100 million or more to either State, local, or tribal governments in the aggregate, or to the private sector.

**List of Subjects**

*40 CFR Part 85*

Environmental protection, Administrative practice and procedure, Air pollution control, Federal preemption, Motor vehicle pollution, Nonroad engine and vehicle pollution,

[8] Section 209(e)(2)(A) states "(I)n the case of any nonroad vehicles or engines other than those referred to in subparagraph (A) or (B) of paragraph (1), * * *"

[9] *EMA* v. *EPA*, 88 F.3d at 1094.

[10] EPA has also amended the text of the implementing regulations in appropriate places by changing "states" to "states and any political subdivision thereof" to make this language fully consistent with the applicable language of section 209(e) of the Act. Additionally, EPA has revised the Title of Part 85 to reflect that this Part contains regulations covering both onroad vehicles and engines and nonroad vehicles and engines. These amendments were not directed by the Court, but are being done as part of today's direct final rule for editorial efficiency.

Reporting and recordkeeping requirements, State controls.

*40 CFR Part 89*

Environmental protection, Administrative practice and procedure, Air pollution control, Confidential business information, Imports, Incorporation by reference, Labeling, Nonroad source pollution, Reporting and recordkeeping requirements.

Dated: December 17, 1997.

**Carol M. Browner,**

*Administrator.*

For the reasons set forth in the preamble, parts 85 and 89 of title 40 of the Code of Federal Regulations are amended as follows:

## PART 85—CONTROL OF AIR POLLUTION FROM MOBILE SOURCES

1. The heading for part 85 is revised to read as set forth above.

### Subpart Q—Preemption of State Standards and Waiver Procedures for Nonroad Engines and Nonroad Vehicles

2. The authority citation for part 85 is revised to read as follows:

**Authority:** 42 U.S.C. 7521, 7522, 7524, 7525, 7541, 7542, 7543, 7547, and 7601(a).

3. Section 85.1603 is amended by revising paragraphs (b), (c) and (d) to read as follows:

**§ 85.1603 Application of definitions; scope of preemption.**

* * * * *

(b) States and any political subdivisions thereof are preempted from adopting or enforcing standards or other requirements from new engines smaller than 175 horsepower, that are primarily used in farm or construction equipment or vehicles, as defined in this subpart.

(c) States and any political subdivisions thereof are preempted from adopting or enforcing standards or other requirements relating to the control of emissions from new locomotives or new engines used in locomotives.

(d) No state or any political subdivisions thereof shall enforce any standards or other requirements relating to the control of emissions from nonroad engines or vehicles except as provided for in this subpart.

4. Section 85.1604 is amended by revising paragraph (a) to read as follows:

**§ 85.1604 Procedures for California nonroad authorization requests.**

(a) California shall request authorization to enforce its adopted standards and other requirements relating to the control of emissions from nonroad vehicles or engines that are otherwise not preempted by § 85.1603(b) or § 85.1603(c) from the Administrator of EPA and provide the record on which the state rulemaking was based.

* * * * *

5. Section 85.1606 is amended by revising the introductory text to read as follows:

**§ 85.1606 Adoption of California standards by other states.**

Any state other than California which has plan provisions approved under Part D of Title I of the Clean Air Act may adopt and enforce emission standards for any period, for nonroad vehicles and engines subject to the following requirements:

* * * * *

## PART 89—CONTROL OF EMISSIONS FROM NEW AND IN-USE NONROAD ENGINES

1. The authority citation for part 89 continues to read as follows:

**Authority:** Sections 202, 203, 204, 205, 206, 207, 208, 209, 213, 215, 216, and 301(a) of the Clean Air Act, as amended (42 U.S.C. 7521, 7522, 7523, 7524, 7525, 7541, 7542, 7543, 7547, 7549, 7550, and 7601(a)).

2. Appendix A to Subpart A is revised including the appendix heading to read as follows:

### Appendix A to Subpart A—State Regulation of Nonroad Internal Combustion Engines

This appendix sets forth the Environmental Protection Agency's (EPA's) interpretation of the Clean Air Act regarding the authority of states to regulate the use and operation of nonroad engines.

EPA believes that states are not precluded under section 209 from regulating the use and operation of nonroad engines, such as regulations on hours of usage, daily mass emission limits, or sulfur limits on fuel; nor are permits regulating such operations precluded, once the engine is no longer new. EPA believes that states are precluded from requiring retrofitting of used nonroad engines except that states are permitted to adopt and enforce any such retrofitting requirements identical to California requirements which have been authorized by EPA under section 209 of the Clean Air Act.

[FR Doc. 97–33769 Filed 12–29–97; 8:45 am]

BILLING CODE 6560–50–P

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 260

**[FRL 5942–5]**

### Withdrawal of Direct Final Rule for Project XL Site-Specific Rulemaking for Molex, Inc., 700 Kingbird Road Facility, Lincoln, NE

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Withdrawal of direct final rule.

**SUMMARY:** Due to adverse comment, EPA is withdrawing the direct final rule for the Project XL Site-Specific Rulemaking for Molex, Inc., 700 Kingbird Road Facility, Lincoln, NE. EPA published the direct final rule on November 3, 1997 at 62 FR 59287–59290. As stated in the **Federal Register** document, if adverse or critical comments were received by December 3, 1997 the effective date would be delayed and notice would be published in the **Federal Register**. EPA subsequently received adverse comments on that direct final rule.

EPA will address the comments received in the companion proposal which was published in the November 3, 1997 **Federal Register** at 62 FR 59332–59334. EPA will not institute a second comment period.

**DATES:** The direct final rule published at 62 FR 59287–59290 is withdrawn as of December 30, 1997.

**FOR FURTHER INFORMATION CONTACT:** Mr. David Doyle, U.S. Environmental Protection Agency, Region VII, Air, RCRA & Toxics Division, 726 Minnesota Avenue, Kansas City, KS 66101, (913) 551–7667.

### List of Subjects in 40 CFR Part 260

Environmental protection, Hazardous waste, Treatment storage and disposal facility, Waste determination.

Dated: December 19, 1997.

**Carol M. Browner,**

*Administrator.*

[FR Doc. 97–33967 Filed 12–29–97; 8:45 am]

BILLING CODE 6560–50–M

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 300

**[FRL–5941–3]**

### National Oil and Hazardous Substances Pollution Contingency Plan; National Priorities List Update

**AGENCY:** Environmental Protection Agency.

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



determine progress each NEP is making in implementing its CCMP and achieving environmental results. In addition to evaluating progress, the results are used to identify areas of weakness each NEP should address for long-term success in protecting and restoring their estuaries. EPA will also compile successful tools and approaches as well as lessons learned from all implementation reviews to transfer to the NEPs and other watershed programs. For this ICR cycle, implementation reviews will be required for seven programs in FY2006, 12 programs in FY2007, and nine programs in 2008.

*Government Performance Results Act*

EPA requests that each of the 28 NEPs receiving section 320 funds report information that can be used in the GPRA reporting process. This reporting is done on an annual basis and is used to show environmental results that are being achieved within the overall NEP Program. This information is ultimately submitted to Congress along with GPRA information from other EPA programs.

*Burden Statement:* The annual public reporting and recordkeeping burden for this collection of information is estimated to average 218 hours per response. Burden means the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or provide information to or for a Federal agency. This includes the time needed to review instructions; develop, acquire, install, and utilize technology and systems for the purposes of collecting, validating, and verifying information, processing and maintaining information, and disclosing and providing information; adjust the existing ways to comply with any previously applicable instructions and requirements which have subsequently changed; train personnel to be able to respond to a collection of information; search data sources; complete and review the collection of information; and transmit or otherwise disclose the information.

The ICR provides a detailed explanation of the Agency's estimate, which is only briefly summarized here:

*Estimated total number of potential respondents:* 28.

*Frequency of response:* Annual.

*Estimated total average number of responses for each respondent:* 2.

*Estimated total annual burden hours:* 6,113.

*Estimated total annual costs:* $409,349.

**Are There Changes in the Estimates From the Last Approval?**

There are no changes in burden from the last approval.

**What is the Next Step in the Process for This ICR?**

EPA will consider the comments received and amend the ICR as appropriate. The final ICR package will then be submitted to OMB for review and approval pursuant to 5 CFR 1320.12. At that time, EPA will issue another **Federal Register** Notice pursuant to 5 CFR 1320.5(a)(1)(iv) to announce the submission of the ICR to OMB and the opportunity to submit additional comments to OMB. If you have any questions about this ICR or the approval process, please contact the technical person listed under **FOR FURTHER INFORMATION CONTACT**.

Dated: May 17, 2006.

**Diane C. Regas,**

*Director, Office of Wetlands, Oceans and Watersheds.*

[FR Doc. E6–7829 Filed 5–22–06; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[AMS–FRL–8173–3]**

## California State Nonroad Engine and Vehicle Pollution Control Standards; Authorization of Large Off-Road Spark-Ignition Engine Standards, Notice of Decision

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of decision for authorization of Large Off-Road Spark-Ignition Engine Standards.

**SUMMARY:** EPA today, pursuant to section 209(e) of the Clean Air Act (Act), 42 U.S.C. 7543(b), is authorizing California to enforce its regulations setting emission standards and other requirements for large off-road spark-ignition engines.

**ADDRESSES:** The Agency's Decision Document, containing an explanation of the Assistant Administrator's decision, as well as all documents relied upon in making that decision, including those submitted to EPA by CARB, are available for public inspection in EPA Air Docket OATR–2004–0404 at the following address: EPA Docket Center (EPA/DC), Public Reading Room, Room B102, EPA West Building, 1301 Constitution Avenue NW., Washington, DC. The EPA Docket Center Public Reading Room is open from 8:30 a.m. to 4:30 p.m. Monday through Friday, except on government holidays. The Air Docket telephone number is (202) 566–1744, and the facsimile number is (202) 566–1741. You may be charged a reasonable fee for photocopying docket materials, as provided in 40 CFR part 2.

**FOR FURTHER INFORMATION CONTACT:** Robert M. Doyle, Attorney-Advisor, Office of Transportation and Air Quality, (6403J), U.S. Environmental Protection Agency, 1200 Pennsylvania Avenue, NW., Washington, D.C. 20460 (U.S. mail), 501 3rd Street NW., Washington, DC 20005 (courier mail). Telephone: (202) 343–9258, Fax: (202) 343–2804, E-Mail: *doyle.robert@epe.gov*.

**SUPPLEMENTARY INFORMATION:**

### I. Obtaining Electronic Copies of Documents

EPA makes available an electronic copy of this Notice on the Office of Transportation and Air Quality (OTAQ) homepage (*http://www.epa.gov/OTAQ*). Users can find this document by accessing the OTAQ homepage and looking at the path entitled "Federal Register Notices." (This service is free of charge, except any cost you already incur for Internet connectivity. Users can also get the official **Federal Register** version of the Notice on the day of publication on the primary Web site: (*http://www.epa.gov/docs/fedrgstr/EPA-AIR/*) Please note that due to differences between the software used to develop the documents and the software into which the documents may be downloaded, changes in format, page length, etc., may occur.

Additionally, an electronic version of the public docket is available through the Federal government's electronic public docket and comment system. You may access EPA dockets at *http://www.regulations.gov*. After opening the *http://www.regulations.gov* Web site, select "Environmental Protection Agency" from the pull-down Agency list, then scroll to Docket ID EPA–HQ–OAR–2004–0404 to view documents in the record of the large offroad spark ignition engine authorization request. Although a part of the official docket, the public docket does not include Confidential Business Information (CBI) or other information whose disclosure is restricted by statute.

### II. Background

*(A) Nonroad Authorizations*

Section 209(e)(1) of the Act addresses the permanent preemption of any State, or political subdivision thereof, from adopting or attempting to enforce any standard or other requirement relating to the control of emissions for certain

new nonroad engines or vehicles.[1] Section 209(e)(2) of the Act allows the Administrator to grant California authorization to enforce state standards for new nonroad engines or vehicles which are not listed under section 209(e)(1), subject to certain restrictions. On July 20, 1994, EPA promulgated a regulation that sets forth, among other things, the criteria, as found in section 209(e)(2), by which EPA must consider any California authorization requests for new nonroad engines or vehicle emission standards (section 209(e) rules).[2]

Section 209(e)(2) requires the Administrator, after notice and opportunity for public hearing, to authorize California to enforce standards and other requirements relating to emissions control of new engines not listed under section 209(e)(1).[3] The section 209(e) rule and its codified regulations[4] formally set forth the criteria, located in section 209(e)(2) of the Act, by which EPA must grant California authorization to enforce its new nonroad emission standards:

40 CFR part 85, subpart Q, § 85.1605 provides:

(a) The Administrator shall grant the authorization if California determines that its standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards.

(b) The authorization shall not be granted if the Administrator finds that:

(1) The determination of California is arbitrary and capricious;

(2) California does not need such California standards to meet compelling and extraordinary conditions; or

(3) California standards and accompanying enforcement procedures are not consistent with section 209.

As stated in the preamble to the section 209(e) rule, EPA has interpreted the requirement that EPA cannot find ''California standards and accompanying enforcement procedures are not consistent with section 209'' to mean that California standards and accompanying enforcement procedures must be consistent with section 209(a), section 209(e)(1), and section 209(b)(1)(C), as EPA has interpreted that subsection in the context of motor vehicle waivers.[5] In order to be consistent with section 209(a), California's nonroad standards and enforcement procedures must not apply to new motor vehicles or new motor vehicle engines. Secondly, California's nonroad standards and enforcement procedures must be consistent with section 209(e)(1), which identifies the categories permanently preempted from state regulation.[6] California's nonroad standards and enforcement procedures would be considered inconsistent with section 209 if they applied to the categories of engines or vehicles identified and preempted from State regulation in section 209(e)(1).

Finally, because California's nonroad standards and enforcement procedures must be consistent with section 209(b)(1)(C), EPA will review nonroad authorization requests under the same ''consistency'' criteria that are applied to motor vehicle waiver requests. Under section 209(b)(1)(C), the Administrator shall not grant California a motor vehicle waiver if she finds that California ''standards and accompanying enforcement procedures are not consistent with section 202(a)'' of the Act. Previous decisions granting waivers of Federal preemption for motor vehicles have stated that State standards are inconsistent with section 202(a) if there is inadequate lead time to permit the development of the necessary technology giving appropriate consideration to the cost of compliance within that time period or if the Federal and State test procedures impose inconsistent certification requirements.[7]

With regard to enforcement procedures accompanying standards, EPA must grant the requested authorization unless it finds that these procedures may cause the California standards, in the aggregate, to be less protective of public health and welfare than the applicable Federal standards promulgated pursuant to section 213(a), or unless the Federal and California certification test procedures are inconsistent.[8]

Once California has received an authorization for its standards and enforcement procedures for a certain group or class of nonroad equipment engines or vehicles, it may adopt other conditions precedent to the initial retail sale, titling or registration of these engines or vehicles without the necessity of receiving an additional authorization.[9]

If California acts to amend a previously authorized standard or accompanying enforcement procedure, the amendment may be considered within the scope of a previously granted authorization provided that it does not undermine California's determination that its standards in the aggregate are as protective of public health and welfare as applicable Federal standards, does not affect the consistency with section 209 of the Act, and raises no new issues affecting EPA's previous authorization determination.[10]

*(B) The Off-Road Large Spark Ignition Engines Regulations Request*

By letter dated February 15, 2000, CARB requested EPA authorization to enforce California's Off-Road Large Spark Ignition Engine (LSI)

[1] Section 209(e)(1) of the Act provides:

No State or any political subdivision thereof shall adopt or attempt to enforce any standard or other requirement relating to the control of emissions from either of the following new nonroad engines or nonroad vehicles subject to regulation under this Act—

(A) New engines which are used in construction equipment or vehicles or used in farm equipment or vehicles and which are smaller than 175 horsepower.

(B) New locomotives or new engines used in locomotives. Subsection (b) shall not apply for purposes of this paragraph.

[2] *See* 59 FR 36969 (July 20, 1994), and regulations set forth therein, 40 CFR part 85, subpart Q, §§ 85.1601–85.1606.

[3] As discussed above, states are permanently preempted from adopting or enforcing standards relating to the control of emissions from new engines listed in section 209(e)(1).

[4] *See* 40 CFR part 85, subpart Q, § 85.1605.

[5] *See* 59 FR 36969, 36983 (July 20, 1994).

[6] Section 209(e)(1) of the Act has been implemented, *See* 40 CFR part 85, subpart Q, §§ 85.1602, 85.1603.

§ 85.1603 provides in applicable part:

(a) For equipment that is used in applications in addition to farming or construction activities, if the equipment is primarily used as farm and/or construction equipment or vehicles, as defined in this subpart, it is considered farm or construction equipment or vehicles. (b) States are preempted from adopting or enforcing standards or other requirements relating to the control of emissions from new engines smaller than 175 horsepower, that are primarily used in farm or construction equipment or vehicles, as defined in this subpart.

§ 85.1602 provides definitions of terms used in § 85.1603 and states in applicable part:

*Construction equipment or vehicle* means any internal combustion engine-powered machine primarily used in construction and located on commercial construction sites.

*Farm Equipment or Vehicle* means any internal combustion engine-powered machine primarily used in the commercial production and/or commercial harvesting of food, fiber, wood, or commercial organic products or for the processing of such products for further use on the farm *primarily used* means used 51 percent or more.

[7] To be consistent, the California certification procedures need not be identical to the Federal certification procedures. California procedures would be inconsistent, however, if manufacturers would be unable to meet both the state and the Federal requirement with the same test vehicle in the course of the same test. *See, e.g.*, 43 FR 32182 (July 25, 1978).

[8] *See, e.g., Motor and Equipment Manufacturers Association, Inc.* v. *EPA*, 627 F.2d 1095, 1111–14 (DC Cir. 1979), *cert. denied*, 446 U.S. 952 (1980) (*MEMA I*); 43 FR 25729 (June 14, 1978).

While inconsistency with section 202(a) includes technological feasibility, lead time, and cost, these aspects are typically relevant only with regard to standards. The aspect of consistency with 202(a) which is of primary applicability to enforcement procedures (especially test procedures) is test procedure consistency.

[9] *See* 43 FR 36679, 36680 (August 18, 1978).

[10] Decision Document for California Nonroad Engine Regulations Amendments, Dockets A–2000–05 to 08, entry V–B, p. 28.

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 9, 60, 80, 85, 86, 89, 90, 91, 92, 94, 1027, 1033, 1039, 1042, 1045, 1048, 1051, 1054, 1060, 1065, 1068, and 1074**

**[EPA–HQ–OAR–2004–0008; FRL–8712–8]**

**RIN 2060–AM34**

# Control of Emissions From Nonroad Spark-Ignition Engines and Equipment

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** We are setting emission standards for new nonroad spark-ignition engines that will substantially reduce emissions from these engines. The exhaust emission standards apply starting in 2010 for new marine spark-ignition engines, including first-time EPA standards for sterndrive and inboard engines. The exhaust emission standards apply starting in 2011 and 2012 for different sizes of new land-based, spark-ignition engines at or below 19 kilowatts (kW). These small engines are used primarily in lawn and garden applications. We are also adopting evaporative emission standards for vessels and equipment using any of these engines. In addition, we are making other minor amendments to our regulations.

We estimate that by 2030, this rule will result in significantly reduced pollutant emissions from regulated engine and equipment sources, including estimated annual nationwide reductions of 604,000 tons of volatile organic hydrocarbon emissions, 132,200 tons of $NO_X$ emissions, and 5,500 tons of directly-emitted particulate matter ($PM_{2.5}$) emissions. These reductions correspond to significant reductions in the formation of ground-level ozone. We also expect to see annual reductions of 1,461,000 tons of carbon monoxide emissions, with the greatest reductions in areas where there have been problems with individual exposures. The requirements in this rule will substantially benefit public health and welfare and the environment. We estimate that by 2030, on an annual basis, these emission reductions will prevent 230 PM-related premature deaths, between 77 and 350 ozone-related premature deaths, approximately 1,700 hospitalizations and emergency room visits, 23,000 work days lost, 180,000 lost school days, 590,000 acute respiratory symptoms, and other quantifiable benefits every year. The total annual benefits of this rule in 2030 are estimated to be between $1.8 billion and $4.4 billion, assuming a 3% discount rate. The total annual benefits of this rule in 2030 are estimated to be between $1.6 billion and $4.3 billion, assuming a 7% discount rate. Estimated costs in 2030 are many times less at approximately $190 million.

**DATES:** This rule is effective on December 8, 2008. The incorporation by reference of certain publications listed in this regulation is approved by the Director of the Federal Register as of December 8, 2008.

**ADDRESSES:**

*Docket:* All documents in the docket are listed in the *www.regulations.gov* index. Although listed in the index, some information is not publicly available, such as CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically in *www.regulations.gov* or in hard copy at the ''Control of Emissions from Nonroad Spark-Ignition Engines, Vessels and Equipment'' Docket. The docket is located in the EPA Headquarters Library, Room Number 3334 in the EPA West Building, located at 1301 Constitution Ave., NW., Washington, DC. The EPA/DC Public Reading Room hours of operation will be 8:30 a.m. to 4:30 p.m. Eastern Standard Time (EST), Monday through Friday, excluding holidays. The telephone number for the Public Reading Room is (202) 566–1744 and the telephone number for the Docket is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** Carol Connell, Environmental Protection Agency, Office of Transportation and Air Quality, Assessment and Standards Division, 2000 Traverwood Drive, Ann Arbor, Michigan 48105; telephone number: 734–214–4349; fax number: 734–214–4050; e-mail address: *connell.carol@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

## Does This Action Apply to Me?

This action will affect you if you produce or import new spark-ignition engines intended for use in marine vessels or in new vessels using such engines. This action will also affect you if you produce or import new spark-ignition engines below 19 kilowatts used in nonroad equipment, including agricultural and construction equipment, or produce or import such nonroad vehicles.

The following table gives some examples of entities that may have to follow the regulations; however, since these are only examples, you should carefully examine the regulations. Note that we are adopting minor changes in the regulations that apply to a wide range of products that may not be reflected in the following table (see Section VIII). If you have questions, call the person listed in the **FOR FURTHER INFORMATION CONTACT** section above:

| Category | NAICS codes [a] | SIC codes [b] | Examples of potentially regulated entities |
|---|---|---|---|
| Industry | 333618 | 3519 | Manufacturers of new engines. |
| Industry | 333111 | 3523 | Manufacturers of farm machinery and equipment. |
| Industry | 333112 | 3524 | Manufacturers of lawn and garden tractors (home). |
| Industry | 336612 | 3731<br>3732 | Manufacturers of marine vessels. |
| Industry | 811112<br>811198 | 7533<br>7549 | Commercial importers of vehicles and vehicle components. |

[a] North American Industry Classification System (NAICS).
[b] Standard Industrial Classification (SIC) system code.

**Table of Contents**

I. Introduction
A. Overview
B. Why Is EPA Taking This Action?
C. What Regulations Currently Apply to Nonroad Engines or Vehicles?
D. Putting This Rule into Perspective
E. What Requirements Are We Adopting?
F. How Is This Document Organized?
G. Judicial Review
II. Public Health and Welfare Effects
A. Public Health Impacts
B. Air Toxics
C. Carbon Monoxide

III. Sterndrive and Inboard Marine Engines
A. Overview
B. Engines Covered by This Rule
C. Exhaust Emission Standards
D. Test Procedures for Certification
E. Additional Certification and Compliance Provisions
F. Small-Business Provisions
G. Technological Feasibility
IV. Outboard and Personal Watercraft Engines
A. Overview
B. Engines Covered by This Rule
C. Final Exhaust Emission Standards
D. Changes to OB/PWC Test Procedures
E. Additional Certification and Compliance Provisions
F. Other Adjustments to Regulatory Provisions
G. Small-Business Provisions
H. Technological Feasibility
V. Small SI Engines
A. Overview
B. Engines Covered by This Rule
C. Final Requirements
D. Testing Provisions
E. Certification and Compliance Provisions for Small SI Engines and Equipment
F. Small-Business Provisions
G. Technological Feasibility
VI. Evaporative Emissions
A. Overview
B. Fuel Systems Covered by This Rule
C. Final Evaporative Emission Standards
D. Emission Credit Programs
E. Testing Requirements
F. Certification and Compliance Provisions
G. Small-Business Provisions
H. Technological Feasibility
VII. Energy, Noise, and Safety
A. Safety
B. Noise
C. Energy
VIII. Requirements Affecting Other Engine and Vehicle Categories
A. State Preemption
B. Certification Fees
C. Amendments to General Compliance Provisions in 40 CFR Part 1068
D. Amendments Related to Large SI Engines (40 CFR Part 1048)
E. Amendments Related to Recreational Vehicles (40 CFR Part 1051)
F. Amendments Related to Heavy-Duty Highway Engines (40 CFR Part 85)
G. Amendments Related to Stationary Spark-Ignition Engines (40 CFR Part 60)
H. Amendments Related to Locomotive, Marine, and Other Nonroad Compression-Ignition Engines (40 CFR Parts 89, 92, 94, 1033, 1039, and 1042)
IX. Projected Impacts
A. Emissions from Small Nonroad and Marine Spark-Ignition Engines
B. Estimated Costs
C. Cost per Ton
D. Air Quality Impact
E. Benefits
F. Economic Impact Analysis
X. Public Participation
XI. Statutory and Executive Order Reviews
A. Executive Order 12866: Regulatory Planning and Review
B. Paperwork Reduction Act
C. Regulatory Flexibility Act
D. Unfunded Mandates Reform Act
E. Executive Order 13132: Federalism
F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
G. Executive Order 13045: Protection of Children from Environmental Health and Safety Risks
H. Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations.
I. Executive Order 13211: Actions that Significantly Affect Energy Supply, Distribution, or Use
J. National Technology Transfer Advancement Act
K. Congressional Review Act

## I. Introduction

*A. Overview*

This rule will reduce the mobile-source contribution to air pollution in the United States. In particular, we are adopting standards that will require manufacturers to substantially reduce emissions from marine spark-ignition engines and from nonroad spark-ignition engines below 19 kW that are generally used in lawn and garden applications.[1] We refer to these as Marine SI engines and Small SI engines, respectively. The new emission standards are a continuation of the process of establishing standards for nonroad engines and vehicles as required by Clean Air Act section 213. All the nonroad engines subject to this rule are already regulated under existing emission standards, except sterndrive and inboard marine engines, which are subject to EPA emission standards for the first time.

Nationwide, emissions from Marine SI engines and Small SI engines contribute significantly to mobile source air pollution. By 2030 without this final rule these engines would account for about 33 percent (1,287,000 tons) of mobile source volatile organic hydrocarbon compounds (VOC) emissions, 31 percent (15,605,000 tons) of mobile source carbon monoxide (CO) emissions, 6 percent (311,300 tons) of mobile source oxides of nitrogen ($NO_X$) emissions, and 12 percent (44,000 tons) of mobile source particulate matter ($PM_{2.5}$) emissions. The new standards will reduce exposure to these emissions and help avoid a range of adverse health effects associated with ambient ozone, CO, and PM levels. In addition, the new standards will help reduce acute exposure to CO, air toxics, and PM for persons who operate or who work with or are otherwise active in close proximity to these engines. They will also help address environmental problems associated with Marine SI engines and Small SI engines, such as injury to vegetation and ecosystems and visibility impairment. These effects are described in more detail later in this document.

*B. Why Is EPA Taking This Action?*

Clean Air Act section 213(a)(1) directs us to study emissions from nonroad engines and vehicles to determine, among other things, whether these emissions ''cause, or significantly contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.'' Section 213(a)(2) further requires us to determine whether emissions of CO, VOC, and $NO_X$ from all nonroad engines significantly contribute to ozone or CO concentrations in more than one nonattainment area. If we determine that emissions from all nonroad engines do contribute significantly to these nonattainment areas, section 213(a)(3) then requires us to establish emission standards for classes or categories of new nonroad engines and vehicles that cause or contribute to such pollution. We may also set emission standards under section 213(a)(4) regulating any other emissions from nonroad engines that we find contribute significantly to air pollution which may reasonably be anticipated to endanger public health or welfare.

Specific statutory direction to set standards for nonroad spark-ignition engines comes from section 428(b) of the 2004 Consolidated Appropriations Act, which requires EPA to adopt regulations under the Clean Air Act ''that shall contain standards to reduce emissions from new nonroad spark-ignition engines smaller than 50 horsepower.'' [2] As highlighted above and more fully described in Section II, these engines emit pollutants that contribute to ground-level ozone and ambient CO levels. Human exposure to ozone and CO can cause serious respiratory and cardiovascular problems. Additionally, these emissions contribute to other serious environmental degradation. This rule implements Congress' mandate by adopting new requirements for particular nonroad engines and equipment that are regulated as part of

[1] Otto-cycle engines (referred to here as spark-ignition or SI engines) typically operate on gasoline, liquefied petroleum gas, or natural gas. Diesel-cycle engines, referred to simply as ''diesel engines'' in this document, may also be referred to as compression-ignition or CI engines. These engines typically operate on diesel fuel, but other fuels may also be used.

[2] Public Law 108–199, Div G, Title IV, § 428(b), 118 Stat. 418 (January 23, 2004).

EPA's overall nonroad emission control program.

We are adopting this rule under the procedural authority of section 307(d) of the Clean Air Act.

*C. What Regulations Currently Apply to Nonroad Engines or Vehicles?*

EPA has been setting emission standards for nonroad engines and/or vehicles since Congress amended the Clean Air Act in 1990 and included section 213. These amendments have led to a series of rulemakings to reduce the air pollution from this widely varying set of products. In these rulemakings, we divided the broad group of nonroad engines and vehicles into several different categories for setting application-specific requirements. Each category involves many unique characteristics related to the participating manufacturers, technology, operating characteristics, sales volumes, and market dynamics. Requirements for each category therefore take on many unique features regarding the stringency of standards, the underlying expectations regarding emission control technologies, the nature and extent of testing, and the myriad details that comprise the implementation of a compliance program.

At the same time, the requirements and other regulatory provisions for each engine category share many characteristics. Each rulemaking under section 213 sets technology-based standards consistent with the Clean Air Act and requires annual certification based on measured emission levels from test engines or vehicles. As a result, the broader context of EPA's nonroad emission control programs demonstrates both strong similarities between this rulemaking and the requirements adopted for other types of engines or vehicles and distinct differences as we take into account the unique nature of these engines and the companies that produce them.

We completed the *Nonroad Engine and Vehicle Emission Study* to satisfy Clean Air Act section 213(a)(1) in November 1991.[3] On June 17, 1994, we made an affirmative determination under section 213(a)(2) that nonroad emissions are significant contributors to ozone or CO in more than one nonattainment area (56 FR 31306). Since then we have undertaken several rulemakings to set emission standards for the various categories of nonroad engines. Table I–1 highlights the different engine or vehicle categories we have established and the corresponding cites for emission standards and other regulatory requirements. Table I–2 summarizes the series of EPA rulemakings that have set new or revised emission standards for any of these nonroad engines or vehicles. These actions are described in the following sections, with additional discussion to explain why we are not adopting more stringent standards for certain types of nonroad spark-ignition engines below 50 horsepower.

TABLE I–1: NONROAD ENGINE CATEGORIES FOR EPA EMISSION STANDARDS

| Engine categories | CFR Cite for regulations establishing emission standards | Cross reference to table I–2 |
|---|---|---|
| 1. Locomotives engines | 40 CFR Part 92 and 1033 | d, l. |
| 2. Marine diesel engines | 40 CFR Part 94 and 1042 | g, i, j, l. |
| 3. Other nonroad diesel engines | 40 CFR Parts 89 and 1039 | a, e, k. |
| 4. Marine SI engines [a] | 40 CFR Part 91 | c. |
| 5. Recreational vehicles | 40 CFR Part 1051 | i. |
| 6. Small SI engines [b] | 40 CFR Part 90 | b, f, h. |
| 7. Large SI engines [b] | 40 CFR Part 1048 | i. |

[a] The term "Marine SI," used throughout this document, refers to all spark-ignition engines used to propel marine vessels. This includes outboard engines, personal watercraft engines, and sterndrive/inboard engines. See Section III for additional information.

[b] The terms "Small SI" and "Large SI" are used throughout this document. All nonroad spark-ignition engines not covered by our programs for Marine SI engines or recreational vehicles are either Small SI engines or Large SI engines. Small SI engines include those engines with maximum power at or below 19 kW, and Large SI engines include engines with maximum power above 19 kW.

TABLE I–2: EPA'S RULEMAKINGS FOR NONROAD ENGINES

| Nonroad engines (categories and sub-categories) | Final rulemaking | Date |
|---|---|---|
| a. Land-based diesel engines ≥ 37 kW—Tier 1 | 56 FR 31306 | June 17, 1994. |
| b. Small SI engines—Phase 1 | 60 FR 34581 | July 3, 1995. |
| c. Marine SI engines—outboard and personal watercraft | 61 FR 52088 | October 4, 1996. |
| d. Locomotives | 63 FR 18978 | April 16, 1998. |
| e. Land-based diesel engines—Tier 1 and Tier 2 for engines < 37 kW—Tier 2 and Tier 3 for engines ≥ 37 kW. | 63 FR 56968 | October 23, 1998. |
| f. Small SI engines (Nonhandheld)—Phase 2 | 64 FR 15208 | March 30, 1999. |
| g. Commercial marine diesel < 30 liters per cylinder | 64 FR 73300 | December 29, 1999. |
| h. Small SI engines (Handheld)—Phase 2 | 65 FR 24268 | April 25, 2000. |
| i. Recreational vehicles, Industrial spark-ignition engines > 19 kW, and Recreational marine diesel. | 67 FR 68242 | November 8, 2002. |
| j. Marine diesel engines ≥ 2.5 liters/cylinder | 68 FR 9746 | February 28, 2003. |
| k. Land-based diesel engines—Tier 4 | 69 FR 38958 | June 29, 2004. |
| l. Locomotives and commercial marine diesel < 30 liters per cylinder | 73 FR 37096 | June 30, 2008. |

[3] This study is available on EPA's Web site at *http://www.epa.gov/otaq/equip-ld*.

Small SI Engines

We have previously adopted emission standards for nonroad spark-ignition engines at or below 19 kW in two phases. The first phase of these standards introduced certification and an initial level of emission standards for both handheld and nonhandheld engines. On March 30, 1999 we adopted a second phase of standards for nonhandheld engines, including both Class I and Class II engines (64 FR 15208).[4] The Phase 2 regulations included a phase-in period that has recently been completed. These standards involved emission reductions based on improving engine calibrations to reduce exhaust emissions and added a requirement that emission standards must be met over the engines' entire useful life as defined in the regulations. We believe catalyst technology has now developed to the point that it can be applied to all nonhandheld Small SI engines to reduce exhaust emissions. Various emission control technologies are similarly available to address the different types of fuel evaporative emissions we have identified.

For handheld engines, we adopted Phase 2 exhaust emission standards in April 25, 2000 (65 FR 24268). These standards were based on the application of catalyst technology, with the expectation that manufacturers would have to make considerable investments to modify their engine designs and production processes. A technology review we completed in 2003 indicated that manufacturers were making progress toward compliance, but that additional implementation flexibility was needed if manufacturers were to fully comply with the regulations by 2010. This finding and a change in the rule were published in the **Federal Register** on January 12, 2004 (69 FR 1824). At this point, we have no information to suggest that manufacturers can uniformly apply new technology or make design improvements to reduce exhaust emissions below the Phase 2 levels. We therefore believe the Phase 2 standards continue to represent the greatest degree of emission reduction achievable for these engines.[5] However, we believe it is appropriate to apply evaporative emission standards to handheld engines similar to the standards we are adopting for the nonhandheld engines. Manufacturers can control evaporative emissions from handheld engines in a way that has little or no impact on exhaust emissions.

Marine SI Engines

On October 4, 1996 we adopted emission standards for spark-ignition outboard and personal watercraft engines that have recently been fully phased in (61 FR 52088). We decided not to finalize emission standards for sterndrive or inboard marine engines at that time. Uncontrolled emission levels from sterndrive and inboard marine engines were already significantly lower than the outboard and personal watercraft engines. We did, however, leave open the possibility of revisiting the need for emission standards for sterndrive and inboard engines in the future. See Section III for further discussion of the scope and background of past and current rulemakings for these engines.

We believe existing technology can be applied to all Marine SI engines to reduce emissions of harmful pollutants, including both exhaust and evaporative emissions. Manufacturers of outboard and personal watercraft engines can continue the trend of producing four-stroke engines and advanced-technology two-stroke engines to further reduce emissions. For sterndrive/inboard engines, manufacturers can add technologies, such as fuel injection and aftertreatment, that can safely and substantially improve the engines' emission control capabilities.

Large SI Engines

We adopted emission standards for Large SI engines on November 8, 2002 (67 FR 68242). This includes Tier 1 standards for 2004 through 2006 model years and Tier 2 standards starting with 2007 model year engines. Manufacturers are today facing a considerable challenge to comply with the Tier 2 standards, which are already substantially more stringent than any of the standards for the other engine categories subject to this final rule. The Tier 2 standards also include evaporative emission standards, new transient test procedures, additional exhaust emission standards to address off-cycle emissions, and diagnostic requirements. Stringent standards for this category of engines, and in particular engines between 25 and 50 horsepower (19 to 37 kW), have been completed in the recent past, and are currently being implemented. We do not have information at this time on possible advances in technology beyond Tier 2. We therefore believe the evidence provided in the recently promulgated rulemaking continues to represent the best available information regarding the appropriate level of standards for these engines under section 213 at this time. The California Air Resources Board has adopted an additional level of emission control for Large SI engines starting with the 2010 model year. However, as described in Section I.D.1, their new standards do not increase overall stringency beyond that reflected in the federal standards. As a result, we believe it is inappropriate to adopt more stringent emission standards for these engines in this rulemaking.

Note that the Large SI standards apply to nonroad spark-ignition engines above 19 kW. However, we adopted a special provision for engine families where production engines have total displacement at or below 1000 cc and maximum power at or below 30 kW, allowing these engine families to instead certify to the applicable standards for Small SI engines. This rule preserves this approach.

Recreational Vehicles

We adopted exhaust and evaporative emission standards for recreational vehicles in our November 8, 2002 final rule (67 FR 68242). These standards apply to all-terrain vehicles, off-highway motorcycles, and snowmobiles.[6] These exhaust emission standards were fully phased in starting with the 2007 model year. The evaporative emission standards apply starting with the 2008 model year.

Recreational vehicles will soon be subject to permeation requirements that are very similar to the requirements included in this rulemaking. We have also learned more about controlling running losses and diffusion emissions that may eventually lead us to propose comparable standards for recreational vehicles. Considering these new requirements for recreational vehicles in a later rulemaking would give us additional time to collect information to better understand the feasibility, costs, and benefits of applying these requirements to recreational vehicles.

The following sections describe the state of technology and regulatory requirements for the different types of recreational vehicles.

[4] Handheld engines generally include those engines for which the operator holds or supports the equipment during operation; nonhandheld engines are Small SI engines that are not handheld engines (see § 1054.801). Class I refers to nonhandheld engines with displacement below 225 cc; Class II refers to larger nonhandheld engines.

[5] Note that we refer to the handheld exhaust emission standards in 40 CFR part 1054 as Phase 3 standards. This is intended to maintain consistent terminology with the comparable standards in California rather than indicating an increase in stringency.

[6] Note that we treat certain high-speed off-road utility vehicles as all-terrain vehicles (see 40 CFR part 1051).

All-Terrain Vehicles

EPA's initial round of exhaust emission standards was fully implemented starting with the 2007 model year. The regulations for all-terrain vehicles (ATV) specify testing based on a chassis-based transient procedure. However, we permit manufacturers on an interim basis to optionally use a steady-state engine-based procedure. We recently completed a change in the regulations to extend this allowance from 2009 through 2014, after which manufacturers must certify all their ATVs based on the chassis-based transient test procedure that applies for off-highway motorcycles (72 FR 20730, April 26, 2007). This change does not represent an increase in stringency, but manufacturers will be taking time to make the transition to the different test procedure. We expect that there will be a good potential to apply further emission controls on these engines. However, we do not have information at this time on possible advances in technology beyond what is required for the current standards.

Off-Highway Motorcycles

For off-highway motorcycles, manufacturers are in many cases making a substantial transition to move away from two-stroke engines in favor of four-stroke engines. This transition is now underway. While it may eventually be appropriate to apply aftertreatment or other additional emission control technologies to off-highway motorcycles, we need more time for this transition to be completed and to assess the success of aftertreatment technologies such as catalysts on similar applications such as highway motorcycles. As EPA and manufacturers learn more in implementing emission standards, we expect to be able to better judge the potential for broadly applying new technology to achieve further emission reductions from off-highway motorcycles.

Snowmobiles

In our November 8, 2002 final rule we set three phases of exhaust emission standards for snowmobiles (67 FR 68242). Environmental and industry groups challenged the third phase of these standards. The court decision upheld much of EPA's reasoning for the standards, but vacated the $NO_X$ standard and remanded the CO and HC standards to clarify the analysis and evidence upon which the standards are based. See *Bluewater Network, et al.* v. *EPA, 370 F 3d 1* (D.C. Cir. 2004). A large majority of snowmobile engines are rated above 50 hp and there is still a fundamental need for time to pass to allow us to assess the success of four-stroke engine technology in the marketplace.[7] This is an important aspect of the assessment we need to conduct with regard to the Phase 3 emission standards. We believe it is best to address this in a separate rulemaking and we have initiated that effort to evaluate the appropriate long-term emission standards for snowmobiles.

Nonroad Diesel Engines

The 2004 Consolidated Appropriations Act providing the specific statutory direction for this rulemaking focuses on nonroad spark-ignition engines. Nonroad diesel engines are therefore not included within the scope of that Congressional mandate. However, we have gone through several rulemakings to set standards for these engines under the broader authority of Clean Air Act section 213. In particular, we have divided nonroad diesel engines into three groups for setting emission standards. We adopted a series of standards for locomotives on April 16, 1998, including requirements to certify engines to emission standards when they are rebuilt (63 FR 18978). We also adopted emission standards for marine diesel engines over several different rulemakings, as described in Table I–2. These included separate actions for engines below 37 kW, engines installed in oceangoing vessels, engines installed in commercial vessels involved in inland and coastal waterways, and engines installed in recreational vessels. We recently adopted a new round of more stringent emission standards for both locomotives and marine diesel engines that will require widespread use of aftertreatment technology (73 FR 37096, June 30, 2008).

Finally, all other nonroad diesel engines are grouped together for EPA's emission standards. We have adopted multiple tiers of increasingly stringent standards in three separate rulemakings, as described in Table I–2. We most recently adopted Tier 4 standards based on the use of ultra low-sulfur diesel fuel and the application of exhaust aftertreatment technology (69 FR 38958, June 29, 2004).

### *D. Putting This Rule into Perspective*

Most manufacturers that will be subject to this rulemaking are also affected by regulatory developments in California and in other countries. Each of these is described in more detail below.

State Initiatives

Clean Air Act section 209 prohibits California and other states from setting emission standards for new motor vehicles and new motor vehicle engines, but authorizes EPA to waive this prohibition for California, in which case other states may adopt California's standards. Similar preemption and waiver provisions apply for emission standards for nonroad engines and vehicles, whether new or in-use. However for new locomotives, new engines used in locomotives, and new engines used in farm or construction equipment with maximum power below 130 kW, California and other states are preempted and there is no provision for a waiver of preemption. In addition, in section 428 of the 2004 Consolidated Appropriations Act, Congress further precluded other states from adopting new California standards for nonroad spark-ignition engines below 50 horsepower. In addition, the amendment required that we specifically address the safety implications of any California standards for these engines before approving a waiver of federal preemption. We are codifying these preemption changes in this rule.

The California Air Resources Board (California ARB) has adopted requirements for five groups of nonroad engines: (1) Diesel- and Otto-cycle small off-road engines rated under 19 kW; (2) spark-ignition engines used for marine propulsion; (3) land-based nonroad recreational engines, including those used in all-terrain vehicles, off-highway motorcycles, go-carts, and other similar vehicles; (4) new nonroad spark-ignition engines rated over 19 kW not used in recreational applications; and (5) new land-based nonroad diesel engines rated over 130 kW. They have also approved a voluntary registration and control program for existing portable equipment.

In the 1990s California ARB adopted Tier 1 and Tier 2 standards for Small SI engines consistent with the federal requirements. In 2003, they moved beyond the federal program by adopting exhaust $HC+NO_X$ emission standards of 10 g/kW-hr for Class I engines starting in the 2007 model year and 8 g/kW-hr for Class II engines starting in the 2008 model year. In the same rule they adopted evaporative emission standards for nonhandheld equipment, requiring control of fuel tank permeation, fuel line permeation, diurnal emissions, and running losses.

[7] Only about 3 percent of snowmobiles are rated below 50 horsepower.

Small SI engines and equipment are summarized in Section VI.G.

*D. Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments and the private sector. Under section 202 of the UMRA, EPA generally must prepare a written statement, including a cost-benefit analysis, for proposed and final rules with ''federal mandates'' that may result in expenditures to state, local, and tribal governments, in the aggregate, or to the private sector, of $100 million or more in any one year. Before promulgating an EPA rule for which a written statement is needed, section 205 of the UMRA generally requires that EPA identify and consider a reasonable number of regulatory alternatives and adopt the least costly, most cost-effective, or least burdensome alternative that achieves the objectives of the rule. The provisions of section 205 do not apply when they are inconsistent with applicable law. Moreover, section 205 allows EPA to adopt an alternative other than the least costly, most cost-effective, or least burdensome alternative if the Administrator publishes with the final rule an explanation of why that alternative was not adopted.

Before EPA establishes any regulatory requirements that may significantly or uniquely affect small governments, including tribal governments, it must have developed under section 203 of the UMRA a small government agency plan. The plan must provide for notifying potentially affected small governments, enabling officials of affected small governments to have meaningful and timely input in the development of EPA regulatory proposals with significant federal intergovernmental mandates, and informing, educating, and advising small governments on compliance with the regulatory requirements.

This rule contains no federal mandates for state, local, or tribal governments as defined by the provisions of Title II of the UMRA. The rule imposes no enforceable duties on any of these governmental entities. Nothing in the rule will significantly or uniquely affect small governments.

EPA has determined that this rule contains federal mandates that may result in expenditures of more than $100 million to the private sector in a single year. EPA believes that the final rule represents the least costly, most cost-effective approach to achieve the air quality goals of the rule. The costs and benefits associated with the final rule are discussed in Section IX and in the Final Regulatory Impact Analysis as required by the UMRA.

*E. Executive Order 13132: Federalism*

Executive Order 13132, entitled ''Federalism'' (64 FR 43255, August 10, 1999), requires EPA to develop an accountable process to ensure ''meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications.'' ''Policies that have federalism implications'' is defined in the Executive Order to include regulations that have ''substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.''

Under section 6 of Executive Order 13132, EPA may not issue a regulation that has federalism implications, that imposes substantial direct compliance costs, and that is not required by statute, unless the Federal government provides the funds necessary to pay the direct compliance costs incurred by State and local governments, or EPA consults with State and local officials early in the process of developing the proposed regulation. EPA also may not issue a regulation that has federalism implications and that preempts State law, unless the Agency consults with State and local officials early in the process of developing the regulation.

Section 4 of the Executive Order contains additional requirements for rules that preempt State or local law, even if those rules do not have federalism implications (i.e., the rules will not have substantial direct effects on the States, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government). Those requirements include providing all affected State and local officials notice and an opportunity for appropriate participation in the development of the regulation. If the preemption is not based on express or implied statutory authority, EPA also must consult, to the extent practicable, with appropriate State and local officials regarding the conflict between State law and Federally protected interests within the agency's area of regulatory responsibility.

This final rule has federalism implications because it preempts State law. It does not include any significant revisions from current statutory and regulatory requirements, but it codifies existing statutory requirements. Prior to the passage of Public Law 108–199, the various states could adopt and enforce nonroad emission control standards previously adopted by the state of California under section 209(e) of the Clean Air Act, once California had received authorization from EPA to enforce such standards. As part of directing EPA to undertake this rulemaking, section 428 of Public Law 108–199 has taken away the authority of states' to adopt California standards for any nonroad spark-ignition engine under 50 horsepower that they had not already adopted by September 1, 2003. No state had done so by that date. No current state law is affected by the provisions of Public Law 108–199 mentioned above. This rule codifies the statutory provision prohibiting other states from adopting California standards for nonroad spark-ignition engines under 50 horsepower. It does not affect the independent authority of California.

EPA did consult with representatives of various State and local governments in developing this rule. EPA has also consulted representatives from the National Association of Clean Air Agencies (NACAA), which represents state and local air pollution officials. These officials participated in two EPA workshops regarding the Small SI safety study in which they expressed concern about the language of section 428 of Public Law 108–199 limiting the states' ability to adopt the California standards for nonroad spark-ignition engines under 50 horsepower and urged EPA to move expeditiously in adopting new Federal emission standards for this category.

As required by section 8(a) of Executive Order 13132, EPA included a certification from its Federalism Official stating that EPA had met the Executive Order's requirements in a meaningful and timely manner, when it sent the draft of this final rule to OMB for review pursuant to Executive Order 12866. A copy of this certification has been included in the public version of the official record for this final rule.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

Executive Order 13175, entitled ''Consultation and Coordination with Indian Tribal Governments'' (65 FR 67249, November 9, 2000), requires EPA to develop an accountable process to ensure ''meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications.''

This final rule does not have tribal implications as specified in Executive Order 13175. This rule will be

No. 26-2749

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

GAIA GARDENS LLC; R & J LAND CARE, LLC; BOB FREDETTE d/b/a FREDETTE LANDSCAPING; and RICCARDO MANCUSO,

Plaintiffs-Appellants,

v.

TOWNSHIP OF MONTCLAIR,

Defendant-Appellee.

---

On Appeal from the United States District Court
for the District of New Jersey
2:23-cv-20733

---

**JOINT APPENDIX**
**VOLUME I OF II (Pages JA1 to JA23)**

---

Charlene Koski
Justin Panitchpakdi
Benjamin W. Schultz
VAN NESS FELDMAN, LLP
1191 Second Avenue
Suite 1800
Seattle, WA 98101
Telephone: (206) 623-9372
Email: ckoski@vnf.com
jpanitchpakdi@vnf.com
bschultz@vnf.com

Counsel for Plaintiffs-Appellants

## TABLE OF CONTENTS

Page

**Volume I of II**

Plaintiffs' Notice of Appeal (July 13, 2026),
ECF 92 ................................................................ JA1

Order Granting Motion to Dismiss (June 16, 2026),
ECF 91 ................................................................ JA4

Opinion on Order Granting Motion to Dismiss (June 16, 2026),
ECF 90 ................................................................ JA6

**Volume II of II**

Docket Entries ........................................................ JA24

Verified Complaint (Sep. 28, 2023), ECF 1 ............................. JA39

Declaration of Daria Paxton in Support of Plaintiffs' Motion
for Preliminary Injunction (Sep. 28, 2023), ECF 2-3 ............ JA85

Declaration of Riccardo Mancuso in Support of Plaintiffs' Motion
for Preliminary Injunction (Sep. 28, 2023), ECF 2-7 ............ JA92

Declaration of Roosevelt N. Nesmith in Support of Plaintiffs'
Motion for Preliminary Injunction (Sep. 28, 2023), ECF 2-8 ... JA97

Opinion on Order Denying Motion for Preliminary Injunction
(Oct. 14, 2023), ECF 21 ............................................... JA121

Order Denying Motion for Preliminary Injunction
(Oct. 14, 2023), ECF 22 ............................................... JA143

Judgment and Opinion (Jan. 14, 2025), ECF 35........................JA144

Letter from Gaia Gardens, LLC to the Court (Mar. 24, 2025), ECF 44*........................................................................JA153

Amended Complaint (Aug. 20, 2025), ECF 55............................JA155

Declaration of Derrick R. Freijomil in Support of Township of Montclair's Motion to Dismiss the Amended Complaint (Oct. 13, 2025), ECF 61-2................................JA181

Brief in Support of Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion to Dismiss the Amended Complaint (Nov. 17, 2025), ECF 72-1 (*excerpts*)* .................................................JA244

Declaration of Daria Paxton in Support of Plaintiffs' Response to Defendant's Motion to Dismiss the Amended Complaint (Nov. 17, 2025), ECF 72-3* ..........................................JA257

Declaration of Bob Fredette in Support of Plaintiffs' Response to Defendant's Motion to Dismiss the Amended Complaint (Nov. 17, 2025), ECF 72-4* ..........................................JA259

Declaration of Jeffrey Baker in Support of Plaintiffs' Response to Defendant's Motion to Dismiss the Amended Complaint (Nov. 17, 2025), ECF 72-5* ..........................................JA261

Declaration of Riccardo Mancuso in Support of Plaintiffs' Response to Defendant's Motion to Dismiss the Amended Complaint (Nov. 17, 2025), ECF 72-6* ..........................................JA263

Letter from Township of Montclair to the Court (Nov. 18, 2025), ECF 73........................................................................JA265

* Montclair has objected to the inclusion of these documents in the joint appendix.

Letter from Gaia Gardens, LLC to the Court (Nov. 18, 2025), ECF 74........JA269

Letter from Township of Montclair to the Court (Nov. 20, 2025), ECF 75........JA271

Brief in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss the Amended Complaint (Dec. 1, 2025), ECF 79 (*excerpts*)*........JA273

Scheduling Order (Feb. 11, 2026), ECF 88*........JA285

* Montclair has objected to the inclusion of these documents in the joint appendix.

Michael D. Goodstein
NJ Bar No. 334782021
Charlene Koski (admitted *Pro Hac Vice)*
WSBA No. 43178
VAN NESS FELDMAN, LLP
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006
Tel: (202) 298-1800
Email: mgoodstein@vnf.com
cbk@vnf.com

*Attorneys for Plaintiffs Gaia Gardens, LLC, R & J Land Care LLC, Bob Fredette d/b/a Fredette Landscaping, and Riccardo Mancuso*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GAIA GARDENS, LLC; R & J LAND CARE LLC; BOB FREDETTE d/b/a FREDETTE LANDSCAPING; and RICCARDO MANCUSO, *Plaintiffs,* v. TOWNSHIP OF MONTCLAIR, *Defendant.* | Civil Action No. 23-20733 (JXN)(CF)<br><br>Hon. Julien Xavier Neals, U.S.D.J.<br>Hon. Cari Fais, U.S.M.J.<br><br>**PLAINTIFFS' NOTICE OF APPEAL** |

Notice is hereby given that Gaia Gardens, LLC, R & J Land Care LLC, Bob Fredette d/b/a Fredette Landscaping, and Riccardo Mancuso (collectively "Plaintiffs") in the above-captioned case, hereby appeal to the United States Court

of Appeals for the Third Circuit from the Order of the United States District Court for the District of New Jersey, entered in this action on June 16, 2026 (ECF No. 91), granting Defendant Township of Montclair's motion to dismiss and dismissing Plaintiffs' Amended Complaint with prejudice, together with the accompanying Opinion (ECF No. 90).

Dated: July 13, 2026. By: *<u>/s/ Michael D. Goodstein</u>*

Michael D. Goodstein
NJ Bar No. 334782021
Charlene Koski (admitted *Pro Hac Vice)*
WSBA No. 43178
**VAN NESS FELDMAN, LLP**
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006
Tel: (202) 298-1800
Email: mgoodstein@vnf.com
cbk@vnf.com

*Attorneys for Plaintiffs Gaia Gardens, LLC, R & J Land Care LLC, Bob Fredette d/b/a Fredette Landscaping, and Riccardo Mancuso*

**CERTIFICATE OF SERVICE**

I, Michael D. Goodstein, being of full age, hereby certify as follows:

1. I am a partner of the law firm Van Ness Feldman, LLP, counsel for Plaintiffs' Gaia Gardens, LLC, R & J Land Care LLC, Bob Fredette d/b/a Fredette Landscaping, and Riccardo Mancuso in the above-captioned matter.

2. I hereby certify that on July 13, 2026, a true and correct copy of this Notice of Appeal was filed electronically with the United States District Court for the District of New Jersey through the Court's CM/ECF System.

3. Pursuant to this Court's Local Rules and ECF Policies and Procedures, the Notice of Electronic Filing transmitted to counsel of record constitutes service on all parties.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 13, 2026

*/s/ Michael D. Goodstein*
Michael D. Goodstein



Van Ness Feldman LLP
2000 Pennsylvania Ave. NW
Washington, DC 20006
(202) 298-1800

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GAIA GARDENS, LLC; R & J LAND CARE LLC; BOB FREDETTE d/b/a FREDETTE LANDSCAPING; and RICCARDO MANCUSO,<br><br>Plaintiffs,<br><br>v.<br><br>TOWNSHIP OF MONTCLAIR,<br><br>Defendant. | Civil Action No. 23-20733 (JXN)(CF)<br><br>**ORDER** |

**NEALS**, District Judge

Before the Court is Defendant Township of Montclair's ("Montclair") motion to dismiss Plaintiffs Gaia Gardens, LLC, R&J Land Care LLC, Bob Fredette d/b/a Fredette Landscaping, and Riccardo Mancuso's (collectively "Plaintiffs") Amended Complaint pursuant to Federal Rule of Civil Procedure[1] 12(b)(6). (ECF No. 61.) Plaintiffs opposed the motion (ECF No. 79), and Montclair replied in further support (ECF No. 81). Jurisdiction is proper pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b). The Court has carefully reviewed the Amended Complaint and the parties' submissions and decides this matter without oral argument pursuant to Rule 78 and Local Civil Rule 78.1. For the reasons stated in the accompanying Opinion,

**IT IS** on this **16th** day of June 2026

**ORDERED** that:

1. Montclair's motion to dismiss (ECF No. 61) is **GRANTED**;

[1] "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

2. Plaintiffs' Amended Complaint (ECF No. 55) is **DISMISSED** ***with prejudice***;

3. The Clerk of Court is directed to close this case.

**JULIEN XAVIER NEALS**
**United States District Judge**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GAIA GARDENS, LLC; R & J LAND CARE LLC; BOB FREDETTE d/b/a FREDETTE LANDSCAPING; and RICCARDO MANCUSO,<br><br>Plaintiffs,<br><br>v.<br><br>TOWNSHIP OF MONTCLAIR,<br><br>Defendant. | Civil Action No. 23-20733 (JXN)(CF)<br><br>**OPINION** |

**NEALS**, District Judge

Before the Court is Defendant Township of Montclair's ("Montclair") motion to dismiss Plaintiffs Gaia Gardens, LLC, R&J Land Care LLC, Bob Fredette d/b/a Fredette Landscaping, and Riccardo Mancuso's (collectively "Plaintiffs") Amended Complaint pursuant to Federal Rule of Civil Procedure[1] 12(b)(6). (ECF No. 61.) Plaintiffs opposed the motion (ECF No. 79), and Montclair replied in further support (ECF No. 81). Jurisdiction is proper pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b). The Court has carefully reviewed the Amended Complaint and the parties' submissions and decides this matter without oral argument pursuant to Rule 78 and Local Civil Rule 78.1. For the reasons set forth below, Montclair's motion to dismiss is **GRANTED**.

[1] "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

## I. BACKGROUND[2]

The Court presumes the parties' familiarity with this matter, and therefore recites only those facts relevant to this motion. *See Gaia Gardens, LLC v. Township of Montclair*, No. 23-3026, 2024 WL 5199327 (3d Cir. Dec. 23, 2024); *Gaia Gardens, LLC v. Township of Montclair*, No. 23-20733, 2025 WL 2374417 (D.N.J. Aug. 15, 2025).

Plaintiffs, three landscaping companies doing business in Montclair and a Montclair resident, challenge a Montclair ordinance that limits the use of gas-powered leaf blowers. (*See generally* Am. Compl., ECF No. 55.) For many years, through ordinance, Montclair has relegated the use of gas-powered leaf blowers to specific months and hours of the day. *See Gaia Gardens*, 2024 WL 5199327, at *1. On August 15, 2023, the Montclair Council introduced and approved Ordinance O-23-31, which, among other things, prohibited the use of gas-powered leaf blowers within Montclair, imposed hourly restrictions on the use of electric leaf blowers, and prohibited the use of gas or diesel generators to power electric leaf blowers. (Am. Compl. ¶ 26.) On September 26, 2023, Montclair amended Ordinance O-23-31 by Ordinance O-23-35[3] ("Ordinance"). (*Id.*; Am. Compl. Ex. A ("Ordinance"), ECF No. 55-1.)

The Ordinance describes its "Purpose and intent" as follows:

> The Township of Montclair hereby finds that the use of gas-powered leaf blowers impairs the health and social welfare, as well as the peace and quality of life of persons residing and working in Montclair. The purpose of this chapter is to eliminate the adverse impact of such equipment by prohibiting its use within the Township. This chapter shall apply to all properties within the Township whether publicly or privately owned.
>
> The Township further finds that the practice of blowing leaves and other debris for property maintenance has unintended environmental

---

[2] When reviewing a motion to dismiss, a court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

[3] Codified at Montclair Municipal Code § 219.

> and health consequences. The blowing of leaves, dust and debris, causes fine particulate emissions and disruption to pollinator habitats. Exposure to fine particulate matter may impact workers using this equipment, those living with respiratory conditions, children, as well as others, and the Township encourages community education regarding alternatives to such use, where possible. It shall be the policy of the Township to balance leaf blowing with mulching fallen leaves into grassy areas and moving leaves into flower beds to be used as organic mulch material.

(Ordinance § 219-1.)

§ 219-2 of the Ordinance defines a "Gas-Powered Leaf Blower" as either "[a] leaf blower that is powered by an engine using gasoline or a mixture of gasoline and oil blend as fuel," or "[a]n electric-powered leaf blower that is plugged into an operating generator that is powered by an engine using gasoline or a mixture of gasoline and oil blend as fuel." (*Id.* § 219-2(b).)

The Ordinance provides for a "Limitation on use of leaf blowers," both electric and gas-powered, within Montclair as follows:

> a) Gas-powered leaf blowers are not permitted to be used within the Township of Montclair, effective October 15, 2023.
> b) Electric leaf blowers shall be permitted throughout the year, subject to the following conditions:
>     i) Air quality action days. Notwithstanding the aforementioned, leaf blowers shall not be operated in the Township of Montclair on dates designated as "Air Quality Action Days" by the New Jersey Department of Environmental Protection and declared by the Township's Emergency Management Coordinator.
>     ii) No gas or diesel generators may be utilized to power any electric leaf blowers at any time.
> c) Hours of use.
>     i) On weekdays between 9:00 a.m. and 6:00 p.m., except that leaf blowers may be used by an occupant or owner of the premises between 9:00 a.m. and 8:00 p.m.
>     ii) On weekends between 10:00 a.m. and 6:00 p.m., except that leaf blowers may be used by an occupant or owner of the premises between 10:00 a.m. and 8:00 p.m.

(*Id.* § 219-3.)

On September 28, 2023, Plaintiffs filed a Complaint (Compl., ECF No. 1) and an Order to Show Cause ("OTSC") for a preliminary injunction pursuant to Rule 65 (Mot. for Prelim. Inj., ECF No. 2). Plaintiffs alleged the Ordinance violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; Article I of the New Jersey Constitution; the Supremacy Clause of Article VI, § 2 of the United States Constitution; the Takings Clause of Article V of the United States Constitution; the Takings Clause of Article I, § 20 of the New Jersey Constitution; and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c). (*See generally* Compl.) In their OTSC, Plaintiffs sought a preliminary injunction to restrain Montclair's enforcement of the Ordinance. (*See generally* Mot. for Prelim. Inj.)

On October 14, 2023, the Court denied Plaintiffs' motion for a preliminary injunction, concluding Plaintiffs failed to show a likelihood of success on the merits or the threat of irreparable injury. (*See generally* Op, ECF No. 21; Order, ECF No. 22.) First, the Court found that the Ordinance was likely not preempted by the Clean Air Act ("CAA" or "Act"), 42 U.S.C. § 7401, *et seq*., because the Ordinance concerns traditional state health and safety regulation, is entitled to a presumption against preemption, and arguably complements rather than conflicts with the CAA or U.S. Environmental Protection Agency ("EPA") regulations despite imposing an outright ban on gas-powered leaf blowers. (*See* Op. at 6–20.) Additionally, the Court determined that Plaintiffs did not establish that their alleged harm could not be redressed by a legal remedy or compensated with monetary damages. (*Id*. at 21–22.)

Plaintiffs appealed on November 13, 2023 (Not. of Appeal, ECF No. 27), and the matter was stayed pending the outcome. (Stay Ord., ECF No. 31). On December 23, 2024, the Third Circuit affirmed. *See Gaia Gardens*, 2024 WL 5199327, at *2. The Third Circuit reasoned that Plaintiffs failed to demonstrate irreparable harm, as their alleged injuries were economic and

compensable through monetary damages, and, therefore, this Court did not abuse its discretion in declining to enjoin enforcement of the ordinance. *Id*. This Court implemented the Third Circuit's decision and lifted the stay. (ECF No. 45.)[4]

On June 4, 2025, Plaintiffs moved for leave to amend the complaint[5] (Mot. for Leave, ECF No. 48), which Magistrate Judge Waldor (ret.) granted. (M.J. Op., ECF No. 53; M.J. Order, ECF No. 54).

Plaintiffs filed the Amended Complaint on August 20, 2025, removing all but the four remaining Plaintiffs and keeping only their preemption claim. (Am. Compl., ECF No. 55.) The Amended Complaint asserts that the Ordinance imposes a zero-emissions standard preempted by the CAA under theories of both implied and express preemption, violating the Supremacy Clause. (*Id*. ¶¶ 32–37.)

On October 13, 2025, Montclair moved to dismiss the Amended Complaint under Rule 12(b)(6), arguing that neither the CAA nor the EPA regulations expressly or impliedly preempt the Ordinance. (Def.'s Mot., ECF No. 61.) Plaintiffs opposed the motion (Pls.' Opp'n Br., ECF No. 79), and Montclair replied in further support (Def.'s Reply, ECF No. 81).[6] This motion is now fully briefed and ripe for the Court to decide.

---

[4] On January 6, 2025, the Court was notified that Plaintiffs' counsel had passed away. (ECF No. 34.) Plaintiffs retained new counsel at the end of March 2025. (*See* ECF Nos. 36, 39–41, 44.)

[5] Montclair opposed the motion (Montclair Opp'n to Leave, ECF No. 49) and filed a cross motion for attorneys' fees (Mot. for Att'y Fees; ECF No. 50). Plaintiffs filed a reply in further support of their motion and responded to Montclair's cross motion. (Pls.' Reply for Leave, ECF No. 52.)

[6] On November 17, 2025, Plaintiffs filed a cross-motion for summary judgment and Opposition to Montclair's motion to dismiss the Amended Complaint (Pls.' Cross-Mot, ECF No. 72), which the Court denied as premature. (*See* Text Order, ECF No. 77).

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." For a complaint to survive dismissal under this rule, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a complaint, "[a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (alteration in original)(citations omitted). A court must only consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

The Third Circuit has outlined a three-part test in deciding a motion to dismiss pursuant to Rule 12(b)(6):

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) (cleaned up).

## III. DISCUSSION

Plaintiffs assert that § 209(e) of the CAA, codified at 42 U.S.C. § 7543(e)(1), both expressly and impliedly preempts state and local emissions standards and the enforcement thereof

on small nonroad engines, including leaf blowers. (Am. Compl. ¶ 15; Pls.' Opp'n Br. at 1.) In Plaintiffs' telling, the Ordinance forbids the use of gas-powered leaf blowers and mandates that any leaf blower used in Montclair have a zero-emission electric-powered engine. (Pls.' Opp'n Br. at 2.) In doing so, Plaintiffs assert the Ordinance unlawfully imposes an emission standard on leaf-blower engines. (*Id.*) Accordingly, Plaintiffs contend that they sufficiently plead a violation of the Supremacy Clause under the CAA. (*Id.*)

In support of the motion to dismiss, Montclair asserts three primary arguments against preemption. First, Montclair argues the Ordinance addresses public health, safety, and welfare—matters traditionally within the province of state regulation. (Def.'s Moving Br. at 1–3, ECF No. 61-3.) Second, Montclair contends the Ordinance is not a "standard or other requirement related to the control of emissions" within the meaning of § 209(e) of the CAA. (*Id.*) Third, Montclair states the Ordinance is an "in-use" and "use and operation" regulation on nonroad engines, which Congress has explicitly clarified is not preempted by the CAA and related EPA regulations. (*Id.*)

Montclair further argues that § 209(e)(1)'s preemptive effect extends only to two categories of engines, neither of which includes leaf blowers. (*Id.* at 15–18.) Montclair submits that § 209(e)(1), by its plain language, does not preempt the Ordinance. (*Id.*) Indeed, Montclair asserts that § 209(e)(2) does not contain any express preemption language at all; rather, it provides California with the opportunity to request authorization from the EPA to "adopt and enforce standards and other requirements relating to the control of emissions" from nonroad engines and vehicles, 42 U.S.C. § 7543(e)(2)(A), and allows other states to opt-in (by application) to authorized California standards relating to the control of emissions, 42 U.S.C. § 7543(e)(2)(B). (*Id.* at 15–16.) Montclair further argues that the Ordinance falls outside the scope of implied preemption because

the Ordinance does not enforce a "standard or other requirement relating to the control of emissions." (*Id.* at 16.)

Under the Supremacy Clause, courts may not give effect to "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law." *Kurns v. A.W. Chesterton Inc.*, 620 F.3d 392, 395 (3d Cir. 2010) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)). "In cases like the present one, courts are called upon to determine whether an act of Congress preempts state law." *Id.* When Congress delegates regulatory authority to an administrative agency, the agency's regulations "issued pursuant to that authority" have the same preemptive effect as federal statutes. *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 406 (3d Cir. 2012).

There are three kinds of preemption: express preemption, implied conflict preemption, and field preemption. *Kurns*, 620 F.3d at 395. Express preemption means "a federal law contains express language providing for the preemption of any conflicting state law." *Id.* Implied conflict preemption arises when (a) "compliance with both state and federal law is impossible," or (b) "state law erects an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Treasurer of N.J.*, 684 F.3d at 406 (quoting *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010)). Field preemption occurs "when Congress has regulated an area so pervasively that it has not left room for state regulation." *Id.*

Two principles guide the Court's inquiry. First, Congress's intent "is the 'ultimate touchstone' of preemption analysis." *Transource Pa., LLC v. DeFrank*, 156 F.4th 351, 372 (3d Cir. 2025) (quoting *Farina*, 625 F.3d at 115). "Congress's purpose may be apparent from the face of a statute." *Id.* The Court may also consider the "'structure and purpose of the statute as a whole,' analyzing 'the way in which Congress intended the statute and its surrounding regulatory scheme

to affect business, consumers, and the law.'" *Id.* (quoting *Farina*, 625 F.3d at 115). Second, the Court presumes "Congress did not intend to displace state law." *Farina*, 625 F.3d at 116 (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). This presumption against preemption "applies with particular force in fields within the police power of the state, but does not apply where state regulation has traditionally been absent." *Id.* (citations omitted).

**A. The CAA Preempts State Emissions Standards**

The CAA declares it "[a] primary goal . . . to encourage or otherwise promote reasonable Federal, State, and local governmental actions . . . for pollution." 42 U.S.C. § 7401(c). Title I of the CAA addresses primarily stationary sources, leaving substantial regulatory authority with the States. *See* 42 U.S.C. § 7410. Title II addresses moving sources—motor vehicles under § 209(a), 42 U.S.C. § 7543(a), and nonroad engines and vehicles used in construction or farm equipment under § 209(e), 42 U.S.C. § 7543(e). For the latter category, Congress provided:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard or other requirement relating to the control of emissions from either of the following new nonroad engines or nonroad vehicles subject to regulation under this chapter—
>
> (A)New engines which are used in construction equipment or vehicles or used in farm equipment or vehicles and which are smaller than 175 horsepower.
>
> (B)New locomotives or new engines used in locomotives.

42 U.S.C. § 7543(e)(1)(A)–(B).

§ 209(e)(2) applies to all other nonroad engines, including the small off-road engines used in leaf blowers. It provides that: "Any State other than California . . . may adopt . . . standards relating to control of emissions from [all other] nonroad vehicles or engines," so long as those standards "are identical . . . . to the California standards." 42 U.S.C. § 7543(e)(2)(A)–(B). § 209(e) does not, on its face, address State authority to regulate the use of those engines *after* they enter

commerce. EPA, the agency charged with administering the CAA, has long maintained that no such preemption exists, explaining that "states are not precluded under 42 U.S.C. § 7543 from regulating the *use and operation* of nonroad engines, such as regulations on hours of usage, daily mass emission limits, or sulfur limits on fuel." 40 C.F.R. § 1074, subpt. A, app. A (emphasis added).

### B. The Presumption Against Preemption Applies

The Supremacy Clause allows Congress to preempt state law. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). But, "because the States are independent sovereigns in our federal system, [courts] have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Farina*, 625 F.3d at 116 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). The Court's preemption analysis, therefore, "start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Lohr*, 518 U.S. at 485 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The presumption against preemption "applies with particular force in fields within the police power of the state, but does not apply where state regulation has traditionally been absent." *Farina*, 625 F.3d at 116. Even where federal law has an express preemption clause, if it is susceptible to more than one plausible reading, the Court has "a duty to accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005).

State police power "extends beyond health, morals and safety, and comprehends the duty, within constitutional limitations, to protect the well-being . . . of a community." *N.J. Staffing All. v. Fais*, 110 F.4th 201, 209 (3d Cir. 2024) (quoting *Kovacs v. Cooper*, 336 U.S. 77, 83 (1949)). "Legislation designed to free from pollution the very air that people breathe clearly falls within

the exercise of even the most traditional concept of what is compendiously known as the police power." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960). Because the Ordinance is designed to protect the public health, welfare, and the environment, the presumption against preemption applies with "particular force." *Farina*, 625 F.3d at 116.

Plaintiffs argue that (1) the CAA's distinction between Title I and Title II rebuts the presumption against preemption, and (2) the presumption is "irrelevant" here because the CAA's preemption of mobile-source emissions is "clear and manifest" on the face of § 209(e). (Pls.' Opp'n Br. at 18–21.) Plaintiffs further argue that "no rational reading" of § 209(e) "could fail to identify that th[e] section unambiguously preempts state regulation of mobile emissions." (*Id.* at 20.) Both arguments are unpersuasive.

***i. The Distinction Between Titles I and II***

Plaintiffs argue that the CAA's distinction between Title I and Title II rebuts the presumption against preemption. According to Plaintiffs, Title I grants States the power to regulate stationary emissions sources, while Title II is the "principal" province of the federal government as to mobile-source emissions. (*See* Am. Compl. at 8–10.) Plaintiffs cite *Engine Manufacturers Ass'n v. South Coast Air Quality Management District* ("*EMA*"), in which the Supreme Court ruled that a California air quality agency may not indirectly regulate vehicle emissions by restricting the purchase of certain vehicles, as such restrictions constitute an emissions standard under § 209(a), a field expressly preempted and governed by federal law. 541 U.S. 246 (2004).

*EMA* does not rebut the presumption against preemption. *EMA* dealt with § 209(a), not § 209(e). § 209(a) bars states from regulating "any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). § 209(e) is narrower and more textured; specifically, § 209(e)(1) reaches only three enumerated categories of equipment

(none of which is a leaf blower), and § 209(e)(2) governs all other nonroad engines through a California-authorization regime.

Plaintiffs ask this Court to assume that, because *EMA* held that California's fleet purchase rules were "standards" under § 209(a), a municipal leaf blower ordinance is also a "standard" under § 209(e). Adopting Plaintiffs' argument would require the Court to treat § 209(a), which deals with new motor vehicle engines, and § 209(e), which regulates nonroad engines, as interchangeable. They are not. Thus, the dispositive question is whether the Ordinance imposes a 'standard or other requirement relating to the control of emissions' within the meaning of § 209(e). 42 U.S.C. § 7543(e).

***ii. § 209(e)***

§ 209(e) does not demonstrate a "clear and manifest" intent to preempt ordinances like the one at issue here. § 209(e) has a deliberately textured structure. § 209(e)(1) preempts only new engines used in three enumerated equipment categories, none of which plainly encompasses leaf blowers. 42 U.S.C. § 7543(e)(1). § 209(e)(2) contains no express preemption language: it simply allows "[a]ny State other than California . . . [to] adopt . . . standards relating to control of emissions from [all other] nonroad vehicles or engines," so long as those standards "are identical . . . . to the California standards." 42 U.S.C. § 7543(e)(2)(A)–(B). Because neither subsection on its face evidences a clear and manifest intent to displace a state's authority to regulate the conditions of equipment use within its borders—a subject historically and quintessentially within the police power—the presumption against preemption applies. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

Plaintiffs' cited authorities do not compel a different result. *Crosby* reiterates that Congress can preempt state law. 530 U.S. at 372. But it does not mean Congress *has* preempted state law here. Moreover, *CSX Transportation, Inc. v. Easterwood* notes that the plain text of an express

preemption clause is the starting point of a preemption analysis. 507 U.S. 658, 664 (1993). But it does not mean that the plain text of *this* express preemption clause applies to the Ordinance. The other cases Plaintiffs cite, *Federal Housing Finance Agency v. City of Ansonia*, 549 F. Supp. 3d 242 (D. Conn. 2021), and *Pennsylvania General Insurance Co. v. Landis*, 96 F. Supp. 2d 408 (D.N.J. 2000), involved entirely different and distinct federal laws. *See Ansonia*, 549 F. Supp. 3d at 247–48 (Housing and Economic Recovery Act); *Landis*, 96 F. Supp. 2d at 413–18 (Federal Hazardous Substances Act). To the extent those decisions stand for the proposition that a court need not invoke the presumption when text is unambiguous, Plaintiffs assume what they must establish: that the text of § 209(e)(2) is unambiguous as applied to the Ordinance. Plaintiffs' citation to *Engine Manufacturers Ass'n v. EPA*, 88 F.3d 1075 (D.C. Cir. 1996), is similarly unavailing. There, the court noted § 209(e)(2) "does *not* expressly preempt any state regulation." *Id.* at 1087 (emphasis added).

Plaintiffs also frame their argument in field and conflict preemption terms. (Pls.' Opp. Br. at 22–23.) Those theories offer little support to rebut the presumption against preemption in this case. Field preemption requires a federal regulatory scheme so pervasive as to make reasonable the inference that Congress "left no room" for the States to supplement it. *Hillsborough County v. Automated Med. Laby's, Inc.*, 471 U.S. 707, 713 (1985). § 209(e)'s text carefully limits express preemption to three enumerated equipment categories and to standards on *new* nonroad engines, while preserving (e)(2)'s California-conformity regime for other categories. It is the antithesis of a comprehensive field occupation.

Conflict preemption requires that compliance with both state and federal law be impossible, or that state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Lozano v. City of Hazleton*, 724 F.3d 297, 303 (3d Cir. 2013) (quoting

*Arizona v. United States*, 567 U.S. 387, 399 (2012)). No such conflict exists here, because federal law does not require the *use* of gas-powered leaf blowers anywhere; CAA Title II regulates engines, not the choice to operate them.

The Court, therefore, applies the presumption against preemption to § 209(e)(2) and the Ordinance.[7] The Court's analysis proceeds on that basis.

### C. The Ordinance Is Not an Emissions Standard

Because leaf blower engines are neither motor vehicle engines, nor "new" nonroad engines, § 209(e)(2) applies. § 209(e)(2) provides that: "Any State other than California . . . may adopt . . . standards relating to control of emissions from [all other] nonroad vehicles or engines," so long as those standards "are identical . . . to the California standards." 42 U.S.C. § 7543(e)(2)(A)–(B). While § 209(e)(2) does not expressly preempt any state regulation, it does "imply a preemption." *Engine Mfrs. Ass'n*, 88 F.3d at 1087. If § 209(e)(2) did not displace any State "standards relating to control of emissions from nonroad vehicles or engines," there would be no need to require that those standards be identical to California's regulations. § 209(e)(2) thus "assumes the existence of a category of [regulations] that are subject to preemption." *Id.* The plain text of § 209(e)(2), therefore, impliedly preempts (a) any "standards relating to control of emissions from [all other] nonroad vehicles or engines"; (b) that are adopted by states other than California; and (c) are not identical to California's standards. 42 U.S.C. § 7543(e)(2)(A)–(B).

The Court, then, turns to the central issue: whether the Ordinance imposes a "standard or other requirement relating to the control of emissions" within the meaning of § 209(e). To answer that question, the Court looks to *EMA*. As the *EMA* Court observed, "standard" means "that which 'is established by authority, custom, or general consent, as a model or example; criterion; test.'"

---

[7] The Court notes that, even if the presumption did not apply, the Court would nonetheless "have a duty to accept the reading [of the CAA] that disfavors pre-emption." *Bates*, 544 U.S. at 449.

*EMA*, 541 U.S. at 252–53 (quoting Webster's Second New International Dictionary 2455 (1945)). The "standards" referred to in § 209(e) "relate to the emission characteristics of a vehicle or engine." *Id.* at 253. To meet those standards, "the vehicle or engine must not emit more than a certain amount of a given pollutant, must be equipped with a certain type of pollution-control device, or must have some other design feature related to the control of emissions." *Id.* A "standard" need not be expressed as a numerical limit at the point of manufacture; an enforcement mechanism that tells regulated parties they must "buy or sell only those vehicles that comply" with a numerical or technology specification is also a "standard." *Id*. at 255. And a "standard," the *EMA* Court found, remains "a standard even when not enforced through manufacturer-directed regulation." *Id*.

The premise of *EMA*, however, was that an underlying standard (i.e., a numerical or technological requirement that engines or vehicles must meet) existed. There, state law required regulated entities to purchase or lease vehicles that satisfied the California Air Resources Board's emission specifications. *Id*. at 248–49. Similarly, in *Pacific Merchant Shipping Ass'n v. Goldstene*, the rules at issue "explicitly prohibit[ed] the operation of auxiliary diesel engines 'which emit[ted] levels of diesel PM, NOx, or SOx in exceedance of the emission rates' that would result from the use of certain fuels." 517 F.3d 1108, 1114 (9th Cir. 2008). And in *Metropolitan Taxicab Board of Trade v. City of New York*, the preempted rules, which "effectively force[d] [taxi companies] to purchase hybrid taxicabs," and had "the stated purpose of increasing the number of 'cleaner vehicles.'" 633 F. Supp. 2d 83, 88, 105 (S.D.N.Y. 2009), *aff'd,* 615 F.3d 152 (2d Cir. 2010).

The Ordinance, by contrast, does not impose a quantifiable emissions limit, require pollution-limiting equipment or after-treatment specification, or dictate engine-emissions criteria. Nor does the Ordinance even reference engine emissions. At most, the Ordinance notes that "[t]he

*blowing of leaves, dust and debris*, causes fine particulate emissions." (*See* Ordinance § 219-1.) And the Ordinance restricts *all* leaf-blower use to specific hours and days, even though electric leaf blower engines do not give off emissions. Accordingly, the Ordinance concerns the public-health and quality-of-life consequences of blowing leaves rather than emissions of leaf blower engines. Thus, the Ordinance, by its own terms, regulates leaf-blowing,[8] not the engines that perform it. (*See* Ordinance § 219-3.)

Plaintiffs argue nonetheless that the Ordinance is a preempted "attempt to enforce a standard" because, in effect, the only blowers that may be used in Montclair are those whose engines produce zero emissions. (Pls.' Supp. Br. at 21–25.) This characterization does not survive close examination. As the Supreme Court held in *EMA*, the CAA preempts a use restriction only when it attempts to enforce an underlying "standard." 541 U.S. at 255 ("The manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them."). Here, the Ordinance does not provide an underlying emissions standard to enforce, rather it restricts leaf blower use within Montclair.

More fundamentally, § 209(e)(2) does not preempt any ordinance that regulates an activity simply because that activity involves an engine. To hold otherwise would mangle "Congress's carefully calibrated regulatory scheme," *EMA*, 541 U.S. at 255, and cast aside the presumption that "Congress does not cavalierly pre-empt" state law, *Farina*, 625 F.3d at 116. Even if Plaintiffs'

[8] Comparable actions have been brought in New Jersey asserting claims against townships under alternative constitutional grounds. In *New Jersey Landscape Contractors Ass'n v. Township of Maplewood*, plaintiffs claimed that Maplewood's ordinance's restrictions on gas-powered leaf blowers for commercial entities violated equal protection and constituted improper regulation under both the U.S. and New Jersey Constitutions. An amendment to the ordinance rendered Plaintiffs' claims moot, and the court dismissed the action. The court denied plaintiffs' request for attorneys' fees. No 17-8820, 2022 WL 1224942 (D.N.J. Apr. 26, 2022).

expansive interpretation of § 209(e)(2) were plausible, which it is not, the Court must nonetheless "accept the reading [of § 209(e)(2)] that disfavors pre-emption." *Bates*, 544 U.S. at 449.

In sum, the Ordinance regulates *leaf blowing*, not *leaf blower engine emissions*. The Ordinance does not require that leaf blower engines "must not emit more than a certain amount of a given pollutant, must be equipped with a certain type of pollution-control device, or must have some other design feature related to the control of emissions." *EMA*, 541 U.S. at 253. Nor does it enforce a standard dictating the same. Montclair enacted the Ordinance to protect its residents from the adverse health and environmental effects of leaf blowing, not the emissions generated by leaf blower engines, which is well within its police power. *N.J. Staffing All.*, 110 F.4th at 209; *Huron Portland Cement*, 362 U.S. at 442. The Court, accordingly, presumes Congress did not intend for CAA § 209(e)(2) to preempt the Ordinance. *Farina*, 625 F.3d at 116.

**D. Dismissal with Prejudice**

The Third Circuit ordinarily requires district courts to grant leave to amend a deficient complaint "unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008); *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). After the Court denied Plaintiffs' request for a preliminary injunction, Plaintiffs filed an Amended Complaint. (*See* Am. Compl.) Because the CAA does not preempt the Ordinance, Plaintiffs' legal theory of preemption retained within the Amended Complaint is fatally defective. This is a defect another pleading cannot cure. Accordingly, the Court denies Plaintiffs leave to amend and dismisses with prejudice the Amended Complaint.

## IV. CONCLUSION

For the foregoing reasons, Montclair's motion to dismiss (ECF No. 61) is **GRANTED**, and Plaintiffs' Amended Complaint (ECF No. 55) is **DISMISSED *with prejudice***. An appropriate Order accompanies this Opinion.

**DATED: 6/16/2026**

**JULIEN XAVIER NEALS**
**United States District Judge**